# In the United States Court of Federal Claims

No. 13-1023 C

Filed: October 18, 2017

| | |
|---|---|
| ***************************************** <br> \* <br> \* <br> \* <br> MW BUILDERS, INC. f/n/a        \* <br> MW BUILDERS OF TEXAS, INC.,   \* <br>                    \* <br>     Plaintiff,                \* <br>                    \* <br> v.                          \* <br>                    \* <br> THE UNITED STATES,         \* <br>                    \* <br>     Defendant.             \* <br>                    \* <br> ***************************************** | Anti-Deficiency Act, 31 U.S.C. § 1350; <br> Breach of Contract; <br> Contract Disputes Act, <br>    41 U.S.C. §§ 7101–7109; <br> Counterclaims, 28 U.S.C. § 2508; <br> False Claims Act, 31 U.S.C. §§ 3729– <br>    3733; <br> Federal Acquisition Regulation, <br>    48 C.F.R. §§ 52.211-12 (Liquidated <br>    Damages), 52.242-14 (Suspension of <br>    Work), 52.249-10 (Contract Default); <br> Good Faith and Fair Dealing; <br> Special Plea In Fraud, 28 U.S.C. § 2514; <br> Tucker Act Jurisdiction, 28 U.S.C. § 1491; <br> Unreasonable Delay; <br> Waiver. |

**Paul Harvey Sanderford**, Sanderford and Carroll, P.C., Temple, Texas, Counsel for Plaintiff.

**Alexander Orlando Canizares**, United States Department of Justice, Washington, D.C., Counsel for the Government.

## POST-TRIAL MEMORANDUM OPINION AND FINAL ORDER[1]

This case concerns the United States Army Corps of Engineers ("Army Corps") attempt to shift its contractual responsibility to make arrangements for permanent electrical utility services that MW Builders, Inc. ("MW Builders") needed to build an Army Reserve Center in Sloan, Nevada. This imposed unnecessary construction delay and costs on MW Builders that the Contracting Officer ("CO") refused to pay. When MW Builders filed a Complaint in the United States Court of Federal Claims, the Government alleged that the contractor's claim was fraudulent.

As discussed herein, the court has determined that the Army Corps breached a September 10, 2010 Contract with MW Builders and violated the duty of good faith and fair dealing for which $418,961.90 is awarded, as compensable delay damages, together with statutory

---

[1] On September 29, 2017, the court forwarded a sealed copy of this Post-Trial Memorandum Opinion And Final Order to the parties to provide them the opportunity to correct any typographical or similar errors. The parties had until October 16, 2017 to submit suggested corrections. On October 18, 2017, the court issued a final Post-Trial Memorandum Opinion And Final Order that incorporated all appropriate corrections.

interest. The Government's counterclaims for fraud are dismissed, but the Government's affirmative defense of waiver concerning one of MW Builders' subcontractors' alleged pass-through claim is granted.

To facilitate review of this Post-Trial Memorandum Opinion And Final Order, the court has provided the following outline.

I.   RELEVANT FACTUAL BACKGROUND.

    A.   In 2008, The United States Army Corps Of Engineers Began Designing An Army Reserve Center To Be Built In Sloan, Nevada.

    B.   On June 11, 2010, The United States Army Corps Of Engineers Issued Solicitation No. W912QR-09-R-0104 Requesting Proposals For A Firm, Fixed-Price Contract To Build The Army Reserve Center In Sloan, Nevada.

    C.   On September 10, 2010, The United States Army Corps Of Engineers Awarded Contract No. W912QR-10-C-0078 To MW Builders, Inc.

    D.   On December 6, 2010, MW Builders, Inc. Entered Into A Subcontract With Bergelectric Corporation To Provide An Electrical System.

    E.   In 2011, MW Builders, Inc. Executed A Third Party Authorization Form And Design Approval Agreement With NV Energy.

    F.   In March 2012, MW Builders, Inc. And The United States Army Corps Of Engineers Had A Dispute Over The Execution Of A Line Extension Agreement With NV Energy.

    G.   On April 6, 2012, MW Builders, Inc. Notified The United States Army Corps Of Engineers That The Construction Schedule Would Be Delayed, Because The Line Extension Agreement With NV Energy Was Not Executed.

    H.   On April 19, 2012, The United States Army Corps Of Engineers Began To Negotiate A Line Extension Agreement With NV Energy.

    I.   On July 12, 2012, The United States Army Corps Of Engineers Signed A Line Extension Agreement With NV Energy.

    J.   On December 27, 2012, MW Builders, Inc. Submitted A Certified Claim To The Contracting Officer For Costs Incurred As A Result Of The United States Army Corps Of Engineers' Failure To Timely Execute A Line Extension Agreement With NV Energy.

    K.   On June 10, 2013, The Contracting Officer Issued A Final Decision Denying MW Builders, Inc.'s Monetary Claim, But Granting A Non-Compensable Time Extension Of 146 Days For MW Builders, Inc. To Complete Construction Of The Army Reserve Center In Sloan, Nevada.

    L.   On December 13, 2013, The Completed Army Reserve Center in Sloan, Nevada Was Accepted By The United States Army Corps Of Engineers.

II.   PROCEDURAL HISTORY.

III. DISCUSSION.

A. Subject Matter Jurisdiction.
B. Standing.
C. Plaintiff's Claims Against The Government.
   1. The September 10, 2010 Contract Required The United States Army Corps Of Engineers To Sign The Line Extension Agreement With NV Energy.
      a. Plaintiff's Argument.
      b. The Government's Response.
      c. The Court's Resolution.
         i. The September 10, 2010 Contract Contains A Latent Ambiguity Regarding Which Party Was Responsible For Signing The Line Extension Agreement With NV Energy.
        ii. Extrinsic Evidence Of Intent Demonstrates That The United States Army Corps Of Engineers Was Responsible For Signing The Line Extension Agreement With NV Energy.
   2. The United States Army Corps Of Engineers Violated The Duty Of Good Faith And Fair Dealing Causing An Unreasonable Delay To The Project.
      a. Plaintiff's Argument.
      b. The Government's Response.
      c. Plaintiff's Reply.
      d. The Government's Sur-Reply.
      e. The Court's Resolution.
         i. The United States Army Corps Of Engineers Violated The Duty Of Good Faith And Fair Dealing.
        ii. The United States Army Corps Of Engineers' Conduct Caused An Unreasonable Delay.
D. The Government's Affirmative Defense And Counterclaims.
   1. The Government's Affirmative Defense Of Waiver.
      a. The Government's Argument.
      b. Plaintiff's Response.
      c. The Court's Resolution.
   2. The Government's Counterclaims.
      a. Subject Matter Jurisdiction.
      b. Standing.
      c. The Government's Argument.
      d. Plaintiff's Response.
      e. The Government's Reply.
      f. The Court's Resolution.
         i. Regarding The Anti-Fraud Provision Of The Contract Disputes Act.

    ii. Regarding The Special Plea In Fraud.

    iii. Regarding The False Claims Act.

IV. CALCULATION OF DELAY CAUSED BY THE UNITED STATES ARMY CORPS OF
    ENGINEERS' BREACH AND DAMAGES.

    A. The Parties' Scheduling Experts.

        1. Plaintiff's Scheduling Experts.

          a. Mr. Neil W. Miltonberger.

          b. Mr. Denny Lee.

        2. The Government's Scheduling Expert, Mr. Stephen Weathers.

        3. The Scheduling Experts' Critiques.

    B. Plaintiff's Damages Claim.

        1. Plaintiff's Claimed Amount.

        2. The Government's Response.

        3. The Court's Determination.

          a. Regarding The Amount Of Delay.

          b. Regarding The Daily Jobsite Overhead Rate.

          c. Regarding The Materials And Equipment Costs.

          d. Regarding Home Office Overhead.

          e. Regarding Profit.

          f. Regarding The Bond Fee.

          g. Calculation Of Damages.

V. CONCLUSION.

                        *       *       *

## I.      RELEVANT FACTUAL BACKGROUND.[2]

### A.      In 2008, The United States Army Corps Of Engineers Began Designing An Army Reserve Center To Be Built In Sloan, Nevada.

    In 2008, the United States Army Corps of Engineers (the "Army Corps") began designing an Army Reserve Center in Sloan, Nevada (the "Project") for use by the Army Reserve 63rd

---

[2] The facts discussed herein were derived from evidence adduced at the trial held on May 4–6, 9 and 10, 2016 in Austin, Texas (TR at 1–1329), together with the parties' Joint Stipulations Of Fact (Jt. Stip. ¶¶ 1–32). The witnesses for each party are identified in Court Attachment A. At trial, Plaintiff's Exhibits (PX 4–684) were admitted into evidence. TR at 6–7. The Government's Exhibits (DX 1–273), together with 95 Joint Exhibits (JX 1–95) also were admitted into evidence. TR at 9–10. The Government also moved into evidence two Rule of the United States Court of Federal Claims ("RCFC") 30(b)(6) depositions: *i.e.*, the April 12, 2016 Deposition of David Cimpl, Chief Financial Officer for MMC Corporation (4/12/16 Cimpl Dep.); and the March 10, 2016 Deposition of Daniel "Sparky" Campbell, MW Builders' Operations Manager (3/10/16

Regional Support Command ("63rd RSC").   TR at 16–17 (Probst); TR at 971 (Miller).   During the "Design Phase," the Army Corps retained Mason & Hanger, an architecture and engineering firm, to design and prepare construction specifications.   Jt. Stip. ¶ 8.   Mr. Jonathan Miller also served as Mason & Hanger's Project Manager.   TR at 970–71 (Miller).   Several Army Corps employees also were involved:

- Hans Probst, the Branch Chief of the Instruction Division of the Army Reserve Program Louisville District, served as the Project Manager, TR 15 (Probst);
- Robert Caskie, an employee from the Army Corps' Los Angeles District Office, served as the Geographical Administrative Contracting Officer, TR 370 (Caskie);
- Johnny Ringstaff, an employee from the Army Corps' Louisville District Office, served as an Administrative Contracting Officer, TR at 1118 (Ringstaff); and
- Tara O'Leary, an Army Corps Design Project Engineer, managed the Army Corps' design contract with Mason & Hanger, TR at 1144–45 (O'Leary).

The Sloan, Nevada site selected by the Army Corps did not have any existing electric utilities.   Jt. Stip. ¶ 5.   Therefore, the local electrical utility, Nevada Power Company, doing business as NV Energy ("NV Energy"), was required to design a new utility line that would connect the Project with existing power lines.   PX 4 at 2; *see also* JX 2 (4/28/09 Meeting Minutes reporting that "[u]tility coordination is critical").

Mason & Hanger was responsible for contacting NV Energy about utility design and, on May 6, 2009, NV Energy provided Mason & Hanger with a draft "Design Initiation Agreement," together with a memorandum that listed all the steps necessary for NV Energy to provide electrical power to the Project.   DX 6 at 4.   NV Energy's May 6, 2009 draft Design Initiation Agreement provided that, "[p]rior to going to construction, [the applicant must] sign one or more of the following agreements: Line Extension Agreement (LEA); Large Profit Service Agreement (LPS Agreement); Contribution In Aid of Construction Agreement (CIAC Agreement); Non-Refundable Construction Agreement (NRCA)."   DX 6 at 5.

On May 14, 2009, a Mason & Hanger employee forwarded the Design Initiation Agreement and attached memorandum to Mark Cutler, an employee of the 63rd RSC.   DX 6 at 2.   On May 15, 2009, Mr. Cutler forwarded the agreement to Ms. O'Leary, the Army Corps Design Project Engineer for the Project,  and stated that the Design Initiation Agreement should "be signed by the [Army] Corps," because it "has a look on it that whoever signs it should really have a warrant or be a contracting officer."   DX 6 at 1.   But, Ms. O'Leary declined to authorize a representative of the Army Corps to sign the Design Initiation Agreement.   DX 6 at 1. Consequently, neither the 63rd RSC, Mason & Hanger, nor the Army Corps signed the Design Initiation Agreement that NV Energy required before it would commence utility work on the Project.   JX 4.   Instead, Ms. O'Leary suggested that the Army Corps "place that requirement on the construction contractor."   DX 6 at 1.

---

Campbell Dep.).   TR at 12–13.   The court also admitted two Court Exhibits (CX 1–2) into evidence.   TR at 773, 969.

On July 15, 2009, the 63rd RSC, the Army Corps, and Mason & Hanger decided that the solicitation should include a requirement that the winning bidder must sign the Design Initiation Agreement with NV Energy. DX 8 at 1; *see also* TR at 978 (Miller). The Army Corps and Mason & Hanger, however, did not include any express requirement about the "Line Extension Agreement" in the solicitation.

**B.      On June 11, 2010, The United States Army Corps Of Engineers Issued Solicitation No. W912QR-09-R-0104 Requesting Proposals For A Firm, Fixed-Price Contract To Build The Army Reserve Center In Sloan, Nevada.**

On June 11, 2010, the Army Corps issued Solicitation No. W912QR-09-R-0104 for a firm, fixed-price contract to build a new 800-person Army Reserve Center in Sloan, Nevada for use of the 63rd RSC. Jt. Stip. ¶¶ 1, 14.

**C.      On September 10, 2010, The United States Army Corps Of Engineers Awarded Contract No. W912QR-10-C-0078 To MW Builders, Inc.**

On September 10, 2010, the Army Corps awarded a contract to construct the Project to MW Builders, based on a $23,661,000.00 bid (the "Contract"). Jt. Stip. ¶ 3. Under the terms of the Contract, the completed Army Reserve Center would consist of: a training center (the "Training Building"); an organizational maintenance shop building; a unit storage building; and a pump house and tank. Jt. Stip. ¶ 2. In addition, the Contract required MW Builders to follow the Contract specifications and design prepared by Mason & Hanger. Jt. Stip. ¶ 8.

Because the Project's location in Sloan, Nevada did not have electric utilities, the Contract required MW Builders to provide both "temporary power"[3] and "permanent power."[4] DX 14; TR at 426–27 (Matson). Contract Drawing ES-002, however, addressed the "Division of Responsibility (Power):"

> NV Energy is the electric utility serving this project. The contractor is responsible for providing all electric infrastructure, equipment, and wiring for the project unless specifically noted as provided by NV Energy in the Division of Responsibility. Contractor shall contact NV Energy prior to bidding to verify that NV Energy will provide everything noted [in the contract drawing table]. Contractor is responsible for providing a complete and working electrical system, and shall include all costs in this bid.

*          *          *

---

[3] The term "temporary power" describes the electricity required to operate construction tools and equipment during construction, and can be supplied by generators that construction contractors bring onsite. TR at 426 (Matson).

[4] The term "permanent power" refers to electrical facilities that remain a permanent part of the building once construction is complete. TR at 427 (Matson).

The contractor will be required to sign a Design Initiation Agreement with NV Energy and pay fees as shown in the bid schedule. The contractor shall contact NV Energy and determine the scope and costs of this work prior to submitting a proposal. The contractor's proposal shall include all work and all costs associated with providing electrical power for the project. Contractor is responsible for all guidelines and requirements within [NV Energy's] Electric Service Requirements, which can be found on their website listed below.

The construction contractor shall obtain written documentation of all transactions with NV Energy and provide them to the [Army Corps.]

DX 14.

The Contract also included Line Item 0006, "Nevada Energy Service Fee," in the amount of $590,160.00, that "includes the fee required by [NV Energy] to bring electric service to the site." Jt. Stip. ¶ 9.

In addition, the Contract required MW Builders to develop and update project schedules using a "Critical Path Method" ("CPM"),[5] of an "appropriate level of detail," and provide monthly schedule updates to the Army Corps. Jt. Stip. ¶ 17. During the course of the Project, the Army Corps hired a third-party scheduling consultant, Management Solutions, LLC ("Management Solutions"), to review MW Builders' CPM schedule updates and either approve them or make suggestions. TR at 512–13 (Stone).

On November 9, 2010, the Army Corps issued a Notice To Proceed. DX 20. MW Builders' work was to be completed in 660 days, *i.e.*, by August 30, 2012. Jt. Stip. ¶ 7.

### D.    On December 6, 2010, MW Builders, Inc. Entered Into A Subcontract With Bergelectric Corporation To Provide An Electrical System.

On December 6, 2010, MW Builders entered into a $4,579,943.00 subcontract with Bergelectric Corporation ("Bergelectric") to "provide a complete Electrical System in accordance with [the Contract] plans and specifications." JX 9 at 2, 14. Bergelectric also was required to provide temporary power for the site, prior to the installation of permanent power. JX 9 at 14. Attached to the December 6, 2010 subcontract was a "Partial Waiver And Release," under which Bergelectric waived "any and all mechanic's liens or other liens or any other claims on any bonds or any other claims whatsoever in connection with this Contract and with the Realty . . . reserving, however, all lien rights for materials and labor furnished or performed after said period[.]" JX 9 at 49. During performance, Bergelectric also was required to sign periodic partial waivers and

---

[5] The Critical Path Method is a scheduling approach wherein the "logic" of a construction schedule describes the interdependency of each construction activity. Miltonberger Direct at 6. The term "critical path" refers to the continuous chain of activities that establishes the minimum overall project duration. Miltonberger Direct at 6. Thus, a delay in any critical path activity will extend the final completion date. Miltonberger Direct at 6–7. The term "float" refers to the amount of time an activity may be delayed before affecting the critical path of the project. Miltonberger Direct at 7.

submit them to MW Builders, together with applications for payment. DX 124 (4/15/12 waiver); *see also* TR 672 (Campbell).

> **E.** **In 2011, MW Builders, Inc. Executed A Third Party Authorization Form And Design Approval Agreement With NV Energy.**

On March 15, 2011, NV Energy informed MW Builders that "the [Project] Owner shall complete a NV Energy Consultant/Third Party [Contact] Authorization Form before any activity will be provided to deliver electric service to the [P]roject site." DX 37 at 30. On that date, an Army Corps representative signed a Third Party Authorization Form, indicating that MW Builders was the "sole contact" between NV Energy and the Army Corps, but MW Builders did not have authority to negotiate contract changes on behalf of the Army Corps.[6] PX 15. The Third Party Authorization Form designated the Army Corps as the "Customer/Legal Owner" of the Project.[7] PX 15.

On March 29, 2011, NV Energy also was provided with a "Project Information Sheet," wherein MW Builders provided a description of the Project to assist NV Energy's utility design and listed the Army Corps as the "Customer/Legal Owner." PX 567 at 4.

On April 15, 2011, NV Energy sent MW Builders a draft "Design Initiation Agreement." DX 37 at 3. This document authorized NV Energy to design a utility system to bring permanent power to the Project. TR at 1027–28 (Creveling). The draft Design Initiation Agreement listed the "US Army Corps of Engineers" as the "Applicant" for permanent power. DX 37 at 14. A timeline titled, "Milestones And NPC Durations For Typical New Business Projects," also was included stating that, generally it took NV Energy 20 weeks before it could begin providing permanent power, but it could take as long as 88 weeks, *i.e.*, 616 days, depending on how long it took to secure the necessary approvals and perform other preliminary design steps, such as site inspection. DX 37 at 19.

On April 27, 2011, Michael Marti, then MW Builders' Project Manager,[8] signed the Design Initiation Agreement and returned it to NV Energy, as required by Contract Drawing ES-002. JX 19 at 10. On or about April 28, 2011, MW Builders hired Richard Rial of STF, Inc., as a consultant to help coordinate with NV Energy. Jt. Stip. ¶ 12.

---

[6] The unsigned version of the Third Party Authorization Form initially provided that MW Builders would have the authority to "communicate and authorize all change requests." JX 14 at 11. In the signed version "and authorize" was crossed out. PX 15.

[7] The Project's eventual owner and end-user was to be the 63rd RSC. But, the 63rd RSC deferred to the Army Corps with respect to the Third Party Authorization Form, because the Army Corps was "the construction agent/property holder until construction completion/beneficial occupancy." DX 37 at 30.

[8] Mr. Marti managed the Project for MW Builders from December 2010 until November 2011. TR at 219–20 (Marti).

On July 25, 2011, Mr. Marti also executed the "Design Approval Agreement," by which MW Builders approved NV Energy's preliminary design for the Project's permanent power. TR at 213 (Marti). The Design Approval Agreement stated that the "Applicant" for permanent power was the "US Army Corps of Engineers." JX 21 at 1.

After executing the Design Approval Agreement, MW Builders began the work necessary to connect the Project site to the electric grid. TR at 213 (Marti).[9] The closest hookup to the grid was an NV Energy-owned utility pole located outside of the Project site at the intersection of Arville Street and Ray Way (the "Arville Hub"). PX 471. To connect to the Arville Hub, MW Builders was required to build an underground "offsite ductbank" across privately owned land, but Contract Drawing CD-100 showed an easement running from the Project site to the Arville Hub across this property. PX 471; *see also* PX 267 ("The contract drawings identify a corridor down the Arville alignment for the construction contractor to install underground ductbanks for both comm[unications] and power."). Once the ductbank work was completed, NV Energy was required to "pull" a utility line from the Arville Hub to the Project site. PX 267. Subsequently, however, the parties discovered that there were no easements that allowed MW Builders to construct ductbanks and manholes along the route to the Arville Hub. PX 267. Thereafter, NV Energy and the telephone company informed the Army Corps that they would not install their lines without an easement in the underground ductbanks. PX 267.

On or about August 9, 2011, MW Builders informed the Army Corps that their part of the electrical work could not continue without the required easements. PX 477 at GOV_00012196. On September 14, 2011, MW Builders sent a letter informing the Army Corps that their failure to secure the easements, which was their responsibility under the Contract, and was delaying MW Builders' work. JX 26. On September 22, 2011, Mr. Caskie, the Army Corps' Geographical Administrative Contracting Officer, sent an email to Mr. Probst, the Army Corps' Project Manager, to inform him that Army Corps made a "big goof" in not securing the easements, because it was "prohibited from awarding a contract wherein [its] real estate interests [were] not covered" and "the design should never have required work on lands that the Government does not have the right to access." PX 267. On October 29, 2011, MW Builders sent the Army Corps a Request for Information ("RFI") concerning the offsite ductbank easement. PX 481.

On December 5, 2011, MW Builders also sent another letter to the Army Corps, complaining that "delays in the delivery of permanent power" could affect completion of the Project. JX 31 at 1. MW Builders attributed these delays to the Army Corps' failure to secure utility easements, prior to the start of the construction. JX 31 at 1. Specifically, NV Energy required an offsite easement to continue the underground electrical work and an "Access To Equipment Agreement," signed by the Project owner, to allow NV Energy employees to monitor the equipment on site. JX 31 at 1. MW Builders warned that, unless permanent power was in place by May 21, 2012, it could not complete the Project by August 30, 2012. JX 31 at 1.

---

[9] In the interim, temporary power was supplied by onsite generators. TR at 687–88 (Campbell).

On February 9, 2012, an NV Energy representative sent an email to the Army Corps requesting that a senior Army official sign the Access To Equipment Agreement. PX 18.

It took until February 28, 2012, for an Army Corps representative to respond to MW Builders' July 9, 2011 email and September 2011 follow up requesting that a senior Army official sign the Access To Equipment Agreement. PX 18. On March 16, 2012, an Army Reserve Major General signed a letter authorizing NV Energy to enter the Project site. JX 49.

**F.     In March 2012, MW Builders, Inc. And The United States Army Corps Of Engineers Had A Dispute Over The Execution Of A Line Extension Agreement With NV Energy.**

To provide permanent power, NV Energy also required a signed "Line Extension Agreement" (also called a "Rule 9 Agreement"). PX 4 at GOV_0010874 ("Prior to going to construction, [the applicant must] sign one or more of the following agreements: Line Extension Agreement (LEA)[.]"); DX 221 at 7 (providing that NV Energy "shall deliver the Rule 9 Agreement and final cost estimate to Applicant"); *see also* TR at 38–39 (Probst).[10] The Line Extension Agreement governed the terms of payment. TR at 473 (Rial) ("A Line Extension Agreement is the contract between the utility and the owner on how the money is to be collected, the breakdown on the money, and then, also, how the moneys will be refunded[.]"). Typically, a Line Extension Agreement had a term of five years and was executed by the utility and the owner of the project, not the construction contractor. TR at 469–70 (Rial), 584 (Risse); *see also* TR at 1077–78 (Finley) (same). But, NV Energy's Utility Electric Service Rule No. 9, governing Line Extension Agreements between NV Energy and commercial customers, did not expressly require that the owner of the property sign the Line Extension Agreement. DX 270; *see also* TR at 631 (Risse) ("I don't think [Rule No. 9] required the ultimate end user to have to sign [the Line Extension Agreement.").

At trial, Katherine Creveling, NV Energy's Senior Project Coordinator, testified that she remembered preparing an initial draft of a Line Extension Agreement with the understanding that MW Builders would sign the agreement, not a government agency. TR at 1001, 1004–05 (Creveling). Although Ms. Creveling was unable to locate a copy of the draft Line Extension Agreement in this case, she remembered that an initial draft Line Extension Agreement was rejected by MW Builders, because MW Builders was not the "applicant" for permanent power. TR at 1005–06 (Creveling).

On March 13, 2012, Mr. Probst, the Army Corps Project Manager assigned to the Project, hosted a conference call that included representatives of: the 63rd RSC; MW Builders; NV Energy; and Mason & Hanger. JX 44 at 1 (3/13/12 email summary of conference call). During the conference call, it was agreed that, by March 16, 2012, NV Energy "will have sent draft contract for review to 63[rd] RSC (Jeffrey Reed[s])[11] and [the] contract will be executed between NV

---

[10] The December 5, 2011 letter sent by MW Builders about permanent power delays did not discuss the Line Extension Agreement. JX 31.

[11] Mr. Jeffrey Reeds was an attorney that represented the 63rd RSC. TR at 71 (Probst).

Energy and 63[rd] RSC such that staging of equipment can start on or about 19 March 2012." JX 44 at 1.  At trial, NV Energy's in-house attorney, Ms. Rebeca Risse, testified that the "draft contract" identified in this email was the draft Line Extension Agreement to be signed by the 63rd RSC.  TR at 583 (Risse).  During the March 13, 2012 telephone conference, the participants also agreed that permanent power would be available at the Project site by April 9, 2012.  JX 44 at 1.

On March 13, 2012, Mr. Rial also sent an email to Mr. Probst, wherein he explained that

NVE is in the process of preparing [the] Line Extension Contract for service to the site.  On today's phone call some of the contact information changed.  I made a note that you wanted the contract in the name of "United States Army Reserve, 63d Regional Support Command."  It was originally submitted to NV Energy as the Army [Corps] of Engineers.

JX 45 at 2.

On March 14, 2012, Ms. Creveling sent an email to the 63rd RSC with a "Government Line Extension Agreement."  JX 47 at 1.  The Line Extension Agreement provided:

- the Agreement term was five years (PX 449(r) ¶ 14.1);
- the 63rd RSC would make a partially-refundable advance payment of $143,495.00 (PX 449(r) ¶ 1.3);
- the refundable portion ("the Allowance") of the 63rd RSC's advance payment would be reduced via an "Allowance True-Up," if the 63rd RSC's demand for electricity decreased within the 18 months after the Agreement was signed (PX 449(r) ¶ 3.5); and
- the Agreement would be governed by and construed, in accordance with the Nevada law, and all actions beyond the scope of the Nevada Utility Commission's jurisdiction were to be filed, in either Nevada state court or in federal district court. (PX 449(r) ¶ 13.4).

On that same date, "uncertainty" arose as to whether or not a representative of the 63rd RSC would sign the Line Extension Agreement.  TR at 81–82 (Probst).  Mr. Probst opined via email to other Army Corps officials that: "I anticipate [the Army Corps] will become involved in the review and possibly signature on the contract with NV Energy depending [on] what the nature of the document is."  JX 46 at 1–2.

Later in the day, Ronald L. Musgrave, an Army Corps Contracting Officer's Representative,[12] responded that

> I really don't know why MW cannot sign the contract as they a[re] paying the fee[13] and the cost for service until it is acceptable, but I don't want to introduce another issue in this process by asking [NV Energy] if that is acceptable.  We did issue a document naming MW as our proxy.  Maybe Rich Rial can go through the backdoor and get an answer.

PX 501 at GOV_00005390.

That evening, however, Mr. Musgrave reported that

> MW's agent, Rich Rial, has spoken with [NV Energy] and they stated MW cannot sign the contract on behalf of the [Army] Corp[s] or [the Army] Reserve[s' 63rd RSC].  They say it is a 5 year contract and the end user needs to be a signatory.  As of now the contract being prepared by NV [Energy] is on hold until they get a commitment as to whom will sign and the name to be shown on the contract.

JX 46 at 1.

On March 19, 2012, Mr. Probst hosted a second conference call with the Army Corps and NV Energy.  PX 60A.  MW Builders, however, was not invited to participate.  TR at 84–85 (Probst).  During this conference, the participants "determined that each party will tentatively consider an arrangement whereby the [Army Corps'] Construction Contractor–MW Builders may enter the agreement with NV Energy since this supports the typical means [the Army Corps] obtains electric serv[ice] for new projects and has provisions in the [Army Corps]-MW Builders Construction Contract."  PX 60A.  On that same date, MW Builders provided NV Energy with a renewed "Project Information Sheet."  DX 88A.  Unlike the earlier March 19, 2012 Project Information Sheet, the March 20, 2012 version stated that the "Customer/Legal Owner/Responsible Party on Contracts" was MW Builders, not the Army Corps.  DX 88A.

On March 20, 2012, Mr. Musgrave learned that NV Energy "ha[d] issues with the contract," particularly with respect to the Line Extension Agreement's five year term and indemnification provision.  PX 60B.

On March 21, 2012, MW Builders informed the Army Corps that it would not sign the Line Extension Agreement, because it "flatly" exceeded the scope of the September 10, 2010 Contract, unless the Contracting Officer (the "CO") ordered it to do so.  PX 528.  On that same date, Mr. Probst also hosted another telephone conference with NV Energy, but again excluded MW

---

[12] Although Mr. Musgrave was located in Las Vegas, Nevada during the Project, his primary responsibility was to "keep the [C]ontracting [O]fficer informed of what was going on" and answer any of MW Builders' requests for information.  TR at 1038 (Musgrave).

[13] The September 10, 2010 Contract required MW Builders to pay NV Energy a $590,160.00 Service Fee.  Jt. Stip. ¶ 9.

Builders.  PX 60C.   During that conference, the participants agreed to procure a letter from a "competent contracting authority of US Army Corps of Engineers . . . confirm[ing] that the [Army Corps] construction contract with . . . MW Builders requires MW Builders to provide a complete and working electric system to serve the Army Reserve Center at Sloan Road."  PX 60C.

On March 22, 2012, Mr. Musgrave informed Mr. Probst that MW Builders still "will not move forward without [a] directive from the [Army] Corps," and suggested that the Army Corps not engage in a "letter writing campaign regarding interpretation" with MW Builders, but instead recommended that the Army Corps should "[m]ake them do it and let the chips fall where they may."  PX 27.

On March 26, 2012, Mr. Probst hosted a third telephone conference that included MW Builders, wherein the participants discussed obtaining a letter from the CO to NV Energy, to explain MW Builders' responsibilities regarding electrical power.  DX 109 at 2.  The issue of who would sign the Line Extension Agreement was not resolved, but the permanent power delivery date remained as April 9, 2012.  TR at 185 (Probst); DX 109 at 2.

On March 28, 2012, Ms. Creveling, the NV Energy Senior Project Coordinator, sent an email to the Army Corps stating that "I have not received the letter that states MW Builders can sign the LEA [*i.e.*, the Line Extension Agreement] contract yet."  PX 504.  Johnny Ringstaff, an Army Corps Administrative Contracting Officer, responded that "I am holding the letter since we are not in a position to sign the agreement.  Our contractor has taken exception to some of the agreement.  Once that is resolved we will send the letter."  PX 504.

On March 29, 2012, MW Builders' Operations Manager Greg Herriott, sent an email to Mr. Ringstaff, reiterating that MW Builders remained opposed to signing the Line Extension Agreement, because "[i]t appears that this Agreement is intended to be signed by the end user, as it obligates the Applicant to a 5 year term of service . . . with the Utility and puts the Applicant at risk of additional costs after the 18 month 'Allowance true-up[.]'"  DX 102 at 1. Mr. Herriott also stated that the Line Extension Agreement permitted multiple signatories and suggested that MW Builders could potentially sign the Line Extension Agreement along with either the Army Corps or the 63rd RSC, provided that "certain language could be modified to limit MW's responsibilities after project completion and acceptance by the Government."  DX 102 at 1.

On April 2, 2012, Mr. Ringstaff provided Ms. Creveling with a letter, signed by the CO, stating that MW Builders was: responsible for providing a "complete and working electric system;" required to follow NV Energy's guidelines; and responsible for paying the "fee required by [NV] Energy to bring electric service to the site."  PX 502 at GOV_00005419.  The April 2, 2012 CO letter, however, did not state that MW Builders was obligated to sign the Line Extension Agreement or that MW Builders was authorized to sign it.  PX 502 at GOV_00005419.  On that same date, Ms. Creveling responded that she had received the letter, but was "under the impression from our meeting . . . that some things still need to be ironed out between MW Builders and the Army before I can start my contract."  DX 109 at 1.

**G.      On April 6, 2012, MW Builders, Inc. Notified The United States Army Corps Of Engineers That The Construction Schedule Would Be Delayed, Because The Line Extension Agreement With NV Energy Was Not Executed.**

On April 6, 2012, MW Builders sent a "Notice Of Potential Delay" to inform the Army Corps of a "delay to the project schedule due to a lack of permanent power at the projected site referenced above." JX 58. Although MW Builders completed the "primary duct bank and installed electrical switchgear in accordance with the Contract Documents and Nevada Energy requirements,"  there was still no permanent power at the site, because "the Line Extension Agreement between the Government and Nevada Energy [was] not yet in place, subsequently delaying permanent power installation and startup."  JX 58.  Once the site had permanent power, however, MW Builders still needed "additional time and compensation" to make up the time it was unable to work, because of the delay caused by the Army Corps' failure to sign the Line Extension Agreement.  JX 58.

**H.      On April 19, 2012, The United States Army Corps Of Engineers Began To Negotiate A Line Extension Agreement With NV Energy.**

On April 19, 2012, the Army Corps' counsel, Mr. Kevin M. Finley, sent an email to Ms. Creveling questioning the terms of the Line Extension Agreement.  JX 60.  Mr. Finley also shared his concerns with NV Energy's in-house counsel, Ms. Rebecca Risse.  TR at 1066, 1073 (Finley). On April 26, 2012, Mr. Finley also sent an email to Ms. Risse, to begin contract negotiations about the Line Extension Agreement and summarized the issues, as follows:

> The current Agreement is drafted for the end user to sign (the [Army] Reserve['s 63rd RSC]), however, it involves issues related to both construction, for which the [Army] Corps is responsible, and operation, for which the [63rd RSC is] responsible.

> Our construction contract was set up for the contractor to handle this by including a line item with MW Builders that provides an allowance in sufficient amount to cover the 'Nevada Energy Service Fee.'  It was done that way to try to avoid this very situation of meeting both utility requirements and Government requirements.

> The Corps did execute a third party authorization form to allow our contractor to coordinate and exchange of information related to the design and I think that has worked and Nevada Energy is satisfied with the design.

> We also furnished a letter to Ms. Creveling dated 27 March 2012 explaining the Contractor's requirements under his contract with the Government.  I believe [b]ased on this [NV Energy] is willing to accept the Contractor's signature on the Agreement.  However, the Contractor is having problem[s] with par. 14.1 (5 year term of service and par. 3.5 (18 month allowance true up).

> This has become a critical path item on our construction contract and we are looking for a path forward.

> The first request would be to modify the agreement in such a way that either the contractor or the Corps can sign it[.]

JX 61 at 1–2.  In the alternative, Mr. Finley requested that the Army Corps sign an agreement that governed construction and the 63rd RSC sign an agreement that governed operations, after construction was completed.  JX 61 at 2.

At trial, Ms. Risse testified that she did not read Mr. Finley's April 26, 2012 email, until the following week and "didn't really understand why [Mr. Finley] was making these various requests," because she thought "we were having the contractor [*i.e.*, MW Builders] sign" the Line Extension Agreement, based on the March 21, 2012 conference call.  TR at 607–09 (Risse).  In her opinion, the email also was "strange," because it appeared that Mr. Finley was attempting to negotiate a contract on behalf of MW Builders, which was not his client.  TR at 608–09 (Risse).  On April 30, 2012, Mr. Finley sent a follow-up email, because Ms. Risse did not respond to his first one.  JX 61 at 1.

On May 2, 2012, MW Builders again reiterated that it would not sign the Line Extension Agreement.  PX 31.  On May 15, 2012, Mr. Probst arranged a telephone call between Ms. Risse and Mr. Finley.  DX 127.  Thereafter, Ms. Risse and Mr. Finley began renegotiating the terms of the Line Extension Agreement via email.  JX 68 (email chain running from 5/17/12 to 6/8/12).

On May 23, 2012, MW Builders sent another letter to the Army Corps, entitled "Permanent Power Delay," emphasizing that the "lack of permanent power to the jobsite continues to have significant cost and schedule impacts," *i.e.*, MW Builders was required to "build the entire project with temporary power;" MW Builders was unable to start up and test equipment; and MW Builders was unable to "install building finishes which require conditioned air in the buildings."  PX 44.  MW Builders attributed the permanent power delay to "the Government's failure to timely acquire the onsite and offsite easements and execute the necessary agreements with the electric utility provider (Nevada Energy)[.]"  PX 44.  MW Builders also stated that it "fulfilled its contractual obligations as relates to the power," but NV Energy still would not "give[] a final price or begin work until the Government execute[d] the Line Extension Agreement."  PX 44.  MW Builders advised the Army Corps that it had no alternative but to request the additional costs incurred as a result of the delay.  PX 44.

On May 25, 2012, Mr. Finley resumed email negotiations with Ms. Risse, requesting that the Line Extension Agreement be modified, so that its terms were enforceable and consistent with federal law.  JX 68 at 4–5.  Negotiations continued over the next four weeks.  PX 500.  On May 29, 2012, Mr. Finley told Ms. Risse: "I would just like to get there sooner than later because we are looking at having to bring in generators so that construction can continue.  That is a costly proposition that we would like to avoid."  JX 68 at 4.  Mr. Finley also explained that "I think the main issue is indemnity (limitations of damages)" and asked Ms. Risse to provide him with a "sample" agreement that NV Energy previously entered into with a military customer.  JX 68 at 4.  On June 4, 2012, Mr. Finley sent another email to Ms. Risse, wherein he stated that "I haven't received any reply to my [emails] of May 25 or May 29[.]"  JX 68 at 3.  On June 7, 2012, Ms. Risse responded, opposing Mr. Finley's proposed change to the enforceability provision.  JX 68 at 3.

On June 15, 2012, Ms. Risse sent another email to Mr. Finley, describing his proposed changes, but complained: "NV Energy has already compromised by agreeing that the government's contractor can be the applicant instead of the [g]overnment." DX 143 at 2. Ms. Risse also questioned why Mr. Finley wanted to change the Line Extension Agreement's choice of law provision, "given that NV Energy's counterparty isn't the federal government but rather the government's contractor." DX 143 at 2.

On June 18, 2012, Mr. Finley responded:

Now, I am confused. I was under the impression that NV Energy would not accept the contractor and was even balking at accepting the Corps of Engineers versus the Reserves (the end user). What I have been trying to draft is an agreement between the [Army] Corps and NV Energy. We seem to be working toward different goals.

DX 143 at 1. On that same date, Ms. Risse replied that she too was confused, because her understanding was that the Line Extension Agreement was to be between NV Energy and MW Builders. PX 500 at GOV_00005315. So, on June 20, 2012, Ms. Risse sent an email to MW Builders' in-house counsel, Harold Mitts, stating that, "[i]t was NV Energy's understanding that MW Builders was going to sign" the Line Extension Agreement. JX 72 at 1.

On June 21, 2012, Mr. Finley and Ms. Risse arranged for a telephone conference call with Mr. Mitts. JX 75 at 1. At trial, Ms. Risse testified that it was only after this call that she actually understood that MW Builders was not signing the Line Extension Agreement. TR at 597–98 (Risse). Thereafter, Ms. Risse resumed negotiations with Mr. Finley. JX 75 at 1 (6/21/12 email from Ms. Risse to Mr. Finley with proposed changes to Line Extension Agreement); *see also* TR at 598–99 (Risse). Negotiations continued from June 21, 2012 until July 7, 2012, during which "drafts were exchanged quickly," because the parties were no longer confused as to who was actually signing the agreement. TR at 598–600, 626 (Risse).[14] While Mr. Finley and Ms. Risse were negotiating the Line Extension Agreement, Mr. Probst initiated discussion with other Army Corps officials about the pragmatic impact of the delay:

Requirement is for an electric utility line extension with Nevada Energy for permanent primary power to the project site. Project is experiencing delay and additional cost, a condition that is frustrating [the Army Corps'] customer [the 63rd RSC. The Army Corps'] contract requires the contractor to provide a complete and working electrical system. The contractor has refused to sign the NV Energy Line Extension Agreement (LEA) claiming the conditions contained therein are meant for the owner, [*i.e.*, the Government.] NV Energy advises that the . . . approved LEA is required and if not signed, NV energy will not provide the line extension. NV energy has advised contractor can act on behalf of the owner ([the Army Corps]) and have accepted [a CO] letter to that effect. *The contractor continues to object to signing the LEA and after investigation into the [Army Corps/MW Builders] construction contract, [the CO] is unwilling to direct the contractor to*

---

[14] Ms. Risse testified that "once we understood that it was going to be the Government who signed it, I thought it went pretty quickly—extremely quickly." TR at 633 (Risse).

> *sign the NV Energy LEA as the [CO] feels the terms are not enforceable and would*
> *expose the Government to a potential Request for Equitable Adjustment (REA) and*
> *a contract ratification if an REA was upheld.*

PX 294 (emphasis added).

On July 7, 2012, Ms. Risse sent a draft Line Extension Agreement to Mr. Finley.  JX 83 at 1.  At trial, Ms. Risse testified that the parties "[came] to an agreement on all of the terms" by that date.  TR at 600 (Risse).

### I.    On July 12, 2012, The United States Army Corps Of Engineers Signed A Line Extension Agreement With NV Energy.

On July 12, 2012, the Army Corps signed the Line Extension Agreement.  Jt. Stip. ¶ 25. On July 17, 2012, MW Builders paid NV Energy's service fee.  Jt. Stip. ¶ 26.  On July 23, 2012, NV Energy signed the Line Extension Agreement.  Jt. Stip. ¶ 25.

On September 19, 2012, the Army Corps was notified that MW Builders was preparing to submit a claim for costs[15] incurred by the Army Corps' failure to sign the Line Extension Agreement.  DX 181 at 1.

By September 26, 2012, NV Energy was supplying permanent power to all buildings at the Project, except the pump house.  Jt. Stip. ¶ 27.  On October 12, 2012, MW Builders informed its subcontractors that the Project had permanent power and directed them to "return to the project and complete all remaining work immediately."  JX 85.

In early October 2012, MW Builders began to install climate sensitive materials, including Acoustic Ceiling Tiles ("ACT") and Vinyl Composition Tiles ("VCT"), inside the Training Building.  PX 343 at 3.  This work could not have been performed without permanent power, required for the Training Building's heating, ventilation, and air conditioning ("HVAC") system to function.  PX 343 at 3.[16]

---

[15] During the Project, MW Builders' Accounting Department used a cost accounting computer system known as "COMET."  4/12/16 Cimpl Dep. at 17–18.  COMET created "job cost summaries" and prepared monthly financial statements submitted to MW Builders' parent corporation, MMC Corporation ("MMC").  4/12/16 Cimpl Dep. at 10–16, 18, 82–83.  Job cost summaries were used to track costs and compare them to budget estimates.  TR at 1167–68 (Campbell).  On April 12, 2016, the Government deposed David Cimpl, the Chief Financial Officer of MMC Corporation, about MMC's and MW Builders' accounting methods.  4/12/16 Cimpl Dep. at 10.  On May 4, 2016, the court admitted this deposition into evidence.  ECF No. 97.

[16] But, the pump house did not have permanent power on October 12, 2012, requiring MW Builders to install "a temporary generator to supply power to the Pump House pumping system" to continue work.  JX 85.  NV Energy did not provide power to the pump house until January 7, 2013.  DX 218 at 3.

**J.     On December 27, 2012, MW Builders, Inc. Submitted A Certified Claim To The Contracting Officer For Costs Incurred As A Result Of The United States Army Corps Of Engineers' Failure To Timely Execute A Line Extension Agreement With NV Energy.**

On December 27, 2012, MW Builders submitted a certified claim to the CO requesting a 169-day time extension and $2,139,215.00 for "costs incurred" by MW Builders as a result of delay caused by "the Government's failure to execute the required 'Line Extension Agreement' with Nevada Energy . . . by the date required to allow [NV Energy] to bring power to the jobsite as scheduled." JX 88 at 1–2.  MW Builders again stated that it was not responsible for signing the Line Extension Agreement.  JX 88 at 1.  MW Builders' claim included ten subcontractor claims in the amount of $985,874.00, including Bergelectric's claim for $296,300.00.  JX 88 at 3.  MW Builders' claim itemized: (1) $181,678.00 for "Material & Equipment" costs; (2) $14,716.00 for tax reimbursement; (3) $19,639.00 for overhead; (4) $17,283.00 for general contractor's profit; (5) $687,999.00 for "Jobsite Overhead Costs;"[17] (6) $192,998.00 for "Home Office Overhead;" (7) $16,381.00 for insurance reimbursement; and (8) a $22,647.00 bond fee.  JX 88 at 3.  In submitting the certified claim, MW Builders' President, Jason Evelyn, represented that

> this claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

JX 88 at 1; *see also* 41 U.S.C. § 7103(b).[18]

---

[17] The jobsite overhead costs were derived by multiplying a "daily cost rate" of $4,071.00 by 169 days.  JX 88 at 3 (Claims Worksheet); TR at 1178–80 (Campbell).  The "daily cost rate" was ascertained, based upon a five-page work sheet (the "General Conditions Worksheet") that MW Builders submitted together with the certified claim; no other underlying documentation was submitted to support the daily cost rate for jobsite overhead.  JX 88 at 6–10 (Claims Worksheet); *see also* TR at 1175, 1178–80 (Campbell).

[18] Section 7103(b) of the Contract Disputes Act ("CDA") provides that:

(1) Requirement generally.–For claims of more than $100,000 made by a contractor, the contractor shall certify that–

(A) the claim is made in good faith;

(B) the supporting data are accurate and complete to the best of the contractor's knowledge and belief;

The General Conditions Worksheet was prepared by MW Builders' Operations Manager Mr. Daniel "Sparky" Campbell in November 2012; the December 27, 2012 claim letter was prepared by Mr. Greg Herriott, an MW Builders employee and Operations Manager.  TR at 1171–72, 1174 (Campbell).

On January 3, 2013, MW Builders submitted a request to the Army Corps for reimbursement of the fee MW Builders paid to NV Energy.  DX 200 at 2.

On May 15, 2013, MW Builders submitted a revised certified claim ("Amended Certified Claim") to the CO, wherein MW Builders again stated that it was not required to sign the Line Extension Agreement, because certain provisions about the conveyance of property rights could only be provided by the Project site owner.  JX 89 at 1–2.  MW Builders added that the "[t]he failure of the Government to timely execute the Line Extension [A]greement implicated the Government[']s general duty to cooperate and to do nothing that unreasonably hinders the contractor's performance."  JX 89 at 2.  MW Builders also revised and increased the claim amount to $2,562,049.00, but did not change any of the estimated costs.  JX 89 at 2.

---

(C) the amount requested accurately reflects the contract adjustment for which the contractor believes the Federal Government is liable; and

(D) the certifier is authorized to certify the claim on behalf of the contractor.

(2) Who may execute certification.–The certification required by paragraph (1) may be executed by an individual authorized to bind the contractor with respect to the claim.

(3) Failure to certify or defective certification.–A contracting officer is not obligated to render a final decision on a claim of more than $100,000 that is not certified in accordance with paragraph (1) if, within 60 days after receipt of the claim, the contracting officer notifies the contractor in writing of the reasons why any attempted certification was found to be defective. A defect in the certification of a claim does not deprive a court or an agency board of jurisdiction over the claim. Prior to the entry of a final judgment by a court or a decision by an agency board, the court or agency board shall require a defective certification to be corrected.

41 U.S.C. § 7103(b).

**K.** **On June 10, 2013, The Contracting Officer Issued A Final Decision Denying MW Builders, Inc.'s Monetary Claim, But Granting A Non-Compensable Time Extension Of 146 Days For MW Builders, Inc. To Complete Construction Of The Army Reserve Center In Sloan, Nevada.**

On June 10, 2013, the Army Corps CO issued a final decision denying MW Builders' claim for both the company and its subcontractors, but granted a non-compensable time extension of 146 days. DX 218 at 4. Therein, the CO also found that, although significant delay incurred as a result of difficulties surrounding the execution of the Line Extension Agreement, it "was beyond the control of the Contractor or the Government," and therefore was "excusable, but not compensable," pursuant to the Federal Acquisition Regulation ("FAR"). DX 218 at 1–3; 52.249-10.

With respect to the apportionment of responsibility, although Contract Drawing ES-002 "places much of the responsibility of arranging for power to the site on the Contractor," it "does not specifically place responsibility of the Line Extension Agreement on the Contractor." DX 218 at 4. As such, NV Energy's delay in providing electrical power to the Project "was beyond the Contractor's control."[19] DX 218 at 4. Therefore, the Army Corps was not entitled to assess liquidated damages[20] against MW Builders for the 146 days of delay that occurred between March 14, 2012, when NV Energy first sent the Government a proposed Line Extension Agreement, and July 12, 2012, when the Army Corps signed the agreement. DX 218 at 3. And, MW Builders was not entitled to recover costs incurred in connection with the delay by the Army Corps, because the entirety of the delay was attributable to NV Energy, a "third party over whom the Government had no control." DX 218 at 4.

**L.** **On December 13, 2013, The Completed Army Reserve Center in Sloan, Nevada Was Accepted By The United States Army Corps Of Engineers.**

On December 13, 2013, the Army Reserve accepted the completed Project from MW Builders. DX 225. The Project's original completion date was August 30, 2012. Jt. Stip. ¶ 7. During the course of the Project, however, the parties made 85 contract changes and extended the completion date by 413 days, extending the contract completion date to October 17, 2013. DX 241.

---

[19] The FAR provision governing contractor default for fixed-price construction contracts provides: "[t]he Contractor's right to proceed shall not be terminated nor the Contractor charged with damages under this clause, if . . . [t]he delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor." 48 C.F.R. § 52.249-10(b)(1).

[20] The FAR provision governing liquidated damages in construction contracts provides: "[i]f the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government[.]" 48 C.F.R. § 52.211-12.

## II.     PROCEDURAL HISTORY.

On December 27, 2013, MW Builders filed a Complaint ("Compl.") in the United States Court of Federal Claims: Count One alleged that the Army Corps breached its duty to cooperate; Count Two alleged that the Army Corps caused an unreasonable delay; and Count Three alleged that the Contracting Officer improperly classified the delay as "non-compensable."  ECF No. 1. As a result, MW Builders alleged that it was owed "a compensable time extension of at least 169 days," as well as $2,562,094.00 in damages.  ECF No. 1.

On May 13, 2014, the Government filed an Answer.  ECF No. 8.

On July 7, 2014, the parties filed a Joint Preliminary Status Report.  ECF No. 9.  On July 17, 2014, the court issued a Scheduling Order allowing fact discovery to proceed from July 16, 2014 until July 15, 2015.  ECF No. 10.  On July 24, 2014, the Government filed an Unopposed Motion For Entry Of A Discovery Order Concerning Materials As To Which Privileges May Be Asserted, that the court granted the same day.  ECF Nos. 11–12.

On January 12, 2015, the Government filed a Motion To Compel Production Of Documents.  ECF No. 13.  That motion requested the court to order MW Builders to respond to the Government's First Set Of Document Requests.  ECF No. 13 at 1.  The court convened telephone status conferences on January 26, 2015 and March 23, 2015.  During the March 23, 2015 Status Conference, the Government voluntarily withdrew the January 12, 2015 Motion To Compel. *See* ECF No. 14.

On July 14, 2015, the parties filed a Joint Status Report And Joint Motion To Enlarge The Discovery Period until October 30, 2015.  ECF No. 15.  That same date, the court granted the parties' July 14, 2015 Motion.  ECF No. 16.

On September 2, 2015, the parties filed a Status Report And Second Joint Motion To Enlarge The Discovery Period until January 13, 2016.  ECF No. 17.  On September 9, 2015, the parties filed a Joint Motion For Scheduling Order, including with a proposed schedule.  ECF No. 18.  On September 10, 2015, the court issued an Order adopting the parties' proposed schedule. ECF No. 20.

On December 30, 2015, the Government filed a Status Report And Consent Request For Status Conference Regarding Productions Of Documents And Trial Issues.  ECF No. 23.

On January 6, 2016, the court convened a telephone status conference.  On January 8, 2016, the parties filed a Joint Motion For Scheduling Order.  ECF No. 24.  The same date, the court entered that Order.  ECF No. 25.  On January 29, 2016, the Government filed a Motion *In Limine* To Exclude Testimony Of Witnesses Not Properly Disclosed.[21]  ECF No. 26.

On February 17, 2016, the Government filed a Motion For Leave To Amend Its Answer To Assert Counterclaims And Affirmative Defenses, together with a proposed Amended Answer

---

[21] The Government moved to exclude the expert testimony of: Eric Stone, of MW Builders, Inc.; Justin Knippel, of Bergelectric Corporation; and Larry Campbell, of Desert Fire Protection, L.P., as they were listed on MW Builders, Inc.'s Designation Of Experts as "non-retained experts."

("Gov't Amend. Answer").   ECF No. 27.   The February 17, 2016 Amended Answer asserted counterclaims, based on: the Special Plea In Fraud, 28 U.S.C. § 2514; the anti-fraud provision of the Contract Disputes Act, 41 U.S.C. § 7103(c)(2); and the False Claims Act, 31 U.S.C. §§ 3729–3733.   ECF No. 27 at 1.   The Amended Answer also asserted the affirmative defenses of accord and satisfaction, and waiver.   ECF No. 27 at 1.

On February 22, 2016, MW Builders filed a Response To Defendant's Motion *In Limine*. ECF No. 29.   On February 23, 2016, the court convened a telephone status conference.   That same date, the Government filed a Status Report that detailed ongoing discussions with MW Builders to resolve the Government's January 29, 2016 Motion *In Limine* and requested that the court order MW Builders to produce any remaining waivers or releases.   ECF No. 30 at 5.   The Government also requested the court's leave to take a deposition of one of MW Builders' non-retained expert witnesses, pursuant to Rule of the United States Court of Federal Claims ("RCFC") 30(b)(6).   ECF No. 30 at 5.   On February 23, 2016, MW Builders filed a Status Report Noting The Parties' Agreement Pertaining To The Matters Subject To The Status Conference Scheduled For February 23, 2016.   ECF No. 31.

On March 2, 2016, the Government filed a Status Report Regarding Plaintiff's Expert Disclosure.   ECF No. 32.   That same date, MW Builders filed a Status Report Regarding Plaintiff's Expert Disclosure.   ECF No. 33.   On March 4, 2016, the Government filed a Status Report, indicating that the parties reached an agreement and the Government was withdrawing the January 29, 2016 Motion *In Limine*.   ECF No. 34.

On March 7, 2016, MW Builders filed a Response To Defendant's February 17, 2016 Motion To Amend.   ECF No. 35.   On March 15, 2016, the Government filed a Reply.   ECF No. 36.   That same date, MW Builders filed a Sur-Response To Defendant's Motion (ECF No. 37), and the Government filed a Response To Plaintiff's Sur-Response (ECF No. 38). On that date, the court issued an order granting the Government's February 17, 2016 Motion To Amend.   ECF No. 39.

On March 24, 2016, MW Builders filed: a Motion To Dismiss Defendant's Counterclaims, Pursuant to Rule 12(b)(6), And Alternative Answer To Defendant's Counterclaims (ECF No. 42); a Motion For Leave To Supplement Its Expert Report, Initial Exhibit List, And Initial Witness List To Respond To The Government's Late-Filed Fraud Counterclaim (ECF No. 43); and a Motion For Authorization Of Service Of Subpoenas More Than 100 Miles From The Place Of Trial (ECF No. 44); and a Request For A Status Conference (ECF No. 45).

On March 25, 2016, the Government filed Responses To MW Builders' March 24, 2016 Motion For Authorization Of Service Of Subpoenas and March 24, 2016 Motion To Supplement. ECF Nos. 46–47.   The Government also included a Cross-Motion *In Limine* To Deny Introduction Of Late Produced Documents At Trial.   ECF No. 47.   That same date, MW Builders filed a Reply. ECF No. 48.

On March 28, 2016, MW Builders filed a Reply to the Government's March 25, 2016 Response And Cross-Motion *In Limine*.   ECF No. 49.   On March 29, 2016, the Government filed a Reply In Support Of The Cross-Motion *In Limine*.   ECF No. 50.

On March 29, 2016, the Government filed a Motion For Extension Of Time To Serve Responses To Plaintiff's Interrogatories And Document Requests And For Leave To Take Deposition. ECF No. 51. That same date, the court issued an Order granting MW Builders' March 24, 2016 Motion For Leave To Supplement and denying the Government's March 25, 2016 Cross-Motion *In Limine*. ECF No. 52.

On March 31, 2016, the Government filed a Status Report Regarding Motion For Extension Of Time And For Leave To Take Deposition, explaining it was withdrawing the March 29, 2016 request for an extension of time to respond to MW Builders' interrogatories, but still was seeking leave to take a RCFC 30(b)(6) deposition of an unnamed fact witness. ECF No. 54. On April 5, 2016, the court issued a Scheduling Order that provided additional deadlines for discovery production. ECF No. 59. On April 8, 2016, MW Builders filed a Pre-Trial Submission that detailed MW Builders' proposed findings of fact, proposed conclusions of law, witness list, exhibit list, and preliminary objections. ECF No. 62. On April 12, 2016, MW Builders filed a Supplemental Disclosure Regarding Its Pre-Trial Filings that included an exhibit MW Builders inadvertently omitted from the April 8, 2016 Pre-Trial Submission. ECF No. 63.

On April 14, 2016, the Government filed a Status Report And Request For Status Conference to resolve a dispute regarding the trial schedule. ECF No. 64. On April 15, 2016, MW Builders filed a Response to the Government's April 14, 2016 Status Report. ECF No. 65.

On April 18, 2016, MW Builders filed the written direct testimony of Mr. Neil W. Miltonberger ("Miltonberger Direct") and attachments ("Miltonberger Direct Atts. 1–6.5"), together with the written direct testimony of Mr. Denny Lee ("Lee Direct") and a Second Supplemental Designation of Experts. ECF No. 68. On April 19, 2016, the Government filed Proposed Findings Of Fact And Conclusions Of Law. ECF No. 76.

On April 22, 2016, the Government filed a Motion *In Limine* To Preclude Privileged Trial Testimony Of Attorney Witnesses (ECF No. 78) and a Motion *In Limine* To Admit Into Evidence Plaintiff's Binding Admissions (ECF No. 79). On that same date, MW Builders filed a Motion *In Limine* (ECF No. 80) to exclude the expert testimony of Mr. Stephen Weathers and a Motion *In Limine* Regarding Any Evidence That Supports The Government's Fraud Allegations (ECF No. 81).

On April 25, 2016, the Government filed a Motion Regarding Procedural Matters At Trial, requesting that the court enter a proposed order governing witness disclosure. ECF No. 82. The Government also filed a Response to MW Builders' April 22, 2016 Motion To Exclude Expert Testimony. ECF No. 83. On that same date, MW Builders filed a Response to the Government's April 22, 2016 Motion To Exclude Privileged Testimony (ECF No. 84), as well as a Response to the Government's April 22, 2017 Motion To Admit Plaintiff's Binding Admissions (ECF No. 85).

On April 26, 2016, the parties filed a Joint Stipulations Of Trial And Pre-Trial Procedure. ECF No. 86. MW Builders also filed a Response to the Government's April 25, 2016 Motion Regarding Procedural Matters. ECF No. 87. On that same date, the Government filed a Response to MW Builders' April 22, 2016 Motion To Exclude Evidence Related To Fraud Claims. ECF No. 88. On that date, the Government also filed the Written Direct Testimony of Mr. Stephen Weathers, together with seven tabs ("Weathers Direct Tabs A–G"). ECF No. 89.

On April 27, 2016, the court issued an Order denying both of the Government's April 22, 2016 Motions *In Limine*, and both of MW Builders' April 22, 2016 Motions *In Limine*. ECF No. 90. The court also denied the Government's April 25, 2016 Motion Regarding Procedural Matters, as moot. On the same date, the Government filed a Revised Exhibit List. ECF No. 91. On April 28, 2016, MW Builders filed a Third Supplemental Exhibit List. ECF No. 92. On the same date, the parties filed a Joint Stipulations Of Fact. ECF No. 93.

On May 2, 2016, MW Builders filed a Fourth Amended Exhibit List. ECF No. 94. On the same date, the Government filed a Response to MW Builders' April 28, 2016 Third Supplemental Exhibit List and May 2, 2016 Fourth Amended Exhibit List. ECF No. 95.

A trial took place from May 4, 2016 to May 10, 2016 in Austin, Texas. TR at 1–1329. On May 9, 2016, and at the request of the court, the Government filed the Updated Written Direct Testimony of Mr. Stephen Weathers ("Weathers Rev. Direct"). ECF No. 96. At the close of trial, the court left the record open to allow both parties' experts to file supplemental damages testimony, if they wished to do so. TR at 1314.

On May 27, 2016, the Government filed an Unopposed Motion To Admit Into Evidence Deposition Exhibits, *i.e.*, the depositions of Mr. David Cimpl and Mr. Daniel Campbell. ECF No. 97.

On June 14, 2016, the court granted the Government's May 27, 2016 Motion and issued a Scheduling Order setting a deadline of August 1, 2016 for MW Builders to file a Post-Trial Proposed Findings Of Fact And Memorandum Of Law. ECF No. 108 at 1. The Order also set a deadline of September 1, 2016 for the Government to file the same. ECF No. 108 at 1.

On July 13, 2016, MW Builders filed an Unopposed Motion For Leave To Extend Post-Trial Briefing Deadlines to August 15, 2016 and for the Government's extension to September 15, 2016. ECF No. 110. On July 14, 2016, the court granted MW Builders' July 13, 2016 Motion.

On August 4, 2016, the Government filed a Response to MW Builders' March 24, 2016 Motion To Dismiss Counterclaims. ECF No. 111. On August 17, 2016, MW Builders filed a Motion To Enter Additional Evidence, *i.e.*, Mr. Neil Miltonberger's Supplemental Expert Report. ECF No. 114. On August 18, 2016, the parties filed a Joint Motion For Entry Of Order On Trial Exhibits. ECF No. 115. On August 19, 2016, MW Builders filed its Post-Trial Proposed Findings Of Fact And Memorandum Of Law ("Pl. Post Tr. Br."). ECF No. 116.

On August 26, 2016, MW Builders filed a Motion To Enter PX 679, PX 680, and PX 681 into evidence. ECF No. 118. The August 26, 2016 Motion asserted that the Government waived any objections to these exhibits at trial and failed to show how it would be prejudiced by their admission. ECF No. 118 at 2–6.

On September 2, 2016, the Government filed Responses To MW Builders' August 26, 2016 Motion (ECF No. 120) and MW Builders' August 17, 2016 Motion To Enter Additional Evidence (ECF No. 121). On September 9, 2016, MW Builders filed a Reply In Support Of The August 17, 2016 Motion To Enter Additional Evidence. ECF No. 122.

On December 8, 2016, after receiving 80 days of extensions, the Government filed its Proposed Findings Of Fact And Conclusions Of Law ("Gov't Post Tr. Br."). ECF No. 127.

On December 19, 2016, MW Builders filed a Motion For Leave To File Additional Post-Trial Briefing in response to the Government's December 8, 2016 Post-Trial Brief. ECF No. 128. On December 21, 2016, the Government also filed a Response To MW Builders' December 19, 2016 Motion. ECF No. 129. On the same date, the court granted MW Builders' December 19, 2016 Motion. ECF No. 130. On January 30, 2017, MW Builders filed a Reply To The Government's December 8, 2016 Proposed Findings Of Fact And Conclusions Of Law ("Pl. Post Tr. Reply Br."). ECF No. 131.

On February 28, 2017, the Government filed a Motion For Leave To File A Reply Brief. ECF No. 132. On March 21, 2017, the court issued an Order granting the Government's February 28, 2017 Motion. ECF No. 133. On March 31, 2017, the Government filed a Reply To Plaintiff's January 30, 2017 Brief ("Gov't Post Tr. Reply Br."). ECF No. 134.

On June 9, 2017, the court issued an Order granting MW Builders' August 17, 2016 Motion To Enter Additional Evidence and MW Builders' August 26, 2016 Motion For Leave To File Plaintiff's Exhibits PX 679–81. ECF No. 135. The June 9, 2017 Order also permitted the Government to file a Rebuttal Report prepared by the Government's expert, Mr. Stephen Weathers ("Weathers Rebuttal"). ECF No. 135.

## III.    DISCUSSION.

### A.    Subject Matter Jurisdiction.

The United States Court of Federal Claims has jurisdiction, under the Tucker Act, to adjudicate any claim arising under the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101–7109, and that has been submitted to a CO for a final decision. *See* 28 U.S.C. § 1491(a)(2) ( "The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41 . . . on which a decision of the contracting officer has been issued[.]"); *see also* 41 U.S.C. § 7104(b)(1) ("[I]n lieu of appealing the decision of a [CO] . . . to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims.").

The term "claim" is defined "as a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract." 48 C.F.R. § 52.233–1. Although a CDA claim need not be submitted in any particular form or use any particular wording, it must contain "a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987). The CDA also requires that the claim indicate to the CO that the contractor is requesting a "final" decision. *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1543 (Fed. Cir. 1996).

A claim "arises under" the CDA if it is based on,

> any express or implied contract . . . made by an executive agency for—(1) the procurement of property, other than real property in being; (2) the procurement of services; (3) the procurement of construction, alteration, repair, or maintenance of real property; or (4) the disposal of personal property.

41 U.S.C. § 7102(a).

In this case, the December 27, 2013 Complaint includes three CDA claims: Count One alleges that the Government breached the duties to cooperate and not hinder; Count Two alleges that the Government caused unreasonable delay; and Count Three alleges that the CO improperly classified the delay as non-compensable delay. Compl. ¶¶ 22–36. MW Builders requested the same relief for all three Counts; *i.e.*, $2,562,049.00 in damages and a 169-day extension of time. Compl. ¶¶ a–d.

MW Builders' August 19, 2016 Post-Trial Proposed Findings Of Fact And Memorandum Of Law characterizes Count One as "primarily rest[ing] on the implied duty of good faith and fair dealing." Pl. Post Tr. Br. at 6. The Government responds that the court does not have jurisdiction over any claim arising from a breach of the implied duty of good faith and fair dealing, because "[t]here is no mention of good faith" in MW Builders' May 15, 2013 Amended Certified Claim. Gov't Post Tr. Br. at 105 (citing *England v. The Swanson Grp., Inc.*, 353 F.3d 1375, 1379 (Fed. Cir. 2004) ("[J]urisdiction over an appeal of a contracting officer's decision is lacking unless the contractor's claim is first presented to the contracting officer and that officer renders a final decision on the claim."). MW Builders replies that the duty not to hinder and the duty to cooperate are both aspects of the implied duty of good faith and fair dealing and MW Builders' May 15, 2013 Amended Certified Claim put the Government on notice that MW Builders alleged a violation of that duty. Gov't Post Tr. Br. at 32 n. 145. In addition, the May 15, 2013 Amended Certified Claim stated that "[t]he failure of the Government to timely execute the Line Extension [A]greement implicated the Government[']s general duty to cooperate and to do nothing that unreasonably hinders the contractor's performance." JX 89 at 2. Therefore, the court construes Count One to allege a breach of the September 10, 2010 Contract and a violation of the duty of good faith and fair dealing. Regarding the latter, the United States Court of Appeals for the Federal Circuit has held that "[b]oth the duty not to hinder *and* the duty to cooperate are aspects of the implied duty of good faith and fair dealing." *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014) (emphasis added) (quoting *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 820 n.1 (Fed. Cir. 2010)). It also has held that the United States Court of Federal Claims may adjudicate a claim, if it arises from the "same operative facts" and requests "essentially the same relief," as a claim presented to the CO, even if the complaint at issue alleges a "slightly different legal theory." *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003). In addition, "[t]his standard . . . does not require rigid adherence to the exact language or structure of the original administrative CDA Claim." *Id.* Therefore, the fact that MW Builders' certified claim did not use the words "good faith" does not divest the court of jurisdiction to adjudicate this claim. *See Transamerica Ins. v. United States*, 973 F.2d 1572, 1578 (Fed. Cir. 1992) ("[C]ertain magic words need not be used and . . . the intent of the claim governs.").

For these reasons, the court has determined that it has jurisdiction to adjudicate the claims alleged in Count One of the December 27, 2013 Complaint.

Count Two of the December 27, 2013 Complaint alleges that the Army Corps' improper actions caused an "unreasonable delay." Compl. ¶ 28–32. The May 15, 2013 Amended Certified Claim alleges that the Government "unreasonably hinder[ed] the contractor's performance" and that, "for reasons not totally known to MW Builders, the Line Extension Agreement went unsigned for 6 months after MW Builders presented it to the Government for execution[.]" JX 89 at 2. As such, Count Two of the Complaint arises from the "same operative facts" as those presented in the May 15, 2013 Amended Certified Claim. *See Scott Timber Co.*, 333 F.3d at 1365.

For these reasons, the court has also determined that it has jurisdiction to adjudicate the claims alleged in Count Two of the December 27, 2013 Complaint.

Count Three alleges the CO's decision improperly classified the cause of the delay. The court considers this Count to be redundant. Therefore, the discussion of MW Builders' claims will concern only the legal injuries alleged in Counts One and Two.

### B.      Standing.

The United States Supreme Court has held that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Standing must be determined "as of the commencement of suit[.]" *Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 570 n.5, (1992)). "The party invoking federal jurisdiction bears the burden of establishing [standing]." *Lujan*, 504 U.S. at 561. The United States Supreme Court held in *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167 (2000) that, to establish standing,

> a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id*. at 180–81.

In addition, "[t]o have standing to sue the sovereign on a contract claim, a plaintiff must be in privity of contract with the United States." *Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003). In other words, the contract in issue must be between the plaintiff and the Government. *See Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990) ("To maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the [G]overnment.").

It is undisputed that MW Builders was in privity of contract with the Government. Compl. ¶ 4 ("MW Builders and the Government, acting by and through [the Army Corps], are parties to a firm, fixed price Contract No. W912 QR-10-C-0078 . . . for the construction of a new Army Reserve Center in Las Vegas, Nevada[.]"). The December 27, 2013 Complaint also alleges that

MW Builders incurred financial injury that is concrete, particularized, and fairly traceable to the Army Corps' actions. And, any financial injury established by MW Builders can be addressed by a monetary award.

For these reasons, the court has determined that MW Builders has standing to seek an adjudication of the claims alleged in Count One and Count Two of the December 27, 2013 Complaint.

### C.  Plaintiff's Claims Against The Government.

Count One of the December 27, 2013 Complaint alleges that the Army Corps violated the duty of good faith and fair dealing and Count Two alleges that the Government caused an unreasonable delay. Compl. ¶¶ 22–31. The gravamen of the December 27, 2013 Complaint is: (1) the September 10, 2010 Contract required the Army Corps to sign the Line Extension Agreement with NV Energy; (2) the Army Corps failed to secure easements, as required by the September 10, 2010 Contract, and did not sign the Line Extension Agreement in a timely manner, thereby breaching the September 10, 2010 Contract; and (3) the Army Corps eventually changed its position, but nevertheless violated the duty of good faith and fair dealing in its discussions with NV Energy that substantially delayed MW Builders' work on the Project.

### 1.  The September 10, 2010 Contract Required The United States Army Corps Of Engineers To Sign The Line Extension Agreement With NV Energy.

#### a.  Plaintiff's Argument.

The parties agree that the September 10, 2010 Contract was ambiguous as to which party was required to sign the Line Extension Agreement with NV Energy. Pl. Post Tr. Br. at 7; *see also* TR at 104 (Government's counsel conceding that the September 10, 2010 Contract was ambiguous as to the Line Extension Agreement). Therefore, the court must look to extrinsic evidence of the parties' intent as to which party was responsible for signing the Line Extension Agreement. Pl. Post Tr. Br. at 7–8 (citing *D'Andrea Bros. LLC v. United States*, 96 Fed. Cl. 205, 219 (Fed. Cl. 2010)).

Prior to issuing the Solicitation, the Army Corps, Mason & Hanger, and the 63rd RSC, began to work on the "Design Phase" of the Project. TR at 16, 27, 159 (Probst). During the Design Phase, each of these entities refused to sign NV Energy's Design Initiation Agreement. PX 45 at GOV_17874–75. As a result, Mason & Hanger, *sua sponte*, amended Contract Drawing ES-002 to require the construction contractor to sign the Design Initiation Agreement. Pl. Post Tr. Br. at 31–32. Thereafter, in a May 6, 2009 memorandum, NV Energy, the utility, advised all concerned that a signed Line Extension Agreement was required before permanent power would be provided and nothing in Contract Drawing ES-002 changed that obligation. PX 4; *see also* DX 6 at 4 (5/6/09 Memorandum).

At trial, the witnesses agreed that Line Extension Agreements and similar types of contracts typically are formed between utilities and the owners/end users of new construction, not between utilities and the contractor. Pl. Post Tr. Br. at 8–12. For example, Robert Caskie, an Army Corps

employee, openly hostile to MW Builders' claim,[22] confirmed this was a standard industry practice. TR at 403–05 (Caskie). In addition, Mr. Kevin Finley, the Army Corps attorney who negotiated the final Line Extension Agreement between the Army Corps and NV Energy, testified that NV Energy's "typical way of doing business" was for the end-user to sign the Line Extension Agreement. TR 1077–78 (Finley). MW Builders' conduct throughout the performance of the contract also evidences its understanding, consistent with industry practice, that the September 10, 2010 Contract assigned responsibility for signing the Line Extension Agreement to the Army Corps or Army Reserve. Pl. Post. Tr. Br. at 12–16. The Contract only required MW Builders to "coordinate" with NV Energy, provide specific information about power needs, and sign the Design Initiation Agreement. TR at 335–36 (Herriott). As such, when MW Builders received the Line Extension Agreement, it "immediately" recognized that Agreement was the responsibility of the end-user. TR at 355 (Herriott), 451 (Matson). For this reason, beginning in March 2012, MW Builders first advised and then actively and continually complained that the Army Corps' failure to execute this Agreement interfered with and delayed progress on the Project. PX 528.

All of this evidence demonstrates that the parties did not intend the Contract to require MW Builders to negotiate, sign, or be responsible for the Line Extension Agreement. Pl. Post Tr. Br. at 37. MW Builders adds that the plain language of the Contract requires only that MW Builders: (1) build the Project in such a way as to meet NV Energy's Technical Requirements; and (2) sign the Design Initiation Agreement. Pl. Post Tr. Br. at 40 (citing PX 422 at 3). There is no express requirement that MW Builders sign a Line Extension Agreement. Pl. Post Tr. Br. at 40 (citing PX 422 at 3). Nor can the Contract reasonably be read as requiring MW Builders to sign the Line Extension Agreement, because the term was for five years, *i.e.*, 1,826 days; the term of the construction Contract was only 660 days. *Compare* PX 449 ¶ 14.1 ("This [Line Extension] Agreement . . . will continue for a term of five (5) years[.]"), *with* PX 52 at GOV_12823 ("The Contract shall . . . complete [performance] within 660 calendar days[.]").

In addition, the canon of *expressio unius est exclusio alterius*, *i.e.*, "the expression of one thing is the exclusion of the other," is relevant, because the September 10, 2010 Contract required that MW Builders sign a Design Initiation Agreement, but does not mention the Line Extension Agreement. Pl. Post Tr. Br. at 46–47; *see also Design & Prod., Inc. v. United States*, 18 Cl. Ct. 168, 198–99 (Fed. Cl. 1989) (determining that a theater construction contract that expressly required installation of seats implicitly did not require construction of interior walls, under the doctrine of *expressio unius est exclusio alterius*). Likewise, it is well established that government contracts that contain latent ambiguities are construed against the Government. *See SIPCO Servs. & Marine, Inc. v. United States*, 41 Fed. Cl. 196, 215–16 (Fed. Cl. 1998) (determining that contractor's reasonable interpretation of latently ambiguous contract should be construed against the Government). Therefore, MW Builders reasonably interpreted the latent ambiguity in the

---

[22] Mr. Caskie explained that, when he worked as a CO, he regularly saw contractors file "frivolous claims." TR at 410–11 (Caskie). According to Mr. Caskie, MW Builders also had multiple issues on the site, but chose to use the issues related to permanent power "to their advantage to support their attempt to get back moneys" they lost on the project. TR at 418–19 (Caskie).

September 10, 2010 Contract concerning the Line Extension Agreement, not to require assumption of that responsibility.  Pl. Post Tr. Br. at 49.

Finally, the Government's argument about the Line Extension Agreement is "riddled with myopic inconsistency."  Pl. Post Tr. Br. at 16.  Initially, the Army Corps decided the 63rd RSC was required to sign the Agreement; after the 63rd RSC refused, the Army Corps attempted to convince MW Builders to sign the document.  Pl. Post Tr. Br. at 16.  After MW Builders refused, the Army Corps considered having multiple signers, before stepping up to the plate and signing the Agreement.  Pl Post Tr. Br. at 16.  The fact that the Army Corps' position shifted so many times evidences that the Army Corps was well aware that MW Builders was not required to sign the Line Extension Agreement.  Pl. Post Tr. Br. at 19, 28–29.  As MW Builders argued, "how a party applies a contract during the performance period of a contract is evidence of how a party interprets the contract," and "how a party interprets a contract is good evidence of what that party intended that contract to mean."  Pl. Post Tr. Br. at 28–29.

### b.    The Government's Response.

The Government responds that MW Builders offered "no evidence" at trial that the September 10, 2010 Contract required the Army Corps to sign the Line Extension Agreement.  Gov't Post Tr. Br. at 108.  The plain language did not impose any permanent power-related obligations on the Government.  Gov't Post Tr. Br. at 108.  In fact, Contract Drawing ES-002 expressly required MW Builders to provide a "complete and working electrical system" at the Project, *i.e.*, MW Builders needed to ensure that NV Energy would extend a line to the Project.  Gov't Post Tr. Br. at 110.

The Government agrees that the September 10, 2010 Contract is ambiguous, but the extrinsic evidence shows that the parties intended MW Builders to be responsible for the Line Extension Agreement.  Gov't Post Tr. Br. at 110–11.  This is so, because MW Builders was required to provide a complete and working electrical system and doing so required the execution of a Line Extension Agreement.  Gov't Post Tr. Br. at 111.  And, multiple witnesses testified that they had no knowledge about the Line Extension Agreement during the Design Phase.  Gov't Post Tr. Br. at 111–12.

In addition, the course of performance supports a finding that MW Builders was required to execute the Line Extension Agreement, because Contract Drawing ES-002 required MW Builders to coordinate with NV Energy and, pursuant to that obligation, MW Builders signed the Design Initiation and Design Approval Agreements with NV Energy.  Gov't Post Tr. Br. at 113.  For this reason, the Army Corps executed an "NV Energy Consultant/Third Party Contact Authorization Form," authorizing MW Builders to be NV Energy's "sole contact" with respect to the Project work.  Gov't Post Tr. Br. at 113; *see also* DX 30 (3/29/11 Contact Authorization Form).  Although MW Builders argues that Line Extension Agreements typically are signed by owners, and not by construction contractors, that does not mean all such agreements *need* to be signed by property owners.  Gov't Post Tr. Br. at 114.

Moreover, interpreting the Contract to require that the Government was responsible for entering the Line Extension Agreement would render the September 10, 2010 Contract invalid under the Anti-Deficiency Act, 31 U.S.C. § 1350.  Gov't Post Tr. Br. at 116.  Under that Act, the

Government cannot lawfully enter into obligations for which there is no appropriation from Congress.  Since the Line Extension Agreement includes open-ended provisions regarding future events, the Government could not sign the agreement without violating that Act.  Gov't Post Tr. Br. at 116–17.

    **c.**        **The Court's Resolution.**

            **i.**        **The September 10, 2010 Contract Contains A Latent Ambiguity Regarding Which Party Was Responsible For Signing The Line Extension Agreement With NV Energy.**

Contract interpretation is a question of law.  *See NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).  In interpreting a contract, the court begins with the language of the agreement.  *Id.*  ("Contract interpretation begins with the language of the agreement."); *see also C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1543 (Fed. Cir. 1993) ("A contract is read in accordance with its express terms and the plain meaning thereof.").  "When the contract's language is unambiguous it must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provision." *TEG-Paradigm Envtl. Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (quoting *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003)).  If a contractual provision is susceptible to more than one reasonable interpretation and is ambiguous, the court should consult extrinsic evidence to determine the parties' intent.  *See Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986) ("It is a generally accepted rule . . . that if a contract is reasonably susceptible of more than one interpretation, it is ambiguous."); *see also Metro. Area Transit, Inc. v. Nicholson*, 463 F.3d 1256, 1260 (Fed. Cir. 2006) ("Having found the contract ambiguous, we may appropriately look to extrinsic evidence to aid in our interpretation of the contract.").

When contract language is ambiguous, the court must determine whether "that ambiguity was patent so as to impose a duty to seek clarification, or only latent." *Interwest Constr. v. Brown*, 29 F.3d 611, 614 (Fed. Cir. 1994); *see also Newsom v. United States*, 676 F.2d 647, 649 (Ct. Cl. 1982) ("If a patent ambiguity is found in a contract, the contractor has a duty to inquire of the contracting officer the true meaning of the contract before submitting a bid.").  Whether an ambiguity is patent or latent is a question of law.  *See Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1996).  When the ambiguity is patent, United States Court of Appeals for the Federal Circuit precedent requires a departure from the ordinary rule of *contra proferentem*, under which ambiguities in government contracts are construed against the drafter, *i.e.*, the Government.  *See Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999) ("The doctrine of patent ambiguity is an exception to the general rule of *contra proferentem* which construes an ambiguity against the drafter[.]").

A patent ambiguity has been defined as "an obvious omission, inconsistency, or discrepancy of significance." *Beacon Constr. Co. v. United States*, 314 F.2d 501, 504 (Ct. Cl.

1963).[23]  In contrast, a latent ambiguity is "neither glaring nor substantial nor patently obvious" on the face of the contract document.  *See Grumman Data Sys. Corp.*, 88 F.3d at 997 (quoting *Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir. 1993) (explaining that latent ambiguities arise in the "grey area between the point . . . at which a document requires more exacting language and that at which additional detail will add nothing but worthless surplusage[]")).  Therefore, a latent ambiguity usually is not apparent unless there is a dispute.  *See Latent Ambiguity*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("An ambiguity that does not readily appear in the language of a document, but instead arises from a collateral matter once the document's terms are applied or executed").

The reason that the September 10, 2010 Contract is ambiguous as to which party was required to sign the Line Extension Agreement, is because the language of Contract Drawing ES-002 is subject to more than one reasonable interpretation.  As MW Builders argues, it is reasonable to read Contract Drawing ES-002 as not requiring MW Builders to sign the Line Extension Agreement, because there is no express instruction requiring MW Builders to sign it.  TR at 104; *see also* Gov't Post Tr. Br. at 110 ("Contract Drawing ES-002 does not expressly say which party was to execute the Line Extension Agreement; the drawing itself does not refer to a 'Line Extension Agreement.'  In that respect, it is ambiguous.")

Contract Drawing ES-002 begins by stating that the "Contractor is responsible for providing all electric infrastructure, equipment, and wiring for the Project unless specifically noted as provided by NV Energy in the division of responsibility."  DX 14.  But, this requirement speaks only to physical construction requirements.  The "Division of Responsibility (Power)" table that accompanies the text lists a number of physical items to be constructed, *e.g.*, a "transformer," a "transformer pad," a "primary duct bank," and a "secondary duct bank;" it does not discuss the execution of documents.  DX 14.  Next, Contract Drawing ES-002 states that the "Contractor shall contact NV Energy prior to bidding to verify that NV Energy will provide everything noted in the table below."  DX 14.  This clause also unambiguously concerns only the physical construction requirements, reflected in the Division of Responsibility table.  The sentence immediately following, however, provides that "Contractor is responsible for providing a complete and working electrical system, and shall include all costs in this bid."  DX 14.  It is here that ambiguity arises, because "complete and working electrical system" can be read as requiring more than just building the physical items listed in the Division of Responsibility table.  But, this ambiguity is "latent," because nothing "obviously [is] omitted" from the surrounding language and it is not inconsistent with the surrounding sentences.  "All costs," reasonably could be interpreted as relating to all costs incurred by MW Builders' to facilitate the installation of electrical power, *e.g.*, building the ducts and paying the fee associated with the Design Initiation Agreement.  In any event, the issue of responsibility for signing the Line Extension Agreement did not arise until March 19, 2012, when the Army Corps changed its view that the responsibility was the 63rd RSC's and instead insisted that MW Builders was responsible for signing this document.  *Compare* JX 44 at 1 (3/13/12 conference call summary, wherein parties agreed that the Line Extension Agreement "will be executed between NV Energy and 63D RSC such that staging of equipment can start on or about 19 March 2012"), *with* PX 60A (3/19/12 conference call summary, wherein Army Corps

_____

[23] The United States Court of Appeals for the Federal Circuit has held that United States Court of Claims decisions issued prior to September 30, 1982, are binding precedent. *See S. Corp. v. United States*, 690 F.2d 1368, 1369 (Fed. Cir. 1982).

announced intention to "consider an arrangement whereby . . . MW Builders may enter the agreement with NV Energy").

Contract Drawing ES-002 also provides that "The electrical distribution system shown on the plans is the preliminary layout discussed with NV Energy during the project design and may not match the final design required by NV Energy. Electrical manholes are not shown, but shall be provided per NV Energy requirements. The electrical design must be coordinated with the communications design provided[.]"  DX 14 at 1. This language also does not require MW Builders to enter into any contracts with NV Energy.   Although the Government placed considerable emphasis on the term "coordinate," as the court observed during trial: "[c]oordinate doesn't mean to enter into a contract." TR at 414. The term "coordinate," in this context, means that the electrical work had to be coordinated with the telecommunications work performed, in accordance with the communications design. DX 14 at 1.[24]

The next sentence appears to require MW Builders to enter into a contract with NV Energy: "The contractor will be required to sign a Design Initiation Agreement with NV Energy and pay fees as shown in the bid schedule." DX 14 at 1. This language, however, refers to the fact that MW Builders was responsible to sign *that* specific contract.  The fact that there was no mention of the Line Extension Agreement was not necessarily an "obvious omission." *See Beacon Constr.*, 314 F.2d at 504. Instead, "when parties list specific items, without any more general or inclusive term, they intend to *exclude similar items*, even though they are similar to those listed." 2 E. ALLEN FARNSWORTH, FARNSWORTH ON CONTRACTS § 7.11 at 293–94 (3d ed. 2004) (emphasis added). In this case, Contract Drawing ES-002 required MW Builders only to sign one specific type of agreement with NV Energy, but did not require MW Builders to enter into "contracts" with NV Energy. Therefore, a reasonable construction contractor could read Contract Drawing ES-002 as requiring MW Builders only to sign the Design Initiation Agreement.  To require MW Builders to sign more than just the Design Initiation Agreement, the Army Corps could have required MW Builders to "enter into any agreements necessary for the provision of permanent power" or otherwise be required to "contract with" NV Energy to provide such power.  Instead, Contract Drawing ES-002 requires that "[t]he contractor shall contact NV Energy and determine the scope and costs of this work prior to submitting a *proposal*.  The contractor's *proposal* shall include all work and all costs associated with providing electrical power for the project." DX 14 at 1 (emphasis added). This, however, was not a directive to MW Builders to sign the Line Extension Agreement.

Contract Drawing ES-002 expressly requires MW Builders to provide "all electric infrastructure, equipment, and wiring for the Project." DX 14 at 2. Contract Drawing ES-002 also requires MW Builders to provide "a complete and working electrical system." DX 14 at 2. In addition, Contract Drawing ES-002 requires the contractor to "contact" NV Energy and "obtain written documentation of all transactions with NV Energy and provide them to the [Army Corps]." DX 14 at 2. But, this contractual provision could be interpreted to require MW Builders to serve as a middleman between the Army Corps and NV Energy. Contract Drawing ES-002 further

---

[24] Contract Drawing ES-002 also included a "Division of Responsibility (Embarq)," that governed the telecommunications aspect of the Project; telecommunications were to be provided by Embarq, a utility company.  DX 14 at 1.

provides that "The contractor is responsible for all guidelines and requirements within Nevada Power Company's [*i.e.*, NV Energy's] Electric Service Requirements, which can be found on their website below." DX 14 at 2. But, this sentence requires MW Builders to abide by the "Electrical Service Requirements," found at the website: a 432 page document consisting of technical requirements related to construction, including, "how deep power lines need to be buried." TR at 459 (Matson); *see also* PX 680. The term "Line Extension Agreement" does not appear anywhere in this document. PX 680.

For these reasons, the court has determined that the September 10, 2010 Contract is ambiguous as to which party was responsible for signing the Line Extension Agreement, but that ambiguity was latent.

> **ii.    Extrinsic Evidence Of Intent Demonstrates That The United States Army Corps Of Engineers Was Responsible For Signing The Line Extension Agreement With NV Energy.**

Because there was a latent ambiguity in the September 10, 2010 Contract as to which party was required to sign the Line Extension Agreement, the rule of *contra proferentem* applies, meaning that any ambiguity may be construed against the Army Corps. That rule, however, is one "of last resort" and should be applied only if the ambiguity cannot be reconciled after "looking to the circumstances attending the transaction and the circumstances under which [the parties] executed the contract." *See Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1352 (Fed. Cir. 2006) (quoting *Chris Berg, Inc. v. United States*, 455 F.2d 1037, 1044 (Ct. Cl. 1972)). Therefore, "before resorting to the doctrine of *contra proferentem*, [the court] 'may appropriately look to extrinsic evidence'" to aid in the interpretation of the contract. *See Gardiner*, 467 F.3d at 1352 (quoting *Metro. Area Transit, Inc.*, 463 F.3d at 1260).

As a threshold matter, the Government argues that there is "no evidence" that the Army Corps was "specifically aware of the Line Extension Agreement prior to Contract award." Gov't Post Tr. Br. at 110. The trial testimony about the pre-award "Design Phase" of the contract supports this assertion: Army Corps and Mason & Hanger witnesses testified that, during the Design Phase, they were concerned with the Design Initiation Agreement and not with the Line Extension Agreement. TR at 16–17 (Probst); TR at 975–78 (Miller). In addition, although the May 9, 2009 letter attached to the draft Design Initiation Agreement mentioned a "Line Extension Agreement," it was in the context of requiring the applicant for permanent power to "sign one or more of the following agreements: Line Extension Agreement (LEA); Large Project Service Agreement (LPS Agreement); Contribution in Aid of Construction Agreement (CIAC Agreement); Non-Refundable Construction Agreement (NRCA)." DX 6 at 5. Consequently, it appears that the Army Corps was not aware of the significance of the Line Extension Agreement before awarding the September 10, 2010 Contract to MW Builders. But, any assertion that the Army Corps was not aware of the Line Extension Agreement, and nevertheless intentionally bargained for MW Builders to sign that Line Extension Agreement, is logically inconsistent. In other words, the Army Corps cannot insist on a requirement, if it was not aware the requirement existed. Recognizing the flaw in its reasoning, the Government next argues that since the September 10, 2010 Contract did not expressly require the Army Corps to sign the Line Extension Agreement, that obligation fell on MW Builders. Gov't Post Tr. Br. at 108–09. This argument is

not supported by any evidence and ignores the fact that the Army Corps was aware of industry practice. *See, e.g.*, *Jowett, Inc. v. United States*, 234 F.3d 1365, 1369 (Fed. Cir. 2000) (explaining that the court may look to industry practice where a "term with an accepted industry meaning [was] omitted from the contract"). In this case, both NV Energy and Army Corps witnesses testified that it was industry practice for building owners of new construction ("end users") to execute Line Extension Agreements. Ms. Risse, the NV Energy in-house attorney responsible for negotiating Line Extension Agreements,[25] testified that NV Energy typically required "the ultimate end user to be the counterparty," because "there are ongoing obligation[s] that survive the termination of the contract, and it's a five year contract." TR at 584 (Risse). Likewise, Mr. Finley, the Army Corps attorney responsible for negotiating the Line Extension Agreement, testified that NV Energy's "typical way of doing business" was for the "end user" to enter into the Agreement, and it was for that reason that NV Energy originally drafted the Line Extension Agreement for the 63rd RSC to sign. TR at 1078 (Finley).

It is true that Ms. Creveling, another NV Energy employee, testified that NV Energy once entered into a Line Extension Agreement with a contractor, instead of the Government end-user, but this occurred on a "much smaller" project.[26] TR at 1013–14 (Creveling). And, the testimony of other witnesses confirmed that situation was an exception, not the rule. TR at 343 (Herriott). Moreover, Mr. Rial, a twenty-three-year veteran of NV Energy who now provides consulting services for companies contracting with NV Energy, testified that he could not remember a situation where a contractor signed the Line Extension Agreement. TR at 462, 469–70 (Rial). This makes sense, because the Line Extension Agreement governs utility payments for at least a five-year term—long after the construction contractor's work is over. TR at 473 (Rial) ("A Line Extension Agreement is the contract between the utility and the owner on how the money is to be collected, the breakdown on the money, and then, also, how the moneys will be refunded[.]").

The bottom line is the Army Corps could have contracted to depart from ordinary industry practice by expressly placing the obligation to enter into a utility contract on the contractor.[27] But, the Army Corps did not do so and apparently was not aware of the fact that NV Energy would require a signed Line Extension Agreement from the Project's end-user. Under these circumstances, the court declines to supply an omitted term that departs from ordinary industry practice, without evidence of pre-contract intent to include such a term. Instead, the court has determined that the parties agreed to follow the typical industry practice with respect to the Line

---

[25] Ms. Risse was responsible for "tak[ing] the lead" on contract negotiations during the ten years she was employed by NV Energy. TR at 578–80. Ms. Risse negotiated the July 12, 2012 Line Extension Agreement executed between the Army Corps and NV Energy in this case. TR at 599–600 (Risse).

[26] Ms. Creveling was unable to find any past projects of similar scope to this Project where the Line Extension Agreement was executed by the contractor, instead of the end user. TR at 1014 (Creveling).

[27] In fact, the Army Corps did seek to contract out of industry practice in a subsequent solicitation, by including a provision that "[t]he Contractor must also sign the Line Extension Agreement provided by Nevada Energy." PX 274 at GOV_00049373.

Extension Agreement, placing that contractual obligation on the Army Corps in its capacity as Project Manager and agent for the 63rd RSC by virtue of its signature on the September 10, 2010 Contract.[28]

The parties' performance also evidences that there was no agreement that MW Builders was required to sign the Line Extension Agreement. Prior to any controversy regarding the Line Extension Agreement, the Army Corps restricted MW Builders' ability to negotiate contract changes on behalf of the Army Corps, by modifying the terms of NV Energy's Third Party Authorization Form. *Compare* JX 14 at 11 (Unsigned and undated Third Party Authorization Form draft, providing that MW Builders would have authority to "communicate and authorize all change requests"), *with* PX 15 (3/29/11 Third Party Authorization Form, including Government modifications, deleting "and authorize"). Other paperwork filled out by MW Builders identified the Army Corps as the "Customer/Legal Owner" of the Project. PX 15 (3/29/11 Third Party Authorization Form); PX 567 (3/29/11 Project Information Sheet). Similarly, on the April 27, 2011 Design Initiation Agreement, the Army Corps was identified as the "Applicant" for permanent power. JX 19 at 10.

In addition, when NV Energy sent the Line Extension Agreement to MW Builders and the Army Corps, all parties held a March 13, 2012 conference call together with the 63rd RSC and concluded that the Agreement should be signed by the 63rd RSC. JX 44 at 1 ("The contract will be executed between NV Energy and 63D RSC such that staging of equipment can start on or about 19 March 2012."). The fact that the Army Corps first took the Line Extension Agreement to the 63rd RSC is inconsistent with the Army Corps' later claim that MW Builders was responsible for entering into the Line Extension Agreement. TR at 1077 (Finley). It was only after the 63rd RSC refused to sign the Line Extension Agreement that the Army Corps took the position that it was MW Builders' responsibility. PX 501 at GOV_00005389 (Mr. Musgrave's email that: "I really don't know why MW cannot sign the contract as they a[re] paying the fee and the cost for service until it is acceptable.").[29]

In any event, the Army Corps changed its position as to which party was obligated to sign the Line Extension Agreement and the CO never issued a directive ordering MW Builders to sign it. PX 528; TR at 1132 (Ringstaff) ("[i]f the contractor feels that something is out of the scope and [the Army Corps] feel[s] like it is in scope, we can direct them to do the work."). And, as Mr. Probst explained in his June 29, 2012 email, the CO refused to take this step, because doing so "would expose the Government to a potential Request for Equitable Adjustment (REA) and a contract ratification if an REA was upheld." PX 294. In short, the Army Corps refused to order MW Builders to sign the Line Extension Agreement, because it was cognizant that doing so would entitle MW Builders to a Request for Equitable Adjustment. Therefore, the extrinsic evidence

---

[28] The Army Corps was the owner of the property while the Project was under construction, and was designated as "the construction agent/property holder until construction completion/ beneficial occupancy." DX 37 at 30.

[29] Mr. Musgrave subsequently advised that the Army Corps should "[m]ake them [*i.e.*, MW Builders] do it and let the chips fall where they may." PX 27.

demonstrates that the parties did not intend for MW Builders to sign the Line Extension Agreement with NV Energy, but instead agreed to follow the industry practice of having the end user sign.

Finally, the Government argues that the September 10, 2010 Contract could not have placed responsibility for the Line Extension Agreement on the federal government, because it would be unenforceable under the Anti-Deficiency Act. Gov't Post Tr. Br. at 116 (citing 31 U.S.C. § 1350 (imposing criminal sanctions for knowingly spending funds in excess of those appropriated by Congress)). It is true that certain sections of the Line Extension Agreement obligated payments that were not in sum certain for future years and the Anti-Deficiency Act only allows spending that is authorized by Congress. JX 72 at 5 (Draft Line Extension Agreement providing that applicant's refund could be reduced via an "Allowance True-Up"). The Army Corps, however, removed those provisions prior to finally executing the July 23, 2012 Line Extension Agreement with NV Energy. *Compare* JX 72 at 5 (6/20/12 draft Line Extension Agreement providing for a potential reduction of an Applicant's refund via an "Allowance True-Up"), *with* JX 94 at 125 (7/23/12 executed Line Extension Agreement intentionally omitting "Allowance True-Up" provisions). Therefore, the fact that the *draft* Line Extension Agreement included language to which Army Corps could not have agreed, is irrelevant since the September 10, 2010 Contract did not include any terms contrary to the Anti-Deficiency Act.

For these reasons, the court has determined that the Army Corps was obligated to sign the Line Extension Agreement and breached the September 10, 2010 Contract by failing to do so in a timely manner.

### 2. The United States Army Corps Of Engineers Violated The Duty Of Good Faith And Fair Dealing Causing An Unreasonable Delay To The Project.

#### a. Plaintiff's Argument.

MW Builders argues that the duties to cooperate and not to hinder are two "sub-duties" of the broader duty of good faith and fair dealing. Pl. Post. Tr. Br. at 107. In this case, MW Builders had a reasonable expectation that the Army Corps would not hinder or interfere with MW Builders' Project Schedule. Pl. Post. Tr. Br. at 108.

The Army Corps first unreasonably failed to secure necessary easements, despite representing in the September 10, 2010 Contract that offsite property rights would be available to MW Builders so permanent power could be connected to the Project site. Pl. Post Tr. Br. at 111. In addition, the Contract Drawings provided by the Army Corps indicated that MW Builders would be able to build offsite ductbanks at the intersection of Arville Street and Ray Way (the "Arville Hub"), and then work with NV Energy to "pull" a utility wire to the Project site. Pl. Post Tr. Br. at 61 (citing PX 267). Although the Contract Drawings suggested that MW Builders would be able to perform construction work in this area, MW Builders subsequently learned that the Army Corps failed to secure the necessary easements for MW Builders to construct the necessary offsite ductbanks. Pl. Post Tr. Br. at 62 (citing JX 26). MW Builders raised this issue with the Army Corps in July 2011, but the Army Corps did not resolve the issue until March 2012. Pl. Post Tr. Br. at 67. In fact, the Army Corps recognized that failure to secure the easements was a "big goof" and, under ordinary circumstances, the Army Corps would work to secure the necessary easements

before opening up a project to bidding.  Pl. Post Tr. Br. at 63 (citing PX 239); *see also* TR at 378–79 (Caskie) ("I wouldn't have let the bids be open if I knew there [were] real estate issues[.]"). Therefore, the Army Corps acted unreasonably when it took months to resolve the easements issue, despite knowing of its critical importance.  Pl. Post Tr. Br. at 111.

NV Energy also needed to inspect MW Builders' ductbank work before pulling a wire to connect the Project site to the utility grid.  Pl. Post Tr. Br. at 65 (citing PX 453, JX 26).  This required permission from the Army Corps so NV Energy provided both with an "Access To Equipment Agreement" in September 2011.  Pl. Post Tr. Br. at 67 (citing PX 18).  But, the Army Corps decided that it could not agree to several provisions in the Access To Equipment Agreement. PX 18 (2/28/12 email regarding Access To Equipment Agreement).  The Army Corps, however, did not inform MW Builders and NV Energy of its disagreement with those provisions until February 28, 2012, *i.e.*, several months after first receiving that Agreement.  PX 18.  Although none of this delay directly affected MW Builders' critical path, the Army Corps' failure to secure the necessary easements and extended negotiations about NV Energy's Access To Equipment Agreement narrowed the window within which a Line Extension Agreement could be executed, without pushing tasks onto the critical path that would delay the Project.  Pl. Post Tr. Br. at 70. Consequently, when the Army Corps later failed to sign the Line Extension Agreement in a timely manner, the resulting delay had a considerably greater impact on the Project's completion date than it otherwise would have had.  Pl. Post Tr. Br. at 70.

Most importantly, during the March 13, 2012 conference call, when the Line Extension Agreement was first discussed with NV Energy and MW Builders present, the Army Corps stated that the 63rd RSC would sign the Line Extension Agreement.  Pl. Post Tr. Br. at 74 (citing JX 44). But, the Army Corps changed its position and later insisted that MW Builders was responsible for signing the Line Extension Agreement.  Pl. Post Tr. Br. at 76–77 (citing PX 501, at GOV_5390). The Army Corps' bad faith is also evidenced by the fact that on March 19, 2012, the Army Corps purposely excluded MW Builders from a second conference call with NV Energy, when it explained the Army Corps intended to make MW Builders sign the Line Extension Agreement. Pl. Post Tr. Br. at 77 (citing TR at 85 (Probst)).

MW Builders, however, was completely candid as it informed the Army Corps on numerous occasions that it would not sign the Line Extension Agreement.  Pl. Post Tr. Br. at 78–84 (citing TR at 182 (Musgrave), 198 (Probst); PX 528; JX 58).  Nevertheless, on April 26, 2012, the Army Corps made misleading and confusing statements to NV Energy, to make it appear that MW Builders would be the counterparty to the Line Extension Agreement.  Pl. Post Tr. Br. at 85 (citing JX 61).  And so, negotiations dragged on.  Pl. Post Tr. Br. at 85–86.  It was not until June 21, 2012, that Ms. Risse, NV Energy's Representative, was clearly informed that the Army Corps, instead of MW Builders, would sign the Line Extension Agreement.  Pl. Post Tr. Br. at 89 (citing TR at 597 (Risse)).

The "contemporaneous project schedules [also] establish the duration and causation" of the "critical path" delay caused by the Army Corps' violation of the duty of good faith and fair dealing. Pl. Post Tr. Br. at 93.  MW Builders began work by creating an initial "baseline schedule."  TR at 509–10 (Stone).  As the Project progressed, MW Builders' schedule was updated on a monthly basis and was reviewed by Management Solutions, the third party scheduling consultant retained by the Army Corps.  TR at 512 (Stone).  The February 2012 updated critical path schedule showed

that the Project would be completed 27 days ahead of schedule.  PX 336.  By the March 2012 Update, however, the lack of permanent power caused a delay and the updated schedule showed a completion date that was ten days late.  TR at 517–18 (Stone).  Nevertheless, the Army Corps continued to decline to sign the Line Extension Agreement and MW Builders' Schedule Updates continued to show delay.  Pl. Post Tr. Br. at 96–97.  By the April 2012 Update, the anticipated delay reached 52 days and, by May 2012, the delay increased to 86 days.  *Compare* PX 338 at 1 (April 2012 Update), *with* PX 339 at 2 (May 2012 Update).  Management Solutions' review of the April 2012 Schedule Update identified several changes and the Army Corps was asked whether it agreed "with the changes such as the change in original duration of Nevada energy-wire/transformer/es, added activities, and logic changes?"[30]  PX 348 at 3.  By the June 2012 Update, the delay is 121 days, because various work activities required permanent power, including air conditioning.  PX 340 at 1 (June 2012 Update).  Subsequently, the Army Corps approved those changes to the underlying logic.  PX 348; TR at 1063–64.  Although the Government's damages expert, Mr. Weathers, did not agree with that decision (CX 2), the fact is that the Army Corps approved them.  Pl. Post Tr. Br. at 99.  By the July 2012 Update, the delay increased to 140 days, because there was "little available work left within [the Training Building] due to lack of permanent power and as a result many subcontractors have demobilized."  PX 341 at 1–2 (July 2012 Update).  By the October 2012 Update, the delay increased to 170 calendar days.  PX 344 at 1 (October 2012 Update).

MW Builders' scheduling expert, Mr. Miltonberger, also estimated that the Project was delayed a total of 413 days that could be divided into three "windows" or time periods. Miltonberger Direct at 3–5.  "Window 2" concerns 170 days of delay and is the subject of this case.[31]  Of that amount, Mr. Miltonberger opines that 140 days resulted from the Army Corps' delay in signing the Line Extension Agreement.  Miltonberger Direct at 4.

### b.    The Government's Response.

The Government responds that MW Builders did not meet the "heightened burden" to establish a breach of the implied covenant of good faith and fair dealing by evidencing "specific intent to injure."  Gov't Post Tr. Br. at 100, 105 (citing *Austin v. United States*, 118 Fed. Cl. 776, 790 (Fed. Cl. 2014)).  Government officials are presumed to act in good faith.  Gov't Post Tr. Br. at 100–01 (citing *Schism v. United States*, 316 F.3d 1259, 1302 (Fed. Cir. 2002)).  Specifically, there is no evidence that the Army Corps acted with animus towards MW Builders or otherwise intentionally targeted MW Builders and Mr. Probst and Mr. Finley acted in good faith.  Gov't Post

---

[30]  Management Solutions regularly approved of MW Builders' subsequent Schedule Updates and represented to the Army Corps that the "level of detail in the schedule is admirable" (PX 350), and MW Builders' schedules were "well managed . . . and contain[ed] adequate detail to manage the project."  PX 351.  These statements undercut Mr. Weathers' testimony that MW Builders' schedule was not sufficiently detailed.  Pl. Post Tr. Br. at 99.

[31]  Window 1 concerns 20 days of Critical Path Delay and was resolved by a Contract Modification executed between MW Builders and the Army Corps.  Miltonberger Direct at 3. Window 3 concerns 223 days of Critical Path Delay, but also was resolved by a Contract Modification executed between MW Builders and the Army Corps.  Miltonberger Direct at 3.

Tr. Br. at 105–06.  Therefore, the Army Corps did not unreasonably delay negotiations surrounding the Line Extension Agreement, but acted "reasonably and diligently," and in good faith. Gov't Post Tr. Br. at 117–18.

It was NV Energy, a third party over which the Army Corps had no control, that insisted on provisions that the Army Corps could not agree to by signing the Line Extension Agreement. Gov't Post Tr. Br. at 118.  The Army Corps' attorney, Mr. Finley, worked diligently with NV Energy's attorney, Ms. Risse, to resolve the Army Corps' legitimate concerns regarding the Anti-Deficiency Act, venue, and the law that would govern any future disputes.  Gov't Post Tr. Br. at 32 (citing DX 143).   Although MW Builders argues that Ms. Risse's confusion was "understandable," because Mr. Finley appeared to be negotiating on behalf of three separate parties (MW Builders, the 63rd RSC, and the Army Corps), she should have been tipped off by the "telling" fact that MW Builders' lawyers were not included in the email conversation.  Gov't Post Tr. Br. at 120.  The Army Corps had "no incentive" to cause confusion as to which party was to sign the Line Extension Agreement.  Gov't Post Tr. Br. at 121.  In any event, the Army Corps and NV Energy were able to resolve their dispute "very quickly," after Ms. Risse's confusion was resolved.  Gov't Post Tr. Br. at 121.

To establish a breach of the duty to cooperate, MW Builders must establish that the delay was the fault of the Army Corps.  Gov't Post Tr. Br. at 99.  In this case, MW Builders assumed the risk of any delay caused by problems with NV Energy, because MW Builders contracted to provide "a complete and working electrical system."  Gov't Post Tr. Br. at 107 (citing DX 14 at 1). Therefore, MW Builders should be barred from recovery, because it caused the delay.  Gov't Post Tr. Br. at 121.  This is so, because Contract Drawing ES-002 obligated MW Builders to contact NV Energy about its permanent power requirements, but MW Builders did not inform the Army Corps about the Line Extension Agreement until March 14, 2012.  Gov't Post Tr. Br. at 122.

In addition, "to properly demonstrate delay[,] . . . the [Critical Path Method] schedule must be kept current to reflect any delays as they occur."  Gov't Post Tr. Br. at 123 (quoting *PCL Constr. Servs., Inc. v. United States*, 47 Fed. Cl. 745, 801 (Fed. Cl. 2000).  In this case, MW Builders' schedules did not reflect a potential permanent power delay until March 28, 2012.  Gov't Post Tr. Br. at 124 (citing DX 72 at 4).  "This assumption was based upon ignorance and nothing more." Gov't Post Tr. Br. at 124.  At trial, MW Builders' Scheduling Engineer, Mr. Stone, testified that he could have incorporated the logic changes made in the March 2012 Schedule Update, if he had been aware of the permanent power issue.  Gov't Post Tr. Br. at 124 (citing TR at 565 (Stone)). Therefore, if "MW Builders had managed the project in a diligent manner, it would have identified the Line Extension Agreement as a potential problem in 2011, if not sooner."  Gov't Post Tr. Br. at 124.  Mr. Rial, the consultant employed by MW Builders to assist with NV Energy, testified that he informed MW Builders about the Line Extension Agreement in July 2011.  Gov't Post Tr. Br. at 124–25; *see also* TR at 484–85 (Rial).  Therefore, to avoid a critical path delay, the Line Extension Agreement needed to be signed at least "nine weeks before" May 3, 2012, *i.e.*, by March 1, 2012.  Gov't Post Tr. Br. at 125; *see also* TR at 892 (Miltonberger).  But, the Army Corps did not receive the Line Extension Agreement until March 14, 2012.  Gov't Post Tr. Br. at 125.

As for MW Builders' arguments about easement delays and how they "pushed the Line Extension Agreement onto the critical path," they "are based solely on speculation and not on any evidence."  Gov't Post Tr. Br. at 127–28.  In any event, the easement delays were not solely caused

by the Government.  Nor was *all* of the delay the fault of the Army Corps.  Gov't Post Tr. Br. at 127–28.  Since any such delay was "concurrent or intertwined," MW Builders did not meet its burden of separating the delays it caused from those that may have been caused by the Army Corps.  Gov't Post Tr. Br. at 129 (citing *Blinderman Constr. v. United Sates*, 695 F.2d 552, 559 (Fed. Cir. 1982).  Therefore, the court should dismiss MW Builders' claim.  Gov't Post Tr. Br. at 129.

**c.**          **Plaintiff's Reply.**

MW Builders replies that *Metcalf Construction Co. v. United States*, 742 F.3d 984 (Fed. Cir. 2014), does not require a plaintiff to show bad faith or targeting by a federal government official to establish a breach of the implied duty of cooperation, which is part of the duty of good faith and fair dealing.  Pl. Post Tr. Reply Br. at 29 (citing *Metcalf*, 742 F.3d at 994).  Instead, the relevant standard is whether the Government *willfully* or *negligently* interfered with a contractor's performance and reasonable expectations.  Pl. Post Tr. Reply Br. at 32 (citing *Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988) ("[S]ubterfuges and evasions violate the obligation of good faith, as does lack of diligence and interference with or failure to cooperate in the other party's performance") (internal citations and quotations omitted)).  Therefore, the Government's argument that MW Builders needs to establish that it was intentionally "targeted" by the Army Corps is not correct as a matter of law.  Pl. Post Tr. Reply Br. at 30.

With respect to easements, MW Builders replies that the Army Corps' delay in securing the easements consumed Project "float" time, *i.e.*, the time between when an activity is first scheduled to occur and the last date the activity can be completed.  Pl. Post Tr. Reply Br. at 34.  As the Government's expert testified, securing the easements was a "predecessor activity" to the Line Extension Agreement.  TR at 1312 (Weathers).  Therefore, the Army Corps' delay in securing those easements lengthened the delay initially caused by the Army Corps.  Pl. Reply at 36–37.

With respect to the Government's argument that any delay connected to the Line Extension Agreement was attributed to Ms. Risse's "confusion," it was the Army Corps that misled and misrepresented that MW Builders was going to sign the Line Extension Agreement when it cut out MW Builders from participating in telephone conferences with Ms. Risse.  Pl. Reply at 42; TR at 85 (Probst).

With respect to MW Builders' schedules, they were accurate and described as "well managed and sufficiently detailed" by Management Solutions, the consultant hired by the Army Corps, in contrast with the Government's retained scheduling expert, Mr. Weathers, who opined that the schedules lacked sufficient detail.  "[C]ontemporaneous project records[, however,] are more credible than the opinions of witnesses who contradict those records years later during trial testimony."  Pl. Reply at 46.

With respect to the Government's contention that MW Builders should have advised the Army Corps of the Line Extension Agreement earlier, there is no evidence that doing so would have changed anything.  Pl. Reply at 47.  As the Government's expert conceded, securing the easements was a predicate condition that had to be accomplished before the Line Extension Agreement could be signed.  Pl. Reply at 47 (citing TR at 1312 (Weathers)).

Finally, the Government's assertion that MW Builders failed to apportion delay is "flatly wrong," because MW Builders' expert performed an apportionment analysis and concluded that 140 days of delay could be attributed to a single cause, *i.e.*, the Army Corps' failure to execute the Line Extension Agreement in a timely fashion.  Pl. Reply at 44 (citing Miltonberger Direct at 11–18).

### d.    The Government's Sur-Reply.

The Government concedes that its argument that evidence of "bad faith" was required to establish a breach of the duty to cooperate was "too broad," but there is no evidence that the Army Corps breached the implied duty of good faith and fair dealing, because it worked hard to resolve the issue when it became aware of the Line Extension Agreement in March 2012.  Gov't Reply at 8–9.  It was MW Builders' fault that the Government did not learn about that agreement until March 2012.  Gov't Reply at 9.  As such, the delay was caused by NV Energy and MW Builders, not the Army Corps.  Gov't Reply at 10.  In addition, no critical path delay was caused by the easement issue.  Gov't Reply at 9.

### e.    The Court's Resolution.

### i.    The United States Army Corps Of Engineers Violated The Duty Of Good Faith And Fair Dealing.

The duty of good faith and fair dealing includes "the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract."  *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005).  "Both the duty not to hinder and the duty to cooperate are aspects of the implied duty of good faith and fair dealing."  *Metcalf*, 742 F.3d at 991 (quoting *Precision Pine & Timber v. United States*, 596 F.3d 817, 820 n.1 (Fed. Cir. 2010)).  Although it "is rarely possible to anticipate in contract language every possible action or omission by a party that undermines the bargain," the terms of the contract and the "nature of that bargain" inform the reasonable expectations of the parties.  *See Metcalf*, 742 F.3d at 991.  Therefore, "the implied duty of good faith and fair dealing cannot . . . create duties inconsistent with the contract's provisions."  *Precision Pine*, 596 F.3d at 831.

The United States Court of Appeals for the Federal Circuit has held that the Government may violate the implied duty of good faith and fair dealing without "specifically targeting," but nevertheless deprive the contractor of the fruits of the contract.  *See Metcalf*, 742 F.3d at 994.  In addition, the Government may violate that duty when its acts or omissions are "inconsistent with the contract's purpose and deprive the other party of the contemplated value."  *Id.* at 991.  For example, an unreasonable "lack of diligence" may violate the implied duty of good faith and fair dealing.  *Id.* at 991 (quoting *Malone*, 849 F.2d at 1445).  A party also may violate the duty of good faith and fair dealing by engaging in "subterfuges and evasions."  *See Malone*, 849 F.2d at 1445; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. d (AM. LAW INST. 1981) ("Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified.").

The Line Extension Agreement was first discussed during a March 13, 2012 conference call that included NV Energy and MW Builders, wherein the participants agreed that the "contract will be executed between NV Energy and 63D RSC." JX 44 at 1. It was only after the 63rd RSC refused to sign the Line Extension Agreement on March 14, 2012, that the Army Corps tried to obtain MW Builders' signature, at the suggestion of Mr. Musgrave, an Army Corps Contracting Officer's Representative. PX 501 at GOV_00005389. On March 19, 2012, the Army Corps convened a conference call with NV Energy, in part "to determine a strategy so that MW Builders would sign the Line Extension Agreement." TR at 85 (Probst). But, the Army Corps excluded MW Builders from that telephone conference. TR at 84–85 (Probst). Ms. Risse, NV Energy's attorney, present during the March 19, 2012 telephone conference, testified that NV Energy "wouldn't have been asked to consider" having MW Builders sign the Line Extension Agreement, "if MW Builders wasn't on board with it." TR at 590–91 (Risse).

On March 21, 2012, MW Builders informed the Army Corps that it would not sign the Line Extension Agreement, without a directive from the CO. PX 528. Nevertheless, the Army Corps proceeded to convene a second telephone conference with NV Energy that *again* excluded MW Builders. PX 60C. After this second call, NV Energy's attorney, Ms. Risse, "thought [her] work was done[,] unless MW Builders came back and had concerns that we needed to discuss and change the extension agreement if necessary." TR at 609 (Risse). The purpose of the Army Corps' conduct was to convince NV Energy that MW Builders would sign the Line Extension Agreement. At the same time the Army Corps made these representations to NV Energy, it knew that MW Builders would *not* sign the Line Extension Agreement, without a letter from the CO directing them to do so.[32] PX 27 (3/22/12 email stating that MW Builders "will not move forward without [a] directive from the [Army] Corps"). And, on April 6, 2012, MW Builders sent a letter notifying the Army Corps that the Project could potentially be delayed, because "the Line Extension Agreement between the Government and Nevada Energy [was] not yet in place, subsequently delaying permanent power installation and startup." JX 58.

On April 26, 2012, the Army Corps first contacted Ms. Risse to begin negotiating the Line Extension Agreement, because the critical path was being affected. JX 61 at 1–2. Ms. Risse testified that she found the April 26, 2012 email confusing and "strange," because it appeared to suggest that MW Builders was going to sign the Line Extension Agreement (as suggested during the conference calls in March), but also listed various complaints that the Army Corps and 63rd RSC had with the Line Extension Agreement. TR at 608–09 (Risse). Moreover, Mr. Finley appeared to be negotiating terms on the behalf of MW Builders, who was not his client. TR at 608–09 (Risse).

By May 23, 2012, confusion about who was to sign the Agreement continued and was causing delay on the Project. JX 68. On June 15, 2012, Ms. Risse sent an email to Mr. Finley, stating that "NV Energy has already compromised by agreeing that the [G]overnment's contractor can be the applicant instead of the [G]overnment." DX 143 at 2. Three days later, Mr. Finley responded that "What I have been trying to draft is an agreement between the [Army] Corps and NV Energy. We seem to be working toward different goals." DX 143 at 1. On June 21, 2012,

---

[32] The CO did not do so, because it would potentially expose the Army Corps to a Request for Equitable Adjustment. PX 294.

Mr. Finley and Ms. Risse had a telephone conference with MW Builders' attorney, Mr. Mitts, where the Army Corps agreed that MW Builders was not responsible for signing the Line Extension Agreement. JX 75 at 1. Thereafter, "drafts were exchanged quickly" and the Army Corps signed the Line Extension Agreement on July 12, 2012. TR at 626 (Risse); *see also* Jt. Stip. ¶ 25.

Regarding the Government attempt to fault Ms. Risse for the uncertainty about the Line Extension Agreement, no such evidence was proffered to excuse the Army Corps' conduct of not being candid with NV Energy about MW Builders' refusal to sign the Line Extension Agreement—and to exclude MW Builders' lawyers from those discussions. The fact that the Line Extension Agreement issue ultimately was quickly resolved evidences that it was the Army Corps that was responsible for the uncertainty and delay caused by the Army Corps' failure to sign the Line Extension Agreement in a timely manner.

Likewise, the Government's attempt to shift the blame for lack of the permanent power— citing the fact that MW Builders did not raise the issue of the Line Extension Agreement until March 2012, when it was "too late[:] only weeks before permanent power was due"—belies the record. (Gov't Post Tr. Br. at 123). Securing easements was a necessary predicate to providing permanent power to the Project site, that was not addressed by the Army Corps until February 6, 2012. PX 4 (the "[P]roject will not be released for construction scheduling until after all of the necessary property rights have been provided to NV Energy."); Jt. Stip. ¶ 21. In fact, the Army Corps did not even provide an "access letter" to NV Energy until March 16, 2012. Jt. Stip. ¶ 23.

Based on this record, the Army Corps' conduct regarding the Line Extension Agreement implicated the duty to not interfere with the other party's performance, the duty not to hinder, and the duty to cooperate. Although the September 10, 2010 Contract assigned some electric utility obligations to MW Builders, no specific party was directed to sign the Line Extension Agreement, because all the parties were aware of industry practice. Therefore, MW Builders entered into the bargain with a "reasonable expectation" that the Army Corps was obligated to make arrangements with respect to the Line Extension Agreement. *See Centex Corp.*, 395 F.3d at 1304 ("The covenant of good faith and fair dealing . . . include[s] the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract."). The Army Corps, however, attempted to impose that obligation on MW Builders by misleading, dilatory, and bad faith conduct. *See Metcalf*, 742 F.3d at 991.

The Government is correct that the United States Court of Appeals for the Federal Circuit has held that a Government agency did not violate the duty of good faith and fair dealing with respect to the contract when it failed to cooperate with a separate, unrelated third party. *See Precision Pine*, 697 F.3d at 830. In that case, the United States Forest Service failed to cooperate with the Fish and Wildlife Service with respect to consultations required under the Endangered Species Act ("ESA"). *Id.* But, the "plain language" of the *Precision Pine* contract stated that its "provisions [could] be modified, suspended, or even canceled to comply with the ESA." *Id.* at 830–31. The September 10, 2010 Contract contains no such reservation. Nevertheless, the Army Corps represented and continued to represent to NV Energy that MW Builders could or would sign the Line Extension Agreement, although the Army Corps knew that was not the case. This evidences that the Army Corps acted in bad faith.

For these reasons, the court has determined that the Army Corps violated the duty of good faith and fair dealing. *Metcalf*, 742 F.3d at 991.

### ii. The United States Army Corps Of Engineers' Conduct Caused An Unreasonable Delay.

The United States Court of Appeals for the Federal Circuit also has held that a contactor may recover for an unreasonable delay, if the Government is "the *sole* proximate cause of the contractor's additional loss, and the contractor would not have been delayed for *any other reason* during that period." *Triax-Pacific v. Stone*, 958 F.2d 351, 354 (Fed. Cir. 1992); *see also Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1295 (Fed. Cir. 2000) ("A contractor seeking to prove the government's liability for a delay must establish the extent of the delay, the contractor's harm resulting from the delay, and the causal link between the government's wrongful act and the delay."). In addition, any Government-caused delay must be "unnecessary or unreasonable in duration." *P.R. Burke Corp. v. United States*, 277 F.3d 1346, 1360 (Fed. Cir. 2002). As a result, the contractor may not recover, if there is a concurrent delay caused by the contractor or some other third party. *See Triax-Pacific*, 958 F.2d at 354 (holding that a contractor could not recover where a delay was caused, in part, by the contractor's failure to timely complete prior projects). But, a contractor may recover when other factors contribute to the delay, provided that there is proof of a "clear apportionment of the delay and the expense attributable to each party." *T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724, 734 (Fed. Cir. 1997) (quoting *Coath & Goss, Inc. v. United States*, 101 Ct. Cl. 702, 714–15 (Ct. Cl. 1944)).

In this case, the Government argues that MW Builders is barred from recovery, because it failed to apportion the delay caused by the Army's conduct with respect to the Line Extension Agreement. Gov't Reply at 7–8. The trial record, however, reflects that the delay was solely caused by the Army Corps. As such, MW Builders was not required to provide a "clear apportionment of the delay and the expense attributable to each party," because there was only one party at fault: the Army Corps. *See T. Brown*, 132 F.3d at 734.[33]

The Government next argues that MW Builders' contemporaneous Critical Path Method schedules are not accurate and do not support a finding of unreasonable delay. The United States Court of Federal Claims determined in *Blinderman Construction Co. v. United States,* 39 Fed. Cl. 529 (Fed. Cl. 1997), *aff'd* 178 F.3d 1307 (Fed. Cir. 1998), that a contractor may not recover damages, even though it established that the Government caused an unreasonable delay, where the contractor did not demonstrate that the delay affected the critical path and the schedules submitted were not updated in a timely manner, to reflect the delay. *Id.* at 584–85.

MW Builders' contemporaneous schedule updates, however, evidence that the permanent power delay affected the critical path and that delay continued to accumulate:

---

[33] In *T. Brown,* our appellate court observed that where multiple causes of a delay exist, apportionment of the delay is required, if either party is to recover. *See* 132 F.3d at 734. But, apportionment is not required where the delay results from a single cause. *Id.*

- The February 22, 2012 Schedule Update was the last schedule update issued before the parties convened a telephone conference to discuss the Line Extension Agreement. PX 336 at 1. In that update, MW Builders projected a Project completion date of September 19, 2012. PX 336 at 1.

- The March 30, 2012 Schedule Update was issued after MW Builders and the Army Corps disagreed about which party was responsible for signing the Line Extension Agreement. PX 337 at 1. In that schedule update, MW Builders advised that "[w]e are beginning to forecast a delay [in the critical path] to the overall completion date of the project due to a lack of permanent power," particularly because air conditioning was required in the Training Building to conduct temperature and moisture sensitive activities, including the installation of Acoustic Ceiling Tiles and Vinyl Composition Tiles. PX 337 at 1–2. Therefore, permanent power or generator-provided temporary power,[34] was needed. PX 337 at 2. For the project not to be delayed, the schedule reflected that permanent power was required by May 4, 2012. PX 337 at 2.

- The April 26, 2012 Schedule Update reflected that MW Builders needed air conditioning by May 4, 2012 to comply with the critical path schedule. PX 338 at 3. MW Builders assumed that it would take 7 days to pay NV Energy's service fee and NV Energy would need 14 days to procure materials after the Line Extension Agreement was assigned. PX 338 at 7. Thereafter, NV Energy needed 30 work-days (42 calendar days) to complete the work required to provide electrical power. PX 338 at 7. As a result, MW Builders projected a "negative float" of 52 days, unless power was supplied on or before May 4, 2012. PX 338 at 7. Therefore, the Project's completion date was adjusted from September 19, 2012 to November 10, 2012. PX 327.

- The May 28, 2012 Schedule Update continued to reflect that MW Builders was experiencing delay caused by lack of permanent power. PX 339 at 1. Because neither permanent power nor sufficient temporary power was available for the air conditioning system, MW Builders was unable to begin work on the temperature sensitive critical path activities. PX 339 at 1. Therefore, MW Builders projected a "negative float" of 86 days. PX 339 at 3. The job completion date was revised to January 9, 2013. PX 328.[35]

---

[34] Generators were present at the Project site, but they were "half the size" needed to provide sufficient power to the Training Building. JX 64 at 1. In a May 11, 2012 email, Mr. Probst, the Army Corps Project Manager, suggested to Mr. Musgrave, an Army Corps Contracting Officer's Representative, that the Army Corps could mitigate delay by renting a larger generator so work could commence. JX 64 at 1. But, no additional generator power was provided during the time the Line Extension Agreement was being negotiated.

[35] This adjustment was required to account for the fact that no work took place in December 2012 during Government holidays. PX 328 at MWB-008687.

- The July 9, 2012 Schedule Update reflected that the Army Corps was "getting close" to reaching a Line Extension Agreement with NV Energy, but no construction was advised by the Army Corps, and "negative float' had increased to 121 calendar days.  PX 340 at 1.  MW Builders also advised that "[t]here is a little available work left within the building due to a lack of permanent power and as a result many subcontractors have de-mobilized."  PX 340 at 2.  The job completion date was revised to February 6, 2013.  PX 329.

- The October 15, 2012 Schedule Update was the first issued after the Line Extension Agreement was signed on July 23, 2012 and permanent power was available on September 26, 2012.  PX 343 at 1.  Therein, it was reported that the Project incurred 165 days of "negative float," due to delays to critical path activities requiring conditioned air.  PX 343 at 1.

By the time the Line Extension Agreement was executed on July 23, 2012, MW Builders' contemporaneous Schedule Updates showed a 140-day delay to the critical path; *i.e.*, the difference between the original completion date of September 19, 2012, and the adjusted completion date of February 6, 2013.  Therefore, unlike the contractor in *Blinderman Construction Co.*, MW Builders proffered critical path schedules, as they existed before, during, and after the delay.  In addition, MW Builders proffered contemporaneous evidence that the delay in securing power affected critical path activities, particularly the temperature sensitive indoor construction work in the Training Building.

Nevertheless, the Government argues that, even if the delay was attributable to the Army Corps, it was "reasonable in duration."  Gov't Reply at 10.  The Army Corps, however, was the sole cause the delay, because it failed to obtain the necessary easements, unreasonably attempted to shift responsibility for executing the Line Extension Agreement to MW Builders, engaged in misleading discussions with NV Energy and failed to cooperate with MW Builders, causing a 116 day delay.  *See P.R. Burke*, 277 F.3d at 1360 (Government-caused delay is unreasonable, if it is "*unnecessary or* unreasonable in duration") (emphasis added).

For these reasons, the court has determined that the Government violated the duty of good faith and fair dealing, and caused an unreasonable delay to the Project.

### D.     The Government's Affirmative Defense And Counterclaims.

### 1.     The Government's Affirmative Defense Of Waiver.

The Government's February 17, 2016 Amended Answer asserted the following affirmative defenses: (1) MW Builders' claims are barred, in whole, or, in part, by accord and satisfaction; (2) MW Builders' claims are barred, in whole, or, in part, by waiver; and (3) the pass-through claims of MW Builders' subcontractors are barred, in whole, or, in part, by waiver.  Gov't Amend. Answer ¶¶ 39–41.  The Government's December 8, 2016 Proposed Findings Of Fact And

Conclusions Of Law, however, presented only an argument relating to the waiver of one of MW Builders' subcontractors, Bergelectric.  Gov't Post Tr. Br. at 95.[36]

### a.      The Government's Argument.

The Government argues that any pass-through claim from Bergelectric is waived.  Gov't Post Tr. Br. at 98.  Under the December 6, 2010 subcontract, Bergelectric was required to sign a periodic form release, as a condition of payment from MW Builders.  JX 9 at 2 (12/6/2010).  The language in the form releases signed by Bergelectric unambiguously waived any claims against MW Builders and, therefore, against the Government.  Gov't Post Tr. Br. at 97 (citing DX 124 at 2 (4/15/12 Bergelectric Waiver)).  Because the language in the releases was unambiguous, the court must consider their plain meaning, instead of extrinsic evidence of the parties' course of dealings or oral testimony.  Gov't Post Tr. Br. at 97.

Assuming *arguendo* that the court may consider extrinsic evidence, Bergelectric's claims still are waived.  Gov't Post Tr. Br. at 97.  MW Builders required its subcontractors to sign a release to protect MW Builders from liability.  TR at 715 (Campbell).  The Government contends that MW Builders was aware of the need to modify the scope of the release, if Bergelectric intended to preserve any pass-through claims, but MW Builders did not do so.  Gov't Post Tr. Br. at 98. The testimony of Justin Knippel, Bergelectric's Regional Manager for Las Vegas and Phoenix, was irrelevant, because he was not the company representative who signed the releases.  Gov't Post Tr. Br. at 97 (citing TR at 774–75 (Knippel)).  Likewise, Mr. Campbell's testimony is irrelevant, because he was not a Bergelectric representative and had no personal knowledge about Bergelectric's intent, when it signed the releases.  Gov't Post Tr. Br. at 98 (citing TR at 717 (Campbell)).

### b.      Plaintiff's Response.

MW Builders required Bergelectric to sign a standard form release to receive payment, but neither party intended the releases to waive any claim arising from the permanent power delay. Pl. Post Tr. Br. at 128.  Instead, these releases were a contractual prerequisite to Bergelectric getting paid each month.  Pl. Post Tr. Br. at 128.  The conduct of the parties after Bergelectric signed the releases also shows that the parties did not intend for Bergelectric to waive any claims, *e.g.*, Bergelectric filing a Complaint against MW Builders in the United States District Court for the Western District of Texas on November 26, 2014; executing an agreement to toll the statute of limitations on Bergelectric's claims; and passing Bergelectric's claims through to the Government in this suit.  Pl. Post Tr. Br. at 128–31.  And, as Messrs. Knippel, Campbell, and Sawyer testified at trial, the parties never intended to waive any claims Bergelectric may have against the Government.  TR at 672–73 (Campbell), 776 (Knippel), 812–13 (Sawyer).  Since the standardized form releases were not intended to waive Bergelectric's pass-through claims and the Government has not introduced any other evidence waiving Bergelectric's claims, the Government has failed to establish that Bergelectric's claims are barred.  Pl. Post Tr. Br. at 130–31.

---

[36] Although MW Builders partnered with several other subcontractors, MW Builders elected not to pursue their pass-through claims.  Jt. Stip. ¶ 32.

### c.      The Court's Resolution.

As a matter of law, a subcontractor may not independently file a claim against the Government, without being in privity.  *See Severin v. United States*, 99 Ct. Cl. 435, 442 (Ct. Cl. 1943) ("The subcontractor could not sue the Government since it has not consented to be sued except, so far as relevant to this case, for breach of contract.  But the Government had no contract with the subcontractor, hence it is not liable to, nor suable by him."); *see also Erickson Air Crane Co. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984) ("The [G]overnment consents to be sued only by those with whom it has privity of contract, which it does not have with subcontractors.").  Instead, the prime contractor must bring a "pass-through" claim in its own name on behalf of its subcontractor.  *See Severin*, 99 Ct. Cl. at 443.  The prime contractor, however, may pursue a subcontractor's damages claim against the Government, only if the prime contractor is liable to the subcontractor for those damages.  *Id.*

MW Builders' subcontract required Bergelectric to sign and execute lien waivers each time it requested a progress payment.  JX 9 at 2 (12/6/10 Bergelectric subcontract).  During the Project, Bergelectric signed periodic waivers as a condition of receiving payment from MW Builders.  DX 124 at 2 (5/9/12 waiver, covering payment until 4/15/12).  These waivers stated:

> NOW, THEREFORE, effective as of receipt of the payment referenced in this Application, the undersigned [Bergelectric] irrevocably and unconditionally releases and waives any and all mechanic's liens or other liens against the Realty or any other claims on any bonds *or any other claims whatsoever in connection with this Contract and with the Realty through the end of the period covered by this Application*, reserving however, all lien rights for materials and labor furnished or performed after said period and hold the Beneficiaries and their respective successors and assigns harmless against any lien, bond, claims or suits in connection with the materials, labor, and everything else in connection with this Contract, except with respect to the retainages to date, if any.

DX 124 at 2 (emphasis added).

This is a general release, because Bergelectric "irrevocably and unconditionally" waived "any . . . claims whatsoever in connection with th[e] Contract" through the end of "the period covered by this Application."  DX 124 at 2.  Generally, "[t]he rule for releases is that absent special vitiating circumstances, a general release bars claims based upon events occurring prior to the date of the release."  *Augustine Med., Inc. v. Progressive Dynamics, Inc.*, 194 F.3d 1367, 1373 (Fed. Cir. 1999) (quoting *Johnson, Drake & Piper, Inc. v. United States*, 531 F.2d 1037, 1047 (Ct. Cl. 1976)).  In this case, Bergelectric signed periodic waivers for the entire period of permanent power delay; *i.e.*, from March 13, 2012, when the Line Extension Agreement was first presented to the Army Corps, through September 26, 2012, when permanent power was made available at the Project.  DX 124 at 2 (5/9/12 waiver, covering payment until 4/15/12); DX 124 at 4 (6/22/12 waiver, covering payment through 5/15/12); DX 124 at 6 (7/20/12 waiver, covering payment through 6/15/12); DX 124 at 8 (8/22/12 waiver, covering payment through 7/15/12); DX 124 at 10 (10/01/12 waiver, covering payment through 8/29/12); DX 124 at 16 (10/31/12 waiver, covering payment through 9/30/12); DX 124 at 18 (11/26/12 waiver, covering payment through 10/31/12).

49

To overcome the text of the release, MW Builders and Bergelectric proffered extrinsic evidence to explain why the written terms of the subcontract were not intended to waive any of Bergelectric's pass-through claims. But, any rights that the parties intended to reserve when executing a release must be expressly stated. *See Augustine Med., Inc.*, 194 F.3d at 1373 ("[I]t is the burden of the parties entering into a [release] to expressly reserve in the agreement any rights that they wish to maintain beyond the date of the [release].").

In this case, Bergelectric agreed "irrevocably and unconditionally" to release and waive "any other claims whatsoever in connection with this Contract." DX 124 at 2. The release, however, contained no express reservation that authorized Bergelectric to pass through a claim against the Government. Since the language of the release was unambiguous and susceptible only to one reasonable meaning, the court's review is limited to the plain meaning without considering extrinsic evidence. *See Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375–76 (Fed. Cir. 2004) ("A contract provision is only ambiguous if susceptible to more than one reasonable meaning."). The plain meaning of the phrase "the undersigned irrevocably and unconditionally releases and waives . . . any other claims whatsoever in connection with this Contract," waives all of Bergelectric's claims against MW Builders and any related pass-through claims against the Army Corps. DX 124 at 2.

For these reasons, the court has determined that, under the *Severin* doctrine, Bergelectric waived all pass-through claims in this case against the Government.

### 2.    The Government's Counterclaims.

In addition, the Government alleges three counterclaims against MW Builders, based on: the anti-fraud provision of the Contract Disputes Act, 41 U.S.C. § 7103(c)(2); the Special Plea in Fraud statute, 28 U.S.C. § 2514; and the False Claims Act, 31 U.S.C. § 3729. Gov't Amend. Answer ¶¶ 49–57.

### a.    Subject Matter Jurisdiction.

Under the Federal Courts Administration Act, 28 U.S.C. § 1503, the United States Court of Federal Claims has jurisdiction "to render judgment upon any set-off or demand by the United States against any plaintiff in such court." In addition, the court has jurisdiction to adjudicate "any setoff, counterclaim, claim for damages, or other demand [that] is set up on the part of the United States against any plaintiff making claim against the United States[.]" 28 U.S.C. § 2508.

Because the court has jurisdiction to adjudicate the claims alleged by MW Builders' December 27, 2013 Complaint, the court also has jurisdiction to adjudicate the counterclaims alleged in the Government's February 17, 2016 Amended Answer. *See Martin J. Simko Constr., Inc. v. United States*, 852 F.2d 540, 547 (Fed. Cir. 1988) ("The Claims Court has jurisdiction to hear government counterclaims asserted under the False Claims Act."); *see also Computer Wholesale Corp. v. United States*, 566 F.2d 1189 (Ct. Cl. 1977) ("If plaintiff had pleaded a proper claim, defendant would be able to claim a setoff or counterclaim for the liquidated damages under 28 U.S.C. § 1503 or § 2508.").

On March 24, 2016, MW Builders filed a Motion To Dismiss The Government's Counterclaims, arguing that they were not alleged with sufficient particularity, pursuant to RCFC

9(b), and should be dismissed for failure to state a claim, pursuant to RCFC 12(b)(6). ECF No. 42. Although the court agrees that the Government's pleading could have been pled with more specificity, during the May 4–10, 2016 trial, the court allowed the Government leave to proffer additional testimony to provide more detail about the Government's counterclaims, rendering MW Builders' March 24, 2016 Motion To Dismiss moot.

### b. Standing.

The Government's February 17, 2016 Amended Answer alleges entitlement to recover penalties, under the CDA and False Claims Act, because MW Builders submitted a fraudulent claim to the Army Corps. Gov't Amend. Answer ¶¶ 52–57. The Government also alleges that MW Builders' damages claim is forfeited under the Special Plea in Fraud statute, because MW Builders attempted to practice fraud against the Government by submitting a certified claim with an intent to deceive the Army Corps. Gov't Amend. Answer ¶¶ 49–51. Therefore, the February 17, 2016 Answer alleges that the Government suffered an injury that is concrete, particularized, and fairly traceable to MW Builders' actions. *See Friends of the Earth*, 528 U.S. at 180–81 ("[To establish standing,] plaintiff must show . . . it has suffered an 'injury in fact' that is . . . concrete and particularized . . . [and] fairly traceable to the challenged action[.]"). In addition, any financial injury established by the Government can be redressed by a monetary award. *Id.* (holding that, to establish standing, the alleged injury can "be redressed by a favorable decision").

For these reasons, the court has determined that the Government has standing to seek an adjudication of the counterclaims alleged in the February 17, 2016 Answer.

### c. The Government's Argument.

All three of the Government's counterclaims are based on the identical allegations of falsity and fraud. The February 17, 2016 Amended Answer alleges that MW Builders' December 27, 2012 certified claim, as revised on May 15, 2013, is false and fraudulent, because "MW Builders knowingly and deliberately overstated its incurred costs." Gov't Post Tr. Br. at 83–88. Specifically, when Mr. Campbell prepared MW Builders' certified claim, he should have submitted the actual cost data reflected in MW Builders' COMET accounting system; instead, Mr. Campbell elected to estimate the costs claimed, in a manner that was higher than MW Builders' actual costs. Gov't Post Tr. Br. at 55–73.[37]

In addition, on the General Conditions Worksheet submitted by MW Builders, together with the certified claim, Mr. Campbell estimated each employee's labor burden, by using a single 38.75% plug number "across the board." TR at 1203 (Campbell). The Government, however, contends that the 38.75% was "contrived and unsupported" and MW Builders did not submit any

---

[37] MW Builders proffered Mr. Campbell as an expert in "reasonable and necessary and allocable costs for construction project job sites and job site overhead." TR at 855. Mr. Campbell also testified as a fact witness. TR at 636–723, 1164–1258. The Government objected to Mr. Campbell being proffered as an expert. TR at 856. At trial, the court ruled that Mr. Campbell was not qualified to testify as an expert, but could testify about the work he performed as a lay witness. TR at 861.

documentary evidence to the contrary. Gov't Post Tr. Br. at 83. The actual labor burden, however, was lower than 38.75%, as evidenced by cost reports derived from MW Builders' COMET accounting system. Gov't Post Tr. Br. at 63. For example, Job Cost Summaries printed out from COMET on October 26, 2015, show that the labor burden costs incurred by each employee assigned to the Project from December 5, 2010 to September 14, 2014 were lower than those reported on the claim. DX 243, DX 244.[38]

In addition, the Claims Worksheet included estimated "Housing" and "Vehicle, Gas, [and] Maintenance" costs that were "not calculated[,] based upon actual data in the accounting system." Gov't Post Tr. Br. at 68. Instead, Mr. Campbell, estimated an employee's "Vehicle, Gas, [and] Maintenance" cost was $7,200 over a period of 24 weeks, but the COMET accounting system reflected that employee's "Miscellaneous Auto Costs" were zero. *Compare* JX 88 at 8 (12/27/12 Claims Worksheet), *with* DX 243 at 3–4 (10/26/15 COMET printout).

The Claims Worksheet also accounted for employee time billed to the Project when certain employees were not assigned to the Project, *i.e.*, from approximately April 2012 to September 26, 2012. Gov't Post Tr. Br. at 71. For example, the Claims Worksheet reflected that Mr. Campbell was working on the Project 100% of the time, but the COMET accounting system printout shows that he did not start billing work to the Project until September 9, 2012. DX 243 at 30.

Plaintiff's expert at trial also confirmed the "overstated and unsupported nature" of the costs claimed by MW Builders' certified claim as he "essentially started over" to ascertain MW Builders' incurred costs and calculated a daily jobsite cost rate of $3,262.00, a rate lower than the $4,071.00 daily jobsite cost rate listed in MW Builders' December 27, 2012 certified claim. Gov't Post Tr. Br. at 74–75 (citing Miltonberger Direct at 5, 21). The Government's damages expert also confirmed that the December 27, 2012 certified claim's daily jobsite rate contained

---

[38] The differences identified by the Government are shown in the following table prepared by the court, based on admitted evidence.

| Employee Name | Weekly Estimated Labor Burden Cost (JX 88) | Weekly COMET Labor Burden Cost (DX 243, 244) | Difference |
|---|---|---|---|
| Ralph Lockeby | $ 522.00 | $ 367.65 | $ (154.35) |
| Gary Puckett | $ 611.00 | $ 430.20 | $ (180.80) |
| Gwen Gonzalez | $ 265.00 | $ 163.85 | $ (101.15) |
| Amanda Klingerman | $ 484.00 | $ 341.42 | $ (142.58) |
| Sparky Campbell | $ 949.00 | $ - | $ (949.00) |

The COMET accounting system showed Mr. Campbell's labor burden to be $0 for the relevant period. DX 243 at 30. At trial, Mr. Campbell testified $0 was a proper amount, because his labor burden costs were reflected in an "allocated rate" accounted for elsewhere. Mr. Campbell, however, never explained where those costs were located. TR at 1213 (Campbell).

"overstated" and "unsupported" costs and the 38.75% labor burden figure was "not supported by any underlying documents." Weathers Rev. Direct at 60–62.

The December 27, 2012 certified claim represented that MW Builders requested to recover costs "incurred" both by the company and subcontractors, as a result of delay of the Line Extension Agreement delay. JX 88 at 1. The dictionary definition of "incur" is: to "become liable or subject to through one's own action." Gov't Post Tr. Br. at 56 (citing www.dictionary.com/browse/incur). Therefore, MW Builders' use of the past tense, *i.e.*, "incurred," represented that that MW Builders was liable for those costs in the past. Gov't Post Tr. Br. at 56. Although some of the entries in the General Conditions Worksheet were identified as "estimates," other costs that Mr. Campbell testified about at trial—*e.g.*, the "Housing" and "Vehicle, Gas, [and] Maintenance" expenses— were not. Gov't Post Tr. Br. at 89. MW Builders, however, could have corrected the estimated costs, but did not do so either in the May 15, 2013 revision to the claim or in the December 27, 2013 Complaint. Gov't Post Tr. Br. at 89, 91.

Mr. Campbell, MW Builders' Project Manager, also testified that he prepared the Claims Worksheet with the expectation that negotiations with the Army Corps would ensue. Gov't Post Tr. Br. at 85. A fundamental purpose of the CDA's certification requirement, however, is to prevent contractors from overstating claims for bargaining purposes. Gov't Post Tr. Br. at 79 (citing *Fiscbach and Moore Int'l Corp. v. Christopher*, 987 F.2d 759, 763 (Fed. Cir. 1993) (holding that the purpose of certification requirement was to "discourage the submission of unwarranted contractor claims and to encourage settlements"); *see also Daewoo Engineering and Constr. Co., Ltd. v. United States*, 557 F.3d 1332, 1338–41 (Fed. Cir. 2009) (affirming the determination that a contractor committed fraud when it knowingly submitted a claim, based upon a "baseless calculation" as a negotiating ploy). If Mr. Campbell intended to estimate future costs in good faith, the two certified claims should have stated that MW Builders was submitting estimated, rather than actual, costs. Gov't Post Tr. Br. at 92.

The deposition testimony of David Cimpl, the Chief Financial Officer of MW Builders' parent company, also confirmed that actual costs incurred could have been verified by MW Builders' COMET accounting system. Gov't Post Tr. Br. at 55. According to Mr. Cimpl, "[i]f I wanted to look at actual job cost . . . I would go to look at what actual job costs are recorded in the accounting system." 4/12/16 Cimpl Dep. at 87–88. This testimony is "binding" on MW Builders. Gov't Post Tr. Br. at 77 (citing *Zip-O-Log Mills, Inc. v. United States*, 113 Fed. Cl. 24, 32 (Fed. Cl. 2013) ("The testimony of a [RCFC] 30(b)(6) witness is binding[.]"). In light of this testimony, the court should find that the costs submitted in MW Builders' certified claim were contradicted by information available in MW Builders' records and therefore constituted a "fraudulent" claim under the Special Plea in Fraud, the anti-fraud provision of the CDA, and the FCA. Gov't Post Tr. Br. at 84 (citing *Ry. Logistics Int'l v. United States*, 103 Fed. Cl. 252, 256–259 (Fed. Cl. 2012) (determining that a contractor's certified claim was fraudulent, although contractor argued at trial that claim was based on "rough estimates," because those estimates were contradicted by contractor's invoices). The United States Court of Federal Claims also has determined that a contractor violated the CDA, the FCA, and the Special Plea in Fraud statute, when it failed to "utilize the best and readily available evidence, and did not indicate that it was ignoring the best and readily available evidence," in submitting a certified claim for payment. Gov't Post Tr. Br. at 87–88 (quoting *UMC Elecs. Co. v. United States*, 43 Fed. Cl. 776, 801–04 (Fed. Cl. 1999)).

The Government concludes that MW Builders submitted the December 27, 2012 certified claim in violation of three separate fraud statutes. First, MW Builders knowingly and intentionally submitted a certified claim that it could not support, in part, because of a misrepresentation of fact or fraud, violating the CDA anti-fraud provision, 41 U.S.C. § 7103(c)(2). Gov't Post Tr. Br. at 93. Therefore, MW Builders is liable for "an amount equal to the unsupported part of the claim plus all of the Federal Government's costs attributable to reviewing the unsupported part of the claim." Gov't Post. Tr. Br. at 93–94 (citing 41 U.S.C. § 7103(c)(2)). The "unsupportable" part of MW Builders' claim is $179,647.00, *i.e.*, the daily jobsite rate of $4,071.00, multiplied by 169 days, minus Mr. Weathers' calculated daily jobsite rate of $3,008.00, multiplied by 169 days. Gov't Post Tr. Br. at 94. In addition, the Government requests the cost of reviewing MW Builders unsupported claim in the amount of $10,105.00, reflecting the costs incurred for Mr. Weathers' review. Gov't Post Tr. Br. at 94 (citing DX 269, DX 268). Therefore, MW Builders is liable under the CDA for $189,752.00. Gov't Post Tr. Br. at 94.

Second, MW Builders violated the Special Plea in Fraud Statute, 28 U.S.C. § 2514, by attempting to practice fraud against the Government, either recklessly or with the specific intent to deceive. Gov't Post Tr. Br. at 93. Under the Special Plea in Fraud statute, a claim against the Government is forfeited in its entirety, if the contractor: (1) knew that a claim was false; and (2) intended to deceive the Government by its submission. Gov't Post Tr. Br. at 78 (citing *Daewoo Eng'g*, 557 F.3d at 1341); *see also American Heritage Bancorp v. United States*, 61 Fed. Cl. 376, 391 (Fed. Cl. 2004) (determining that a contractor may violate the Special Plea in Fraud statute, even if it does not know "for certain" that the statements were false, if the statements were made with "reckless disregard for the truth."). To establish the requisite element of scienter in this case, the Government needs to demonstrate only that Mr. Campbell and MW Builders acted "recklessly" by submitting the December 27, 2012 claim. Gov't Post Tr. Br. at 93.

Third, MW Builders knowingly presented a "false or fraudulent claim for payment," in violation of the FCA. Gov't Post Tr. Br. at 80 (citing 31 U.S.C. § 3729(a)(1)). A person may act "knowingly" for purposes of the FCA, if they act with reckless disregard toward the truth; no specific intent to defraud is required. Gov't Post Tr. Br. at 81 (citing 31 U.S.C. § 3729(b)(1)). Moreover, MW Builders knowingly submitted a false claim and consciously and recklessly disregarded accurate information in its accounting system. Gov't Post Tr. Br. at 83. As such, MW Builders is liable for the FCA's civil penalty of $11,000. Gov't Post Tr. Br. at 85.

### d.     Plaintiff's Response.

MW Builders responds that the "[t]he Government's positions are out of touch with the practical realities of the construction industry, the facts of this case, and controlling caselaw." Pl. Post Tr. Reply Br. at 1. As an initial matter, Mr. Cimpl's testimony that actual costs could be derived from the COMET accounting system is not a "binding" admission of fraud by MW Builders; RCFC 30(b)(6) testimony "is just testimony" and "evidence that can be used like any other evidence." Pl. Post Tr. Reply Br. at 6 (citing *A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001) ("[T]estimony given at a Rule 30(b)(6) deposition is evidence which, like any other deposition testimony, can be contradicted and used for impeachment purposes.")).

With respect to the statutory arguments, the Government has the burden to establish "clear and convincing evidence" of fraudulent intent under the Special Plea in Fraud statute. Pl. Post Tr.

Reply Br. at 7–8.  The anti-fraud provision of the CDA requires proof of specific intent to defraud, and defines "misrepresentation of fact" as "a false statement of substantive fact . . . made with intent to deceive or mislead." Pl. Post Tr. Reply Br. at 13–14 (41 U.S.C. § 7109(9) (internal correction omitted)).  Only the FCA places a contractor at risk for liability and damages, without evidence of specific intent to defraud, because the standard under the FCA is "reckless disregard for truth," *i.e.,* showing of an "aggravated form of gross negligence, or gross negligence plus." Pl. Post Tr. Reply Br. at 14 (citing *UMC Elecs. Co.*, 43 Fed Cl. at 819 n.15).

MW Builders also rejects the Government's contention that Mr. Campbell's inclusion of his estimated salary was false, because his salary was not reflected in MW Builders' COMET accounting system.  Pl. Post Tr. Reply Br. at 21.  The fact that the accounting system did not charge Mr. Campbell's salary to the Project does not mean that Mr. Campbell's salary was not incurred, although  Mr. Campbell's certified claim was an estimate of the additional costs MW Builders incurred after the Project's scheduled completion.  Pl. Post Tr. Reply Br. at 21.

The Government is also incorrect that Mr. Miltonberger's expert testimony should be read as supporting a finding of falsity.  Pl. Post Tr. Reply Br. at 22.  The primary difference between the $3,262.00 daily cost rate that Mr. Miltonberger calculated (the "Kenrich Rate"), and Mr. Campbell's daily cost rate of $4,071.00 was that the daily cost rate used costs incurred, but not reflected in MW Builders' accounting system for the project, *e.g.,* the non-union "gopher" labor and Mr. Campbell's salary.  Miltonberger Direct at 34-37.

Consequently, the only "potentially problematic" portion of MW Builders' claim is the Labor Burden: Mr. Campbell used a Labor Burden of 38.75%, but Mr. Miltonberger used the Labor Burden recorded by MW Builders' cost accounting system between March 1, 2012, and October 21, 2012, or 27.31%.  Pl. Post Tr. Reply Br. at 22–23 (citing Miltonberger Direct at 35). The 38.75% Labor Burden, however, was not "baseless," because Mr. Campbell reasonably decided to rely on a Labor Burden that MW Builders used on a change order proposal for additional work completed in November 2011 related to the design of the Project's water lines.  Pl. Post Tr. Reply Br. at 23; *see also* PX 651 (11/4/11 change order proposal); Miltonberger Direct at 11 (discussing the water line modification).

With respect to intent, although Mr. Campbell's preparation of the certified claim could be characterized "sloppy, ignorant, . . . and potentially negligent," it was not made with any intent to defraud.  Pl. Post Tr. Reply Br. at 27 (citing TR at 1229).  Although the Government cites to cases where the United States Court of Federal Claims determined that a contractor acted with intent to defraud, those cases are distinguishable: *Daewoo Engineering* involved a contractor that "drastically" inflated its claim by $50 million, 557 F.3d at 1339; and *UMC Electronics* involved a contractor that charged the Government for materials that the contractor never invoiced nor received, 43 Fed. Cl. at 809.  Mr. Campbell, however, admitted his mistake and the Government offered no explanation why MW Builders would commit fraud to claim only $179,647.00.[39]  Pl.

---

[39] The Government submits that the "unsupportable" part of MW Builders' claim is $179,647.00 or the difference between the December 27, 2012 certified claim's daily jobsite rate of $4,071.00, multiplied by 169 days minus the Government's damages expert Mr. Weathers' calculated daily jobsite rate of $3,008.00, multiplied by 169 days.  Gov't Post Tr. Br. at 94.

Post Tr. Reply Br. at 24–25. Finally, Mr. Campbell's testimony that he would be willing to negotiate evidences the willingness to settle, but does not reflect an intent to defraud. Pl. Post Tr. Reply Br. at 26.

### e.     The Government's Reply.

The Government replies that the following facts "conclusively establish" that MW Builders submitted a claim, with "deliberate ignorance" and "reckless disregard" of its falsity: (1) on December 27, 2012, MW Builders could have retrieved actual cost data from the COMET accounting system; (2) MW Builders knowingly did not use this information, but instead filed a certified claim, based on estimated costs; (3) the December 27, 2012 certified claim sought costs "incurred" by the delay in the delivery of permanent power; (4) Mr. Campbell admitted that the December 27, 2012 certified claim included errors; (5) MW Builders never informed the Army Corps that the December 27, 2012 certified claim included estimated costs; (6) MW Builders did not specify that costs were estimated, nor did it explain the estimating process; (7) MW Builders' December 27, 2013 Complaint included the same costs; (8) Mr. Miltonberger did not testify that the jobsite overhead costs in the December 27, 2012 certified claim were correct, but estimated they were lower; and (9) MW Builders admitted that it should have used actual costs in its claim. Gov't Post Tr. Reply Br. at 1–2. Together, these facts establish that MW Builders violated the FCA. Gov't Post Tr. Reply Br. at 2. The Government adds that these facts also establish that MW Builders acted with specific intent to defraud the Army Corps, and violated the Special Plea in Fraud statute and the antifraud provision of the CDA.[40] Gov't Post Tr. Reply Br. at 2–3.

### f.     The Court's Resolution.

#### i.     Regarding The Anti-Fraud Provision Of The Contract Disputes Act.

Under the CDA's anti-fraud provision, a contractor that is "unable to support any part of the contractor's claim," as a result of "misrepresentation of fact or fraud," is liable to the Government for an amount equal "to the unsupported part of the claim plus all of the Federal Government's costs attributable to reviewing the unsupported part of the claim." 41 U.S.C. § 7103(c)(2). A "misrepresentation of fact" is "a false statement of substantive fact, or conduct that leads to a belief of a substantive fact material to proper understanding of the matter in hand, made with intent to deceive or mislead." 41 U.S.C. § 7101(9); *see also Comm. Contractors, Inc. v. United States*, 154 F.3d 1357, 1362 (Fed. Cir. 1998) ("To recover under the CDA, the government is required to establish that the contractor made false or fraudulent statements in its submitted claim with *an intent to deceive or mislead the [G]overnment*." (emphasis added)). Therefore, to establish a violation of the CDA, the Government must prove, by a preponderance of evidence, falsity and

---

[40] The Government adds that the December 27, 2012 certified claim's failure to differentiate between actual and estimated costs violated the FAR that differentiates between "actual costs" and "forecasted costs." Gov't Post Tr. Br. at 86 (citing 48 C.F.R. § 15.408 tbl. 15-2).

intent to defraud.  *See* 41 U.S.C. §§ 7101(9), 7103(c)(2); *see also Daewoo Eng'g*, 557 F.3d at 1335 ("The [G]overnment must establish this falsity and intent by a preponderance of the evidence.").

The General Conditions Worksheet included a column, titled "Construction Staff" that listed certain MW Builders employees by name and a column titled "Quantity," that listed the number of weeks they worked, up to a maximum of 24 weeks, *i.e.*, 168 days.  JX 88 at 6–9.  A percentage column entitled "No." indicated the percentage amount of the "Quantity" period that any particular employee worked.  An example from the Claims Worksheet is shown below:

| GENERAL CONDITIONS | | No. | Quantity | Unit Labor | LABOR COST | Unit Mat'l. | MATL. COST | TOTAL LABOR & MATL. |
|---|---|---|---|---|---|---|---|---|
| **CONSTRUCTION STAFF** | | | | | | | | |
| Operations Manager | Greg Herriott (covered in Home Office OVHD) | 50% | 0 wk(s) | $ 2,450 | $ - | | | $ - |
| Operations Mgr/Senior Project Manager | Sparky Campbell | 100% | 24 wk(s) | $ 2,450 | $ 47,040 | | | $ 47,040 |
| Relocation | | | 0 ls | | | $ - | $ - | $ - |
| Housing Expense | | 100% | 24 wk(s) | | | $ 500 | $ 12,000 | $ 12,000 |
| Fringes | | 100% | 24 wk(s) | | | $ 212 | $ 5,088 | $ 5,088 |
| Labor Burden | | 100% | 24 wk(s) | $ 949 | $ 18,228 | | | $ 18,228 |
| Vehicle, Gas, Maintenance | | 100% | 24 wk(s) | | | $ 300 | $ 7,200 | $ 7,200 |

JX 88 at 6.

The General Conditions Worksheet also showed that MW Builders' construction staff cost was based on Mr. Campbell working 100% of the time for a 24 week period, *i.e.*, spending 168 days working on the Project.  JX 88 at 6.  At trial, Mr. Campbell testified that he did not cite this 24 week time period for a particular period of time.  TR at 1191.  Instead, he testified that "I am not saying it does comprise of any date.  I am just saying it's a calculation of 24 weeks.  It was going to take 24 weeks to complete the project.  We were delayed 24 weeks, so [it] is the cost we were going to incur over the period of 170 days."  TR at 1191.

In addition, the General Conditions Worksheet included "Labor Burden" costs for each of MW Builders' employees, including payroll taxes, workman's compensation, and insurance.  JX 88 at 6–9; 4/12/16 Cimpl Dep. at 33, 41 (explaining the meaning of labor burden costs).  Mr. Campbell calculated each employee's labor burden by calculating an amount equal to 38.75% of each employee's labor costs.  TR at 1203 (Campbell).  This 38.75%, however, was a "plug number" that MW Builders used to calculate labor burden on a proposed change order submitted during the course of the Project.  TR at 1227 (Campbell).  In addition to the labor burden, the Claims Worksheet listed the following expenses for each employee: "Relocation;" "Housing Expenses;" "Fringes;" and "Vehicle, Gas, [and] Maintenance."  JX 88 at 6–8.  At trial, Mr. Campbell testified that he estimated the "Housing Expenses" and "Vehicle, Gas, [and] Maintenance" expenses.  TR at 1223 (Campbell).  With respect to the "Fringes," Mr. Campbell testified that, although he did not estimate those costs, he now believed mistakes were made in calculating the amount of fringe for at least two employees.  TR at 1234 (Campbell).

At trial, Mr. Campbell also testified that, at the time the certified claim was submitted, he was "very confident" in the costs reported on the General Conditions Worksheet.  TR at 1176 (Campbell).  But, Mr. Campbell also testified that making estimates led to "multiple errors on [the] form;" some benefitted the Government and some benefitted MW Builders.  TR at 1177 (Campbell).  In short, the Claims Worksheet was "not accurate," in hindsight.  TR at 1176

(Campbell).  Mr. Campbell, however, was not concerned about submitting estimates at the time, because of the expectation that the certified claim would lead to negotiations with the Army Corps and, possibly, result in a change order.  TR at 1181–83 (Campbell).

Therefore, the Government argues that Mr. Campbell could and should have used MW Builders' accounting system in reporting the "actual costs" that MW Builders incurred from the Line Extension Agreement delay.  Gov't Reply at 1–2; *see also* 4/12/16 Cimpl Dep. at 87–88 ("If I wanted to look at actual job cost . . . I would go to look at what actual costs are recorded in the accounting system.").  Instead, Mr. Campbell estimated the costs on the General Conditions Worksheet in November 2012, and submitted with MW Builders' December 27, 2012 certified claim, based on his assumption that the project was delayed by 24 weeks (169 days), as a result of the lack of permanent power:

> [THE GOVERNMENT]: Okay.  So what is -- what time period does this 24-week period comprise? From what date to what date?
>
> [MR. CAMPBELL]: I am not saying it does comprise of any date.  I am just saying it's a calculation of 24 weeks.  It was going to take 24 weeks to complete the project.  We were delayed 24 weeks, so is the cost we were going to incur over the period of 170 days.
>
>          . . . .
>
> [THE GOVERNMENT]: All right. And specifically we are talking about 169 days as being the permanent power delay; right?
>
> [MR. CAMPBELL]: Not necessarily a time frame of the permanent power delay, but the time frame that it was going to take to complete the project. So the -- you know, once -- once we are able to start work and everything, we have about 24 weeks to do it in.  So this is the staff that was calculated to complete the project for the delay of 170 days or 24 weeks. I am not -- this form, I didn't go [to the accounting system] and say -- I didn't look at any particular date and time frame. I didn't put that in a box.  I just said, we were delayed 24 weeks, and we are calculating the costs of this staff for 24 weeks to complete the project.

TR at 1191–92; *see also* TR at 1238–39 (Campbell) ("I put together the worksheet: This is the typical costs we are going to incur on the job, and calculated an amount for 24 weeks.").

In other words, instead of specifying the exact period in which MW Builders incurred actual costs attributable to the delay, Mr. Campbell estimated the costs MW Builders would incur over a hypothetical 169 days *i.e.*, the time MW Builders' performance was delayed, because of the absence of permanent power.  When estimating these costs, Mr. Campbell also used a 38.75% "Labor Burden Percentage" that MW Builders submitted to the Army Corps on a prior Project Change Order Proposal on November 4, 2011.  PX 651; *see also* Miltonberger Direct at 11.  Then, Mr. Campbell used these cost estimates to calculate a daily jobsite overhead rate of $4,071.00—a rate higher than the $3,262.00 daily cost estimated by MW Builders' damages expert, Mr.

Miltonberger, and the $3,008.00 daily cost estimated by the Government's damages expert, Mr. Weathers.[41]   Miltonberger Direct at 33–34; Weathers Rev. Direct at 69–70.

It is true that MW Builders' December 27, 2012 certified claim did not state that MW Builders reported only estimated future costs, instead of costs incurred over a specific time period, (JX 88 at 1, 9–10; TR at 1209 (Campbell)).   And, it is also true that Mr. Campbell testified that he made "multiple mistakes" in preparing the General Conditions Worksheet (TR at 1176, 1216 (Campbell) (admitting that the worksheet was "not accurate")).[42]   Mr. Campbell also admitted that he should not have estimated a prospective daily jobsite overhead rate, but instead should have utilized the data in MW Builders' accounting system.   TR at 1229 (Campbell).   In short, the General Conditions Worksheet used to calculate costs in the December 27, 2012 certified claim was inaccurate and misleading.   JX 88 at 6.   But, MW Builders included a caveat that "[t]hese costs reflect our best knowledge at the present time, however, we reserve our right to revise this amount as may be necessary at a later date."   JX 88 at 2.

The fact that MW Builders should have used actual costs, instead of estimated costs, does not evidence that MW Builders acted with a specific intent to defraud the Government.   Although the Government cites to several cases where it was determined that a poorly-supported claim evidenced specific intent to defraud, these cases are distinguishable.   The Government cites *UMC Electronics Co.*, a non-precedential opinion, for the proposition that a contractor acts with fraudulent intent and violates the CDA, when it submits a claim based on estimated costs, instead of utilizing the "best and readily available evidence" of actual costs.   Gov't Post Tr. Br. at 88. There, the contractor submitted a claim for equitable adjustment that it could be obligated to pay, based on the escalation clauses of vendor purchase orders.   *See UMC Elecs. Co.*, 43 Fed. Cl. at 817–18.   But, the vendors did not bill the contractor, nor did the contractor pay those amounts.   *Id.* Moreover, the contractor, made "repeated and unequivocal representations" that the costs were invoiced "actual costs."   *Id.* at 798.   In addition, when the equitable adjustment was filed, 99% of the vendor invoices were much lower than the amounts claimed.   *Id.* at 820–21.   MW Builders, however, neither expressly nor fraudulently characterized their estimated costs as "actual costs." Next, the Government cites *Daewoo* for the proposition that when a contractor submits a claim as a mere "negotiating ploy," that is tantamount to fraudulent intent.   *See Daewoo Eng'g and Constr. Co. v. United States*, 73 Fed. Cl. 547, 585 (Fed. Cl. 2006), *aff'd*, 557 F.3d 1332 (Fed. Cir. 2009).

---

[41] The difference between the Government's expert Mr. Weathers' rate (the "CPMI rate") and MW Builders' expert Mr. Miltonberger's rate (the "Kenrich rate") is attributable to the period of time that each attributed to the delay caused by the absence of permanent power at the Project. *Compare* Weathers Rev. Direct at 70, *with* Miltonberger Direct at 34 ("The $245 per day variance between the Kenrich Rate of $3,262 and the CMPI Rate of $3,008 is solely due to Mr. Weathers' improper use of a truncated time period.").   Mr. Weathers arrived at a daily rate, based on costs incurred during the 153 days between May 1, 2012 and September 30, 2012.   Weathers Rev. Direct at 69.   In contrast, Mr. Miltonberger calculated a daily rate, based on costs incurred during the 245 days between March 1, 2012, and October 31, 2012.   Miltonberger Direct at 33.

[42] Some of these mistakes favored the Government.   Miltonberger Direct at 34 n.124 ("[C]alculation errors favored the Government in that they lowered the daily rate $375 from $4,446 to $4,071[.]").

But in *Daewoo*, the claims at issue were inflated by $50 million and "baseless;" MW Builders' claim was not baseless, but its "best knowledge" at the time the claim was submitted. JX 88 at 2.

Understandably, the Government seized on Mr. Campbell's testimony that he submitted the December 27, 2012 certified claim with an expectation it would lead to settlement negotiations with the Army Corps, as proof of intent to defraud. Gov't Post Tr. Br. at 85; *see also* TR at 1181–82 (Campbell). But, MW Builders' willingness to settle what it believed in good faith to be a valid certified claim does not evidence intent to defraud. TR at 1176 (Campbell) ("At the time I put [the General Conditions Worksheet] together, I was very confident in the costs that were provided in that form, were accurate."). In fact, one reason Congress enacted the CDA's certification requirement to "*encourage settlements.*" *See Fischbach and Moore Int'l Corp.*, 987 F.2d 759, 763 (Fed. Cir. 1993) (emphasis added).

The Government is correct that MW Builders' claim was overstated by $179,647.00. Gov't Post Tr. Br. at 94. But, MW Builders' damages expert explained: part of Mr. Campbell's daily cost rate was higher than Mr. Miltonberger's, but the majority of that difference was attributable to Mr. Campbell including certain non-Union labor and material costs[43] and his salary, which were not assigned to the Project by MW Builders' accounting system. Miltonberger Direct at 34–37. He characterized Mr. Campbell's assignment of these costs, however, as "somewhat subjective." Miltonberger Direct at 37. The remainder of the difference is attributable to Mr. Campbell taking the 38.75% "Labor Burden Percentage" that MW Builders used in a previous November 4, 2011 Change Order Proposal and applying it in calculating the December 27, 2012 certified claim. Miltonberger Direct at 35; *see also* PX 651 (change order proposal). But these decisions do not evidence specific intent to defraud the Government. And, the Government proffered no evidence that MW Builders certified the December 27, 2012 claim was either made or submitted, without an honest belief that it reflected what MW Builders was owed.

For these reasons, the court has determined that the Government did not establish that MW Builders acted with an intent to defraud by a preponderance of the evidence or otherwise violated the anti-fraud provision of the CDA in submitting the December 27, 2012 certified claim.

### ii.    Regarding The Special Plea In Fraud.

To establish a violation of the Special Plea in Fraud statute, 28 U.S.C. § 2514, the Government must show by "clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended to defraud the [G]overnment by submitting those claims." *Veridyne Corp. v. United States*, 758 F.3d 1371, 1376–77 (Fed Cir. 2014) (quoting *Daewoo*, 557 F.3d at 1342). Proof of "negligence and ineptitude," however, does not evidence intent to defraud under 28 U.S.C. § 2514. *See Miller v. United States*, 213 Ct. Cl. 59, 69 (Ct. Cl.

---

[43] The non-union labor costs included weekly cleanup costs, janitorial services, weather protection, and "gopher" work, but was labeled as an "estimate" on the General Conditions Worksheet. JX 88 at 9. The "non-time related" material costs included relocation, temporary facility, and safety costs. JX 88 at 9–10.

1977) (holding that a contractor's "confused and incorrect" invoices, although evident of a "pattern of carelessness and slothfulness," did not rise to the level of deliberate fraud.).

The Government argues that it has shown clear and convincing evidence that the December 27, 2012 certified claim was submitted with the specific intent to defraud. Gov't Post Tr. Reply Br. at 3. But, since the Government did not establish intent to defraud by a preponderance of the evidence, under the anti-fraud provisions of the CDA, as a matter of law, it cannot show an intent to defraud under the heightened clear and convincing evidence standard, under the Special Plea in Fraud statute. *See Veridyne Corp.*, 768 F.3d at 1376–77. In the alternative, the Government argues that it need not show clear and convincing evidence of "scienter," because the United States Court of Federal Claims determined, in *American Heritage Bancorp*, that a "maker of false statements can have the requisite scienter under [28 U.S.C.] § 2514[,] even if he does not know for certain that his statements are false, as long as the statements are made with reckless disregard for the truth." Gov't Post Tr. Br. at 78 (quoting 61 Fed. Cl. at 391). This non-binding decision, however, is contrary to the express language of 28 U.S.C. § 2514 and is not supported by appellate precedent.

Unlike the FCA, the Special Plea in Fraud statute contains no express language that permits a finding of fraud, based on a contractor's "recklessness." *See* 28 U.S.C. § 2514 ("A claim . . . shall be forfeited by any person who corruptly practices or attempts to practice any fraud[.]"). "Corruptly,"[44] however, does not equate to a reckless violation of the statute, but requires actions are deliberate and evidence specific intent to defraud. Therefore, the United States Court of Appeals for the Federal Circuit has held that a contractor violates the Special Plea in Fraud statute only when a false claim is submitted both with actual knowledge of falsity and an intent to defraud. *See Veridyne Corp.*, 758 F.3d at 1376–77 ("To prevail under section 2514, the [G]overnment must establish by clear and convincing evidence that the contractor *knew that its submitted claims were false, and that it intended to defraud the [G]overnment by submitting those claims.*" (emphasis added and internal quotation marks omitted)); *see also Daewoo Eng'g*, 557 F.3d at 1341 (same); *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1379 (Fed. Cir. 2001) (same); *Comm. Contractors, Inc. v. United States*, 154 F.3d 1357, 1362 (Fed. Cir. 1998) (same); *Young-Motenay, Inc. v. United States*, 15 3d 1040, 1042 (Fed. Cir. 1994) (same).

For these reasons, the court declines to read the Special Plea in Fraud Statute as permitting a finding of fraud, based upon a contractor's "reckless disregard for truth," and has determined that MW Builders did not violate the Special Plea in Fraud statute by submitting the December 27, 2012 certified claim.

### iii.     Regarding The False Claims Act.

Under the FCA, any person who "knowingly" presents a "false or fraudulent claim for payment" to the Government or who "knowingly makes, uses, or causes to be used, a false record

---

[44] In 1948, when the Special Plea in Fraud statue was enacted, "corrupt" was defined as "changed from a state of uprightness, correctness, truth, etc. to a bad state; vitiated; depraved; debased; perverted; as *corrupt* language; *corrupt* judges." *Corrupt*, WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 599 (2d ed. 1948); *see also* Pub. L. No. 80-773, ch. 646, 62 Stat. 978 (1948) (enacting the Special Plea in Fraud Statute into law).

or statement material to a false or fraudulent claim," is liable for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of any damages sustained by the Government. *See* 31 U.S.C § 3729(a)(1)(A), (B); *see also* 28 C.F.R § 85.3(a)(9) (adjusting the FCA penalties to $5,500 and $11,000). Again, "[t]he Government must establish a violation of the False Claims Act by a preponderance of the evidence." *See Daewoo Eng'g*, 557 F.3d at 1340.

"Claim" is defined by the FCA as any "request or demand, whether under contract or otherwise, for money or property" that is presented "to an officer, employee, or agent of the United States." 31 U.S.C. § 3729(b)(2)(A)(i). A claim is "false or fraudulent" when it includes a material misrepresentation. *See Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002–03 (2016) ("A misrepresentation . . . must be material to the Government's payment decision in order to be actionable under the False Claims Act."). A misrepresentation is "material" when it has "the natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). With respect to knowledge, a person acts "knowingly" for purposes of the FCA, even without actual knowledge of falsity, if the person "acts in deliberate ignorance of the truth or falsity of the information" or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Reckless disregard may be evidenced by a "pattern of carelessness and slothfulness," such as the "failure to keep an inventory, [a] lack of payroll records . . . and confused and incorrect invoices." *See Miller*, 213 Ct. Cl. at 69–70. Therefore, a contractor acts with reckless disregard, when an inaccurate claim is submitted for payment without making a minimal examination of the records that is reasonable and prudent under the circumstances. *Id.* at 70 (holding that a contractor violated the FCA when he did not check the material costs claimed against inventory). The Government asserts that MW Builders recklessly submitted a false claim when it submitted the December 27, 2012 Certified Claim. Gov't Post Tr. Reply Br. at 2.

MW Builders' Senior Operations Manager and on-site Project Manager, Mr. Campbell, Operations Manager Greg Herriott, and MW Builders' President, Jason Evelyn prepared MW Builders' December 27, 2012 Certified Claim. TR at 1172–1176 (Campbell). In November 2012, Mr. Campbell prepared the Claim Worksheet to support MW Builders' claim. TR at 1178 (Campbell).[45] Mr. Herriott prepared the letter accompanying the Claim Worksheet, wherein MW Builders requested to recover costs "incurred" as a result of the Line Extension Agreement delay. TR at 1172 (Campbell); *see also* JX 88 at 1. After receiving these documents, Mr. Evelyn signed and certified the December 27, 2012 claim prior to submission. TR at 741 (Evelyn). Mr. Evelyn was an experienced contractor, who previously performed "hundreds of millions of dollars" worth of construction work for the Government over the nineteen years that he worked at MW Builders, but he did not recall any other situation when the company submitted a claim to a CO. TR at 725 (Evelyn). When Mr. Campbell presented the Claims Worksheet to Mr. Evelyn for certification, he informed Mr. Evelyn that he felt "very comfortable" about the costs claimed, and he believed the claim was "accurate." TR at 1178 (Campbell). Mr. Evelyn briefly reviewed the claim, but did

---

[45] In August 2012, Mr. Herriott, MW Builders' on-site Project Manager, became ill with cancer. TR at 639 (Campbell). This required Mr. Campbell to assume Mr. Herriott's on-site responsibilities and also prepare the December 27, 2012 Certified Claim, although he did not have Mr. Herriott's firsthand knowledge of what costs were assigned to the Project. TR at 639–40 (Campbell).

not participate in the preparation process and did not review any of the accounting backup. TR at 742 (Evelyn).

The court does not disagree with the Government's view that Mr. Evelyn's review was not as thorough as it could have been. But, in other cases where the United States Court of Federal Claims has found FCA liability, there was not even a minimal examination of records. For example, in *Gulf General Enterprises Co. v. United States*, 114 Fed. Cl. 258 (Fed. Cl. 2013), the general manager of the contracting company testified that he did not examine an attorney-prepared certified claim that he had signed until prior to his deposition during discovery. *Id.* at 295. If he had examined the claim, he would have discovered that his company claimed approximately $7,000,000 in damages when the Government only could order a maximum of $1,447,457.22 under the contract. *Id.* at 328. Under these circumstances, the court determined that the contractor acted with reckless disregard of the truth. *Id.* at 329. Similarly, in *Railway Logistics International v. United States*, 103 Fed. Cl. 252 (Fed. Cl. 2012), the court found that the contractor knowingly submitted a false claim in violation of the FCA, despite the contractor's argument that it was guilty only of "poor record-keeping," because it submitted an "obviously and grossly inflated" claim that exceeded the actual cost by at least $1,800,000. *Id.* at 258–59.

In this case, however, the costs reported on MW Builders' Claims Worksheet were not facially false or inconsistent. JX 88 at 6–10. Mr. Campbell's estimated costs were similar to the actual costs recorded in MW Builders' accounting system and most of the difference is accounted for by his decision to include certain costs, such as the non-union labor costs, assigned to the Project. Miltonberger Direct at 34–37. The other difference arose from Mr. Campbell's use of a 38.75% Labor Burden that was used on a prior change order. Miltonberger Direct at 35. Therefore, there was nothing in the December 27, 2012 Certified Claim that appeared to be as glaringly inconsistent as the $5 million of supported costs in *Gulf General Enterprises Co.* or the $1,800,000 million in *Railway Logistics International*. As such, the court declines to find that MW Builders' pre-submission review of its claim was reckless, *i.e.*, grossly negligent.

For these reasons, the court has determined that MW Builders did not violate the FCA when it submitted the December 27, 2012 Certified Claim.

## IV.   CALCULATION OF DELAY CAUSED BY THE UNITED STATES ARMY CORPS OF ENGINEERS' BREACH AND DAMAGES.

Since the court has determined that the Army Corps violated the duty of good faith and fair dealing by attempting to shift the contractual obligation to sign the Line Extension Agreement to MW Builders, the court must determine the extent of the unreasonable delay that was caused by the Army Corps' conduct, and the costs MW Builders.

A.     **The Parties' Scheduling Experts.**

1.     **Plaintiff's Scheduling Experts.**

a.     **Mr. Neil W. Miltonberger.[46]**

Mr. Miltonberger was retained by MW Builders to "determine the durations and root causes of delays to MW Builders' work and identify and quantify resulting economic damages to MW Builders." Miltonberger Direct at 2. Mr. Miltonberger performed an "Observational/ Dynamic/Contemporaneous As-Is" analysis, *i.e.*, he: (1) "observed" MW Builders' contemporaneous project schedules; (2) "dynamically" considered changes in schedule "logic," *i.e.*, the order in which activities must be performed, that were incorporated in the schedules, as they were updated; and (3) reviewed the contemporaneous schedules "as-is," *i.e.*, without any after-the-fact changes. Miltonberger Direct at 8.

The initial Project Substantial Completion date was August 30, 2012, but MW Builders did not achieve that objective until October 17, 2013, because the Project was delayed by 413 days. Miltonberger Direct at 3. Mr. Miltonberger divided this delay into three time periods, or "Windows 1, 2, and 3." Miltonberger Direct at 9. Window 1 covered the period from the November 9, 2010 Notice To Proceed through February 22, 2012, including 20 days of critical path delay relating to waterline design revisions. Miltonberger Direct at 9, 11. Window 2 covered the period from February 22, 2012, to October 31, 2012, including 170 days of delay. Miltonberger Direct at 3, 9. Window 3 covered the period from October 31, 2012, when MW Builders began installing temperature and humidity sensitive material, until October 13, 2013, the substantial complete date. Miltonberger Direct at 18–19. Window 3 included 223 days of delay. Miltonberger at 9.

The Window 1 delay was resolved by a January 2012 Change Order, pursuant to which the Project Substantial Completion was extended 20 days, *i.e.*, until September 19, 2012. Miltonberger Direct at 11. The Window 3 delay likewise was resolved by several change orders issued by the Army Corps, that granted MW Builders a total of 247 extra days. Miltonberger

---

[46] Mr. Miltonberger is the Vice President of the Kenrich Group, a firm that performs forensic analysis of schedule delays for both construction owners and contractors. TR at 865–66 (Miltonberger). Mr. Miltonberger holds both Bachelor of Science and Master of Science degrees in Civil Engineering from the University of Illinois at Urbana Champaign, as well as a Master of Business Administration degree from Northwestern University J. L. Kellogg Graduate School of Management, in which he specialized in finance and real estate. Miltonberger Direct at 12. Mr. Miltonberger is also a Licensed Professional Engineer in the State of Illinois, and a Cost Professional certified by AACE International. Miltonberger Direct at 2. Mr. Miltonberger's studies included coursework in Critical Path Method scheduling, a method of analysis that he uses to estimate the length of project delay. Miltonberger Direct at 1. Mr. Miltonberger has been working in the field of forensic schedule analysis for twenty-three years. TR at 865 (Miltonberger). Therefore, the court has determined that Mr. Miltonberger qualifies as an expert in "forensic schedule analysis and economic damages." TR at 867; *see also* FRE 702.

Direct at 18–19. The 170-day delay in Window 2 is the subject of this case. Miltonberger Direct at 3.

In the opinion of MW Builders' expert, contemporaneous schedules show that the 170-day delay is solely attributable to a lack of permanent power. Miltonberger Direct at 4. MW Builders' March 2012 Schedule Update first identified the impact on subsequent critical path activity. Miltonberger Direct at 14. For the Project to remain on schedule, permanent power was a necessary prerequisite to multiple critical path activities, including the installation of climate and temperature sensitive materials in the Training Building, equipment start-up, elevator installation and testing, and fire pump start-up and system flush. Miltonberger Direct at 14. Subsequent schedule changes showed the Critical Path delay, as it accumulated, because of the Army Corps' failure to sign the Line Extension Agreement until July 23, 2012. Miltonberger Direct at 14–15.

During Window 2, 140 days of critical path delay occurred between the February 22, 2012 Schedule Update and July 23, 2012, the date the Line Extension Agreement was signed by the Army Corps. Miltonberger Direct at 16. An additional 30 days of delay was attributed to electrical metering activities at the Pump House.[47] Miltonberger Direct at 16. But, the full Critical Path Delay was not "realized" until the October 31, 2012 schedule narrative, wherein MW Builders explained that the critical path was delayed by 169 days due to lack of permanent power. Miltonberger Direct at 17.

To calculate MW Builders' time-related costs, Mr. Miltonberger reviewed MW Builders' cost-accounting system and identified the following time-related Jobsite Overhead Cost items:

- Construction Management Costs: MW Builders employees' time that was charged to the Project;
- Equipment Costs: daily costs for time-related equipment;
- Materials Costs: costs for time-related items such as job trailers, portable toilets, and office supplies; and
- Support Craft Labor: craft labor that supported the overall job site, such as site cleanup.

Miltonberger Direct at 20.

These time-related job overhead costs differed during the course of the Project, including "ramp-up" costs at the beginning of an activity and "ramp-down" costs at the end of an activity. Miltonberger Direct at 20. Mr. Miltonberger accounted for these differences by calculating an average daily cost only for Window 2. Miltonberger Direct at 20; *see also* Miltonberger Direct Att. 5. Contemporaneous Project records also verify that, from March 1, 2012 to October 31, 2012

---

[47] MW Builders is not requesting damages for the 30 days of delay related to the pump-house activities. Pl. Reply at 45–46; *see also* Pl. Post Tr. Br. at 93 (arguing that the Army Corps caused 140 days of delay).

MW Builders incurred $799,926.00 in time-related costs.  Miltonberger Direct Att. 5.[48]  Dividing this amount by the 245 days that elapsed during this period yielded a "Jobsite Overhead Daily Rate" of $3,262.00 per day.  Miltonberger Direct at 5.  Multiplying this daily amount by the 140 additional days of delay caused by the Army Corps' conduct yielded a total of $456,680.00. Miltonberger Direct at 21.  This was referred to as "Extended Jobsite Overhead."  Miltonberger Direct at 21.

### b.    Mr. Denny Lee.[49]

MW Builders also proffered Mr. Denny Lee as an expert in "performing labor review and inefficiency analysis and evaluation of damages and costs incurred in construction projects."  TR at 819.  Mr. Lee was retained to analyze Bergelectric's uncompensated costs incurred due to the late delivery of permanent power.  Lee Direct at 1.  Mr. Lee's expert testimony, however, is irrelevant, because the court has determined that Bergelectric waived any pass-through claims.

### 2.    The Government's Scheduling Expert, Mr. Stephen Weathers.[50]

Mr. Weathers was retained to analyze MW Builders' May 15, 2013 claim for 169 days of compensable delay and respond to MW Builders' expert reports.  Weathers Rev. Direct at 8.  In performing his analysis, Mr. Weathers reviewed the September 10, 2010 Contract, the Army Corps' contract files, and documents obtained from MW Builders and NV Energy, including MW Builders' schedules and cost records.  Weathers Rev. Direct at 8–9.

Mr. Weathers opined that, if the Government is responsible for delay in signing the Line Extension Agreement, the delay was, at most, 71 days.  Weathers Rev. Direct at 13.  His conclusion

---

[48] Although Mr. Miltonberger relied on MW Builders' accounting records to ascertain these costs, he also "tested" portions of his conclusions against MW Builders' invoices and payroll records to ensure that the accounting entries matched actual costs.  TR at 920 (Miltonberger).

[49] Mr. Lee is the Chief Financial Officer and Vice President of CTG International, LLC, an independent consulting firm.  Lee Direct at 1.  He previously worked for other national and international business and litigation consulting firms, and managed numerous industrial and federal projects ranging from $3 to $25 million.  Lee Direct at 1.  In addition, he worked as a construction claims consultant for the past 15 years and was involved in over $500 million of construction claims.  Lee Direct at 1.

[50] Mr. Weathers is a founding shareholder and Project Manager at Capital Project Management ("CPMI"), a construction consulting firm that "provides project scheduling and dispute resolution consulting services."  Weathers Rev. Direct at 7–8.  Mr. Weathers has over 30 years of experience in the construction industry and has testified numerous times, including in the United States Court of Federal Claims.  Weathers Rev. Direct at 8.  Therefore, the court considered Mr. Weathers an expert in "schedule delay analysis, construction damages, including loss of productivity, construction contract administration and management."  TR at 1264; *see also* FRE 702.

was based on an analysis of MW Builders' February 22, 2012 schedule,[51] that showed June 5, 2012 as the "late finish date" for activities dependent on permanent power. Weathers Rev. Direct at 13, 33, 43; *see also* PX 325 (2/22/12 schedule). The February 22, 2012 schedule assumed the "early finish date" was April 9, 2012. Weathers Rev. Direct at 33–34. But, that schedule allowed for 39 days of "float," *i.e.*, the amount of time that can pass before an activity becomes "critical." Weathers Rev. Direct at 34. Therefore, in Mr. Weathers' judgment, permanent power could be supplied as late as June 5, 2012, and not affect the Project completion date. Weathers Rev. Direct at 34. But, with a start date of June 5, 2012, 113 days passed before permanent power was supplied on September 26, 2012. Weathers Rev. Direct at 43.

MW Builders' February 22, 2012 schedule, however, set aside 28 days for NV Energy to do its work after the Line Extension Agreement was executed. Weathers Rev. Direct at 43–45. The Line Extension Agreement was signed on July 12, 2012, and MW Builders paid NV Energy's fee on July 18, 2012. Weathers Rev. Direct at 43 (citing DX 153, 160). Therefore, according to MW Builders' February 22, 2012 schedule, NV Energy should have finished its work by August 15, 2012, *i.e.*, 28 days after MW Builders paid the fee on July 18, 2012. Weathers Rev. Direct at 44.[52] Therefore, the delay was 71 days, *i.e.,* from June 5, 2012 to August 15, 2012. Weathers Rev. Direct at 45.

---

[51] This was the last schedule update filed by MW Builders prior to the Line Extension Agreement dispute in March 2012.

[52] MW Builders' February 22, 2012 projection that NV Energy's work should take 28 calendar days (20 work days) was consistent with a July 17, 2012 NV Energy email, wherein Ms. Creveling stated it would take NV Energy about three weeks to complete its work. DX 200 at 9.

3.      **The Scheduling Experts' Critiques.**

Mr. Miltonberger criticized Mr. Weathers' analysis as technically flawed, because he used an "Impact As-Planned" methodology.  Miltonberger Direct at 21–25.  Mr. Miltonberger created the following table to illustrate how Mr. Weathers' analysis mirrored that approach:

**Table 4**
**The Basic Steps In Mr. Weathers'**
**Impacted As-Planned Analysis**
**Of Permanent Power Delays**

| Step # | Impacted As-Planned Step[71] | Mr. Weathers' Analysis |
|---|---|---|
| 1. | Select the as-planned network to be utilized as the "Un-Impacted Schedule". | Mr. Weathers selects the February 22, 2012 AR17 schedule update as his "Un-Impacted Schedule." |
| 2. | Create the "Impacted Schedule" by inserting an activity into the "Un-Impacted Schedule" to represent the selected delay. | Mr. Weathers inserts an activity that reflects an alleged 113-day delay to Permanent Power. |
| 3. | Compare the Project completion date of the impacted and un-impacted schedules to determine the impact of the inserted delay. | Mr. Weathers concludes that the 113-day difference between the "Impacted Schedule" and the "Un-Impacted Schedule" represents the Permanent Power delay. |

Miltonberger Direct Tbl. 4.

The "Impacted As-Planned" method measures the delay of an activity along a project's planned critical path and assumes it accurately reflects the project's actual critical path delay. Miltonberger Direct at 23–4, 27–8.  But, it does not account for the fact that a delay in one activity, along the project's planned critical path, can adversely affect another activity on the critical path, resulting in additional delays not accounted for in the project's originally planned critical path. Miltonberger Direct at 23.  For this reason, the "Impacted As-Planned" methodology has been criticized by AACE International, the principal certification body for cost estimators and cost engineers, as it does not account for changes in logic or in durations of activities.  Miltonberger Direct at 23 (citing AACE INTERNATIONAL RECOMMENDED PRACTICE NO. 29R-03–FORENSIC SCHEDULE ANALYSIS at 76).

In addition to using a "technically flawed and unreliable" scheduling method, Mr. Weathers also used the wrong schedule, because he relied on the February 22, 2012 Schedule Update.  Miltonberger Direct at 25.  MW Builders did not realize that permanent power delay affected the critical path until the March 28, 2012 Schedule Update.  Miltonberger Direct at 25. But, Mr. Weathers found that the permanent power delay began to accrue on May 16, 2012. Miltonberger Direct at 27.  If Mr. Weathers used the March 28, 2012 Schedule Update, however, he would have realized that MW Builders subsequently updated its schedule logic, so that providing permanent power on May 16, 2012 would result in 38 days of delay.  Miltonberger Direct at 27.

Mr. Weathers countered that he did not use an "Impacted As-Planned" methodology, because he did not "import" any logic into the February 22, 2012 schedule.  Weathers Rev. Direct

at 52–53. Instead, Mr. Weathers compared that schedule against the actual date on which permanent power was supplied, *i.e.*, September 26, 2012. Weathers Rev. Direct at 53. In addition, although Mr. Miltonberger argues that the February 22, 2012 schedule did not have schedule logic for permanent power activities, it is not the Army Corps' fault that MW Builders did not amend the schedule to include all the correct activities until March 28, 2012. Weathers Rev. Direct at 54. To the extent that the March 28, 2012 schedule was the first to logically tie together permanent power and conditioned air, these ties should have been included from the outset. Weathers Rev. Direct at 54.

Like Mr. Miltonberger, Mr. Weathers calculated daily jobsite overhead costs for MW Builders by totaling the amount of time-related costs incurred over a period of delay and then dividing that amount by the number of days in the period. Weathers Rev. Direct at 69. Although Mr. Miltonberger based his $3,262.00 a day rate on the 245 days that elapsed between the February 22, 2012 schedule and the signing of the Line Extension Agreement on July 23, 2012, Mr. Weathers used a shorter period. Weathers Rev. Direct at 69.

Mr. Weathers also derived two different daily jobsite overhead cost rates, based on two different sets of data:

- if delay is measured from May 3, 2012 (the day MW Builders argues was the last day for permanent power to be supplied without critical path delay) to September 26, 2012 (the day permanent power was supplied), then the daily jobsite overhead cost rate is $3,008.00 per day, based upon the $460,211.00 in costs incurred during that period ($460,221.00/153 days= $3,008.00/day);
- if delay is measured from June 5, 2012 to August 15, 2012, then the daily jobsite overhead rate is $2,787.00 per day.[53]

Weathers Revised Direct at 70.

Mr. Weathers also analyzed other costs claimed by MW Builders. Weathers Rev. Direct at 59. First, he looked at MW Builders' $155,988.00 claim for materials and equipment costs, based on the cost of renting generators from January 2012 to September 2012. Pl. Post Tr. Br. at 120; *see also* Weathers Rev. Direct at 71. But, the generator costs cited were incurred well before April 9, 2012. Weathers Rev. Direct at 73. In addition, many of the costs MW Builders claimed were duplicative of Bergelectric's claim. Weathers Direct at 73. For example, during the period from May 3, 2012 to October 19, 2012, MW Builders incurred $1,158.00 in generator and fuel costs. Weathers Direct Tab F. But, that amount was offset by a $1,112.00 credit received for temporary power, so the amount should be $46.00. Weathers Direct Tab F. After that amount is adjusted for taxes and for the 71 day period between June 1, 2012 and August 15, 2012, MW Builders' materials and equipment costs were $20.89 or roughly $21.00. Weathers Direct Tab F.

---

[53] Mr. Weathers used monthly cost data for this rate, so he divided the $256,401.00 in time-related costs incurred from June 1, 2012 to August 31, 2012, by the 95 days that elapsed during this period, for a total of $2,787.00 per day. Weathers Revised Direct at 70.

MW Builders also seeks to recover home office overhead at a rate of 10%. Pl. Post Tr. Br. at 121. But, Mr. Weathers testified that a more reasonable overhead rate would be 3.8%, based upon a total home office overhead of $12,227,059.00 divided by total company billings of $321,939,423.00. Weathers Rev. Direct at 76 (citing JX 88 at 5). Mr. Weathers, however, opined that the 3.8% should be marked up to 5%, since that was consistent with MW Builders' bid sheets that included a "Fee" of less than 4% and an "Operations Overhead" amount of 0.65%. Weathers Rev. Direct at 77 (citing DX 1 at 3).

## B.    Plaintiff's Damages Claim.

### 1.    Plaintiff's Claimed Amount.[54]

MW Builders claims that the following costs were incurred as a result of the unreasonable delay caused by the Army Corps' breach of the September 10, 2010 Contract and violation of the duty of good faith and fair dealing:

- Extended General Conditions Costs, at a rate of $3,262.00 per day for 140 days, or $456,680.00;
- Material and Equipment Costs, in the amount of $155,988.00 for generator rentals;
- overhead of at a rate of 10%;
- profit at rate of 8%;
- a bond fee of 1.07%.

Pl. Post Tr. Br. at 122.

### 2.    The Government's Response.

The Government responds that, if MW Builders recovers extended general conditions costs, it should recover them at the rate and for the delay found by Mr. Weathers, *i.e.*, MW Builders should recover costs at a rate of $2,787.00 a day for 71 days, or a total of $167,911.00. Gov't Post Tr. Br. at 133. Specifically, MW Builders is not entitled to recover $155,988.00 in generator costs, because the September 10, 2010 Contract assigned responsibility for temporary power to MW Builders, and MW Builders subsequently subcontracted that responsibility to Bergelectric. Gov't Post Tr. Br. at 134 (citing TR at 693 (Campbell) (conceding that MW Builders and Bergelectric were responsible for temporary power)). Moreover, the period for which MW Builders claims generator costs is "grossly excessive," because it ran from January 2012 to September 2012, but MW Builders' contemporaneous schedules showed that permanent power was not to be installed until April 2012 at the earliest. Gov't Post Tr. Br. at 134.

---

[54] MW Builders revised the total claimed damages on several occasions. In the December 27, 2012 Certified Claim, MW Builders claimed $2,139,215.00 in damages. JX 88 at 1. But, in the subsequent May 15, 2013 Revised Certified Claim, MW Builders claimed $2,562,049.00 in damages. JX 89 at 2. Subsequently, that claim was revised downwards and, in the August 19, 2016 Proposed Findings Of Fact And Conclusions Of Law, MW Builders claimed $1,362,206.65 in damages. Pl. Post Tr. Br. at 122.

With respect to overhead, MW Builders should recover overhead at a rate of 3.8%, as calculated by Mr. Weathers.  Gov't Post Tr. Br. at 135 (citing Weathers Revised Direct at 76). And, MW Builders also should not recover profit, because FAR 52.242-14(b) expressly disallows profit, when calculating amounts owed due to a Government-caused delay.  Gov't Post Tr. Br. at 135; *see also* 48 C.F.R. § 52.241-14(b).[55]

### 3.      The Court's Determination.

#### a.      Regarding The Amount Of Delay.

The experts in this case used two different methods to calculate the delay caused by the Army Corps.  Mr. Miltonberger calculated 140 days of delay, by conducting a "Windows" analysis, analyzing MW Builders' contemporaneous schedules, and dividing the Project into three separate "windows" or delay periods.  Miltonberger Direct at 9.  In his analysis of "Window 2," Mr. Miltonberger tracked the effect of the permanent power delay, as it was "realized" by MW Builders' schedulers, up until July 12, 2012, when the Line Extension Agreement was signed by

---

[55] FAR 52.242-14, as incorporated in the September 10, 2010 Contract, provides:

(a) The Contracting Officer may order the Contractor, in writing, to suspend, delay, or interrupt all or any part of the work of this contract for the period of time that the Contracting Officer determines appropriate for the convenience of the Government.

(b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the Contracting Officer in the administration of this contract, or (2) by the Contracting Officer's failure to act within the time specified in this contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor, or for which an equitable adjustment is provided for or excluded under any other term or condition of this contract.

(c) A claim under this clause shall not be allowed (1) for any costs incurred more than 20 days before the Contractor shall have notified the Contracting Officer in writing of the act or failure to act involved (but this requirement shall not apply as to a claim resulting from a suspension order), and (2) unless the claim, in an amount stated, is asserted in writing as soon as practicable after the termination of the suspension, delay, or interruption, but not later than the date of final payment under the contract.

48 C.F.R. § 52.242-14; *see also* DX 16A at 169 (9/10/10 Contract incorporating Suspension of Work clause).

the Army Corps. Miltonberger Direct at 16. During that period, as more days accumulated without permanent power, MW Builders' schedulers pushed the completion date outwards with each schedule update. Therefore, although MW Builders' schedules at the beginning of Window 2 estimated a substantial completion date of September 19, 2012 (PX 337), the June 29, 2012 schedule estimated a substantial completion date of February 6, 2013, *i.e.*, 140 days later. Miltonberger Direct at 16 (citing PX 329, 336).

In contrast, Mr. Weathers compared one schedule—MW Builders' February 22, 2012 Schedule—against the actual Project dates. Weathers Direct at 43. MW Builders' February 22, 2012 Schedule set a "late finish date" for permanent power as June 5, 2012, and provided that NV Energy's post-Line Extension Agreement work would take 20 work days or 28 calendar days. DX 75. But, the Line Extension Agreement was not signed until July 12, 2012, and NV Energy's fee was not paid until July 18, 2012. Weathers Direct at 43. Permanent power, however, was not provided until September 26, 2012, or 113 days after June 5, 2012. Weathers Direct at 43. Therefore, based on the February 22, 2012 Schedule, NV Energy should have provided power by August 15, 2012, *i.e.*, 28 calendar days after NV Energy's fee was paid. Weathers Direct at 43. Therefore, Mr. Weathers believed the delay should begin on June 5, 2012 and end on August 15, 2012, or 71 days. Weathers Direct at 43.

Mr. Weathers' main complaint with Mr. Miltonberger's analysis was that it incorporates several logic changes that MW Builders made to schedules during the course of the Line Extension Agreement delay. First, in MW Builders' March 28, 2012 Schedule Update, MW Builders adjusted the schedule to add activities to "track and estimate" potential delay related to the obtaining of permanent power. PX 337. These three activities "represent[ed] the time required, per building, to startup the HVAC system." PX 377 at 2. Then they were logically linked to temperature sensitive activities, such as the installation of VCT, that could not be performed inside buildings until air conditioning was available. PX 377 at 2. This logic change added an additional 10 days to MW Builders' projections. PX 377 at 2. Second, in the April 26, 2012 Schedule Update, MW Builders revised its estimate of how long NV Energy needed to perform its work related to the provision of the permanent power. PX 338 at 2. Previously, MW Builders assumed this work would take 20 work days, or 28 calendar days. PX 338 at 2. But, on April 26, 2012, MW Builders projected that NV Energy's work would take 30 work days, or 42 calendar days. PX 338 at 2. This change in logic resulted in 14 calendar days being added for activities that may occur after the Line Extension Agreement was signed.

The September 10, 2010 Contract required MW Builders to submit schedule updates on a monthly basis to the Army Corps for approval. DX 17 at 3; *see also* Jt. Stip. ¶ 17. Several of these schedule updates were reviewed by Management Solutions, the Army Corps' scheduling consultant. PX 348. After reviewing the April 26, 2012 Schedule Update, Management Solutions informed the Army Corps that MW Builders made changes to the scheduling logic. PX 348. But, the Army Corps approved those changes in logic and approved MW Builders' schedule. PX 348; *see also* TR at 1063–64 (Musgrave).

During trial, Mr. Weathers testified that he did not disagree with the "substance" of these logic changes and updates to MW Builders' schedule. TR at 1288 (Weathers). But, he objected to their timing, because MW Builders should have made those changes earlier. TR 1289 (Weathers). In addition, the fact that MW Builders previously underestimated how long NV

Energy would take to do its work (*i.e.*, 30 work days instead of 20 work days) cannot be attributable to the Government; it is either MW Builders' fault for not communicating with NV Energy or a third party delay. TR 1293 (Weathers).

In the court's judgment, the logic changes included in the March 28, 2012 schedule were necessary to determine the critical path delay, since the March 28, 2012 schedule was the schedule to logically tie temperature sensitive construction activities to the provision of permanent power and the activation of air-conditioning in the buildings. In addition, Mr. Miltonberger's "Windows" method appeared to be the more reliable method for determining critical path delay, because it reflected the contemporaneous changes to the schedule that occurred as MW Builders continued to operate without permanent power. This is important, because it reflects that MW Builders began to run out of construction activities that did not require permanent power, during the months between when the Line Extension Agreement issue first was raised on March 13, 2012, and July 12, 2012, when the Army Corps fulfilled its contractual obligation to sign the Line Extension Agreement. But, the court also agrees with Mr. Weathers' analysis, in so far as the Government should not be blamed for MW Builders failure to: (a) logically tie certain activities together; and (b) properly estimate the amount of time NV Energy needed to do its work. Weathers Direct at 54–55. Therefore, the court has decided to deduct 24 days from Mr. Miltonberger's calculated delay.

For these reasons, the court has determined that the Army Corps' was responsible for 116 days of delay.

## b.     Regarding The Daily Jobsite Overhead Rate.

Mr. Miltonberger and Mr. Weathers calculated the daily jobsite overhead rate in the same manner. Miltonberger Direct Att. 5; Weathers Direct 15. First, they both identified the period during which they determined the delay occurred. Miltonberger Direct Att. 5. Second, they added together MW Builders' time related costs for each of those months to obtain a total costs incurred by the delay. Miltonberger Direct Att. 5. Third, they divided that amount by the number of days that elapsed during that period. Miltonberger Direct at 5.

Mr. Miltonberger and Mr. Weathers, however, differed in the periods they selected. Mr. Miltonberger selected a period from March 1, 2012 to October 31, 2012 (*i.e.*, what he determined to be "Window 2"), and calculated a daily rate of $3,262.00.[56] Miltonberger Direct Att. 5. Mr. Weathers selected the period from May 1, 2012 to September 30, 2012, and calculated a daily rate of $3,008.00.[57] In the court's judgment, Mr. Weathers' daily jobsite overhead rate more closely matches the period during which MW Builders was affected by the delay, *i.e.*, from May 4, 2012,

---

[56] MW Builders incurred $799,296.00 in time related costs during this period; dividing that amount by the 245 days between March 1, 2012 and October 31, 2012 yields a daily rate of $3,262.00. Miltonberger Direct Att. 5.

[57] MW Builders incurred $460,220.75 in time related costs during this period; dividing that amount by the 153 days between May 1, 2012 and September 30, 2012 yields a daily rate of $3,007.98 or approximately $3,008.00. Weathers Direct at 63.

the day on which MW Builders' March 28, 2012 schedule required permanent power, until September 26, 2012, when permanent power was made available at the site.

For these reasons, the court has determined that MW Builders' extended general conditions costs should be calculated at a daily jobsite overhead rate of $3,008.00 a day.

### c. Regarding The Materials And Equipment Costs.

MW Builders claim includes $155,988.00 in Materials and Equipment costs to rent the generators that provided temporary power. Pl. Post Tr. Br. at 122. Included in that amount are generator costs for periods *prior to* the contemporaneous schedules that set the delivery date for permanent power, *i.e.*, $87,910.00 in generator costs incurred from January 2012 to June 2012. Pl. Post Tr. Br. at 122; *see also* PX 682 at 2. But, the earliest date identified for NV Energy's provision of permanent power in any of MW Builders' schedules was April 9, 2012, as set forward in the February 22, 2012 Schedule. DX 74. MW Builders, however, did not apportion generator costs between when it agreed to rely only on temporary power and when it expected to purchase power from NV Energy. Although MW Builders likely incurred additional generator costs due to the Line Extension Delay, MW Builders provided no means for the court to apportion those costs.[58]

For these reasons, the court has determined that MW Builders did not establish entitlement to and may not recover $155,988.00 in Materials and Equipment costs.

### d. Regarding Home Office Overhead.

MW Builders' claim includes home office overhead at a negotiated rate of 10%, previously accepted by and reflected in the Army Corps contract modifications. PX 683 at 823–25 (9/27/12 Contract Modification, wherein the Army Corps agreed to increase the contract price by $39,321.00, including a home office overhead at a rate of 10%). Mr. Weathers, however, used an alternative home office overhead rate of 5%. Weathers Direct at 76. The court, however, sees no reason why the home office overhead rate previously negotiated and agreed upon by the parties is not reasonable.

For these reasons, the court has determined that MW Builders may recover home office overhead at a rate of 10%.

### e. Regarding Profit.

MW Builders claim includes an 8% profit of Extended General Conditions and Material and Equipment costs. Pl. Post Tr. Br. at 122. The September 10, 2010 Contract's compensable delay clause, incorporated pursuant to FAR 52.242-14, however, expressly disallows profit. Gov't Post Tr. Br. at 135. But, MW Builders seeks recovery for a breach of contract and a violation of the duty of good faith and fair dealing, *not* for a compensable delay. The United States Court of Federal Claims has determined that a contractor may recover profit, when it demonstrates that it was unreasonably delayed by the Government's violation of the duty of good faith and fair dealing. *See Fireman's Fund Ins. Co. v. United States*, 92 Fed. Cl. 598, 706 (Fed. Cl. 2010) (including

---

[58] Mr. Miltonberger did not offer an expert opinion about the generator costs.

profit when calculating damages for an unreasonable delay caused by a breach of the duty of good faith and fair dealing).

For these reasons, the court has determined that MW Builders may recover profit at a rate of 8%.

### f.      Regarding The Bond Fee.

MW Builders claims a bond fee of 1.07%, and this amount is not disputed by the Government.  Pl. Post Tr. Br. at 122.

For these reasons, the court has determined that MW Builders may recover for its bond fee at a rate of 1.07%.

### g.      Calculation Of Damages.

The court has provided the following table summarizing the costs MW Builders incurred as a result of unreasonably delay caused by the Army Corps' breach of contract and violation of the duty of good faith and fair dealing:

| A. Extended General Conditions Costs ("EGCC") | |
|---|---:|
| Days | 116 |
| Daily Rate | $ 3,008.00 |
| Total | $ 348,928.00 |
| **B. Home Office Overhead** | |
| EGCC | $ 348,928.00 |
| Home Office Overhead Rate | 10% |
| Home Office Overhead Incurred | $ 34,892.80 |
| EGCC + Home Office Overhead | $ 383,820.80 |
| **C. Profit** | |
| EGCC + Home Office Overhead | $ 383,820.80 |
| Profit Rate | 8% |
| Profit Amount | $ 30,705.66 |
| EGCC + Home Office Overhead with Profit | $ 414,526.46 |
| **D. Bond Fee** | |
| EGCC + Home Office Overhead with Profit | $ 414,526.46 |
| Bond Fee Rate | 1.07% |
| Bond Amount | $ 4,435.43 |
| Total | $ 418,961.90 |
| **Total Damages** | **$ 418,961.90** |

## V.      CONCLUSION.

For these reasons, the court has determined that the Army Corps breached the September 10, 2010 Contract and violated the duty of good faith and fair dealing, as alleged in Counts I and II of the December 27, 2013 Complaint.  The court also has determined that the resulting delay

caused by the Army Corps was a compensable delay of 116 days.  Therefore, MW Builders is entitled to recover $418,961.90 as damages, together with interest calculated from December 27, 2012, to the date of payment, pursuant to 41 U.S.C. § 7109.

In addition, the court has determined that Bergelectric waived all claims against MW Builders and associated pass-through claims against the Government.  The court also has determined that MW Builders did not defraud the Government.  Accordingly, the Counterclaims I–III alleged in the February 17, 2016 Amended Answer are dismissed.

The Clerk of Court is directed to enter judgment in accordance with this Post-Trial Memorandum Opinion And Final Order.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Chief Judge**

# Court Attachment A

**Witnesses Called by MW Builders**

(In order of appearance)

**Mr. Hans Probst** was a Project Manager for the US Army Corps of Engineers (the "Army Corps") in connection with the Army Reserve Center ("ARC") Project. ECF No. 62 at 63. He was the branch chief of the Instruction Division of the Louisville District over the Reserve Program in the Army Corps from April 2002 to present. TR at 15. Direct Examination 13–145; Cross Examination 145–92; Redirect Examination 192–98 (called by Plaintiff).

**Mr. Mike Marti** was the on-site project manager for MW Builders in connection with the construction of the Las Vegas ARC Project from the beginning of the Project through approximately November 2011. ECF No. 62 at 56. Direct Examination 200–18; Cross Examination 219–322; Redirect Examination 322–24 (called by Plaintiff).

**Mr. Gregg Herriott** was the Operations Manager for MW Builders in connection with the construction of the Las Vegas ARC Project. ECF No. 62 at 57. He was an operations manager for MW Builders from 2005 to 2013. TR at 326. Direct Examination 326–36; Cross Examination 336–67; Redirect Examination 367–68 (called by Plaintiff).

**Mr. Robert Farrell Caskie, III** was an Administrative Contracting Officer for the ARC Project and had various administrative and management duties on behalf of the Government related to the Project. ECF No. 62 at 64. He performed his duties out of Army Corps' Las Vegas office. ECF No. 62 at 64. Direct Examination 369–98; Cross Examination 398–420; Redirect Examination 420–21 (called by Plaintiff).

**Mr. Bret Matson** was a Project Engineer and Project Manager for MW Builders from January 2011 until May 2012, in connection with the construction of the Las Vegas ARC Project. ECF No. 62 at 56. Direct Examination 423–30; Cross Examination 430–61 (called by Plaintiff).

**Mr. Richard Rial** was a consultant engaged by MW Builders to assist with the process required by NV Energy to bring temporary and permanent power to the ARC Project site. ECF No. 62 at 63. Direct Examination 462–73; Cross Examination 474–504 (called by Plaintiff).

**Mr. Eric Stone** worked as a Scheduling Engineer for MW Builders during the course of the ARC Project. ECF No. 62 at 54. Direct Examination 506–23; Cross Examination 524–68 (called by Plaintiff).

**Ms. Rebecca Risse** was an Assistant In-House counsel for NV Energy during 2012 and was a participant in the Line Extension Agreement contract negotiations between NV Energy and the Government in 2012. ECF No. 62 at 62. Direct Examination 578–600; Cross Examination 600–33; Redirect Examination 633–35 (called by Plaintiff).

**Mr. Justin Knippel** is the Regional Manager for Bergelectric and occupied that position during Bergelectric's work as a subcontractor on the ARC Project. ECF No. 62 at 58. Direct Examination 750–77; Cross Examination 778–99 (called by Plaintiff).

**Mr. Nathan Sawyer** was a Project Manager for Bergelectric and occupied that position during portions of Bergelectric's work as a subcontractor on the ARC Project.  ECF No. 62 at 59.  Direct Examination 810–13; Cross Examination 813–14 (called by Plaintiff).

**Mr. Denny Lee** worked for work for C2G International in Aliso Viejo, California where he did cost and scheduling consulting.  TR at 817.  He is an expert on performing labor review and inefficiency analysis and evaluation of damages and costs incurred in construction projects.  TR at 819.  Cross Examination 815–17; Voir Dire Examination 817–19; Cross Examination (Continued) 819–41 (called by Plaintiff).

**Mr. Kevin Finley** was an Associate Counsel for Army Corps and was involved in negotiating the Line Extension Agreement between Army Corps and NV Energy.  ECF No. 62 at 66.  Direct Examination 1065–1105; Cross Examination 1105–16 (called by Plaintiff).

**Witnesses Called by the Government**

(In order of appearance)

**Mr. Jason Evelyn** was the President of MW Builders in connection with the construction of the Las Vegas ARC Project.  ECF No. 62 at 55.  He has been President since November, 2011 and has been with the company for 19 years.  TR at 724–25.  Direct Examination 724–28; Cross Examination 728–46 (called by Plaintiff).  Recross Examination 1259–61 (called by Government).

**Mr. Jonathan Miller** was a Project Manager for Mason & Hanger who was involved in the Las Vegas ARC Project during the periods at issue in this case.   ECF No. 76-1 at 4.   Direct Examination 969–93; Cross Examination 993–98 (called by the Government).

**Ms. Katherine Creveling** was a supervisor in the New Development Center of NV Energy.   ECF No. 76-1 at 4.   She was involved in the Las Vegas ARC Project in her capacity as an NV Energy employee.  ECF No. 76-1 at 4.   She has worked for NV Energy for over 21 years.  TR at 1000. Direct Examination 1000–33; Cross Examination 1033–35 (called by the Government).

**Mr. Ronald Musgrave** was a Contracting Officer's Representative with the Army Corps who was involved in the Las Vegas ARC Project during periods at issue in this case.  ECF No. 76-1 at 3. Mr. Musgrave is now retired.  ECF No. 76-1 at 3.   Direct Examination 1036–62; Cross Examination 1062–64; Redirect Examination 1064 (called by the Government).

**Mr. Johnny Ringstaff** was an Administrative Contracting Officer with the Army Corps involved in the Las Vegas ARC Project during periods at issue in this case.  ECF No. 76-1 at 1–2.  Direct Examination 1117–38; Cross Examination 1138–42 (called by the Government).

**Ms. Tara O'Leary** was a Design Project Manager with the Army Corps who was involved in the Las Vegas ARC Project during periods at issue in this case.  ECF No. 76-1 at 3.  She had been in her position for roughly 10 years.  TR at 1144.  Direct Examination 1143–55 (called by the Government).

**Mr. Stephen Weathers** was a founding shareholder of CPMI, a construction consulting firm that provides project scheduling and dispute resolution consulting services to owners, contractors, subcontractors, architects, engineers and sureties.  ECF No. 96 at 7–8.  He has been qualified as an expert in construction scheduling, delay analysis, construction contract management and administration and construction damages. ECF No. 96 at 8.   Other 720–21, 748; Direct Examination 1264–84; Cross Examination 1284–1304; Redirect Examination 1304–12; Recross Examination 1312–13;  (called by the Government).  Other 1320–26.

**Witnesses Called by Both MW Builders and the Government**

(In order of appearance)

**Mr. Daniel "Sparky" Campbell** was a Project Manager and Operations Manager for MW Builders in connection with the construction of the Las Vegas ARC Project.  ECF No. 62 at 54.  He worked for MW Builders from 1988 to the present in various positions.  TR at 636–37.   Direct Examination 636–74; Cross Examination 674–718; Redirect Examination 719–23; Direct Examination (Continued) 852–62; Cross Examination (Continued) 862–63 (called by Plaintiff).  Cross Examination (continued) 1164–1254; Redirect Examination 1254–57; Recross Examination 1257–58 (called by the Government).

**Mr. Neil Miltonberger** was Vice President of the Kenrich Group after working for them for eight years.  TR at 865.  He is a specialist in forensic schedule analysis and economic damages.  TR at 865.  Direct Examination 864–67; Voir Dire Examination 868; Cross Examination 869–958; Redirect Examination 958–59 (called by Plaintiff).  Direct Examination (continued) 1314–20 (called by the Government).  Other 1326–27.

# In the United States Court of Federal Claims

No. 13-1023 C
Filed: October 18, 2017[1]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| MW BUILDERS, INC. f/n/a | \* | |
| MW BUILDERS OF TEXAS, INC., | \* | Federal Rules of Evidence; |
| Plaintiff, | \* | Rule 26 of the Rules of the United States Court of Federal Claims ("RCFC") (General provisions governing discovery). |
| v. | \* | |
| THE UNITED STATES, | \* | |
| Defendant. | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM OPINION AND FINAL ORDER ON EVIDENTIARY ISSUES

The following comprise the record regarding the court's Post-Trial Memorandum Opinion And Final Order entered today in this case:

## I.    Trial Testimony.

The testimony admitted during the five-day evidentiary hearing held at the United States Federal Court of Claims, 501 West 5th Street, Austin, Texas on May 4, 5, 6, 9 and 10, 2016.  *See* Trial Volume 1 (May 26, 2016) ECF No. 99; Trial Volume 2 (May 26, 2016) ECF No. 101; Trial Volume 3 (May 26, 2016) ECF No. 103; Trial Volume 4 (May 26, 2016) ECF No. 105; Trial Volume 5 (May 26, 2016) ECF No. 107.

---

[1] On September 29, 2017, the court forwarded a sealed copy of the Post-Trial Memorandum Opinion And Final Order to the parties to provide them the opportunity to correct any typographical or similar errors.  This Memorandum Opinion And Final Order On Evidentiary Issues was attached.  The parties had until October 16, 2017 to submit suggested corrections.  On October 18, 2017, the court issued a final Post-Trial Memorandum Opinion And Final Order that incorporated all appropriate corrections, to which this Memorandum Opinion And Final Order On Evidentiary Issues is attached.

## II.   Exhibits.

The parties also moved into evidence, without objection, the following exhibits. *See* Plaintiff MW Builder, Inc.'s Pre-Trial Submission (April 8, 2016), ECF No. 62; MW Builder's Inc.'s Supplemental Disclosures regarding its pretrial filings pursuant to Appendix A of the Rules of the Court of Federal Claims (April 12, 2016), ECF No. 63; Defendant's Exhibit List (April 19, 2016), ECF Nos. 76-3 & 76-4; Joint Exhibit List (April 19, 2016), ECF No. 76-5; Defendant's Notice of Filing Revised Exhibit Lists and Disk (April 27, 2016), ECF No. 91; Defendant's Revised Exhibit List (April 27, 2016), ECF No. 91-1; Revised Joint Exhibit List (April 27, 2016), ECF No. 91-2; MW Builders, Inc.'s Third Supplemental Exhibit List (April 28, 2016) ECF No. 92; Defendant's Unopposed Motion to Admit Into Evidence Deposition Exhibits to Accompany Previously Admitted Transcripts, May 27, 2016, ECF No. 97; Defendant's Letter Re: Deposition Exhibits, June 15, 2016, ECF No. 109; Master Index, Aug. 12, 2016, ECF No. 117; Joint Motion for Entry of Order on Trial Exhibits (August 18, 2016), ECF No. 115.  The Court also ruled on certain motions *in limine* prior to trial concerning certain evidence.  Order, April 27, 2016, ECF No. 90.  Although the parties initially had objected to certain of the exhibits below prior to trial, neither party objected to the admissibility of these exhibits when offered into evidence during trial.  Thus, any objection is waived, and the following exhibits are admitted into evidence:

### A.   Plaintiff's Exhibits

| | |
|---|---|
| **PX4** | Email chain from Tara O'Leary to Kevin Finley et al., FW: Las Vegas ARC FYO9 NV Energy Design Initiation Agreement and Authorization to Proceed (July 6, 2009) |
| **PX5** | Email from Hans Probst to Ronald Musgrave; re: FW: Las Vegas ARC FYO9 NV Energy Design Initiation Agreement and Authorization to Proceed (March 21, 2012) |
| **PX8** | Email chain with attachments from Hans Probst to Michael King et al., FW: Las Vegas Phase I - NV Energy with multiple attachments (September 12, 2012) |
| **PX9** | Letter from Hans Probst to Eric Loughner re: LAS VEGAS NV ARC Acquisition Strategy (June 12, 2009) |
| **PX10** | Email chain from Tara O'Leary to Jon Miller et al., RE: Las Vegas ARC FYO9 NV Energy Design Initiation Agreement and Authorization to Proceed (July 7, 2009) |
| **PX14** | NV Energy Consultant/Third Party Contact Authorization Form Draft (Not Signed or Dated) |
| **PX15** | Executed NV Energy Consultant/Third Party Contact Authorization Form (March 29, 2011) |
| **PX16** | Email from Hans Probst to Ronald Musgrave et al., Re: Las Vegas ARC Nevada Energy Contract (April 27, 2011) |

| | |
|---|---|
| **PX17** | Email from Hans Probst to Johnny Ringstaff RE: Las Vegas - ARC - RFI-0174 (December 6, 2011) |
| **PX18** | Email with attached license agreement from Daphne Weekly to Sharon McShea et al. RE: Las Vegas Army Reserve Center with attached License (February 28, 2012) |
| **PX20** | Email from Hans Probst to Ronald Musgrave RE: NV Energy Project, Las Vegas Army Reserve Center - Access Authorization (March 12, 2012) |
| **PX27** | Email from Hans Probst to Ronald Musgrave et al., RE: Las Vegas - ARC - Gimme Power (March 22, 2012) |
| **PX29** | Email from Hans Probst to Ronald Musgrave Re: Problem at New Reserve Center (April 20, 2012) |
| **PX30** | Email from Hans Probst to Garold Sherlock et al., RE: Las Vegas Phase I; NV Power (May 2, 2012) |
| **PX31** | Email from Hans Probst to Ronald Musgrave RE: Las Vegas - ARC - Changes (May 2, 2012) |
| **PX35** | Email from Hans Probst to Diane McCartin RE: Army Reserve Utility Issues (June 29, 2012) |
| **PX38** | Email from Hans Probst to Tara O'Leary et al. FW: Las Vegas - ARC - Water Permit and Filter Design - Need to Stay Off Critical Path (September 7, 2012) |
| **PX39** | Email from Hans Probst to Diane McCartin; Fw: Las Vegas ARC FY09 MILCON PN 69436 - Temporary Power with Serial Letter – S-0064 attached (May 23, 2012) |
| **PX40** | MW Builders Serial Letter: S-0098 re: Nevada Energy Power Service Costs – MW Builders Cost Proposal No. 0062 and attachments  (January 3, 2013) |
| **PX42** | MW Builders Serial Letter S-0071 re: Permanent Power Delay (July 3, 2012) |
| **PX43** | MW Builders Serial Letter S-0072 re: Outstanding Cost Proposals Related to NV Energy Requirements to Obtain Permanent Power (July 6, 2012) |
| **PX44** | MW Builders Serial Letter S-0064 re: Permanent Power Delay (March 3, 2012) |
| **PX45** | Email from Jon Miller to Hans Probst et al. RE: Las Vegas Phase I – NV Energy (and attachments) (March 21, 2012) |
| **PX46** | NV Energy Project Information Sheet with 63[RD] Reginal Support as Customer (Not Dated) |
| **PX49** | Letter from Hans Probst to Eric Loughner Re: LAS VEGAS NV ARC Acquisition Strategy Reference: (a) Design Directive dated 10 June 2009 (June 22, 2009) |
| **PX50** | Price Breakout Schedule from Solicitation (Not Dated) |

| PX51 | Letter from Corps of Engineers Awarding Contract to MW Builders (September 1, 2010) |
|---|---|
| PX52 | As Awarded Project Specifications Volume 1 of 2 (September 1, 2010) |
| PX53 | As Awarded Project Specifications Volume 2 of 2 (September 1, 2010) |
| PX54 | Modification A00050 for Non-Compensable Time Extension (September 29, 2014) |
| PX55 | Mason & Hanger Certified Final Drawings (June 2010) |
| PX56 | Mason & Hanger Project Design Drawings, As Awarded (July 27, 2010) |
| PX57 | Amendment of Solicitation, 0002, Update of Specifications (July 23, 2010) |
| PX60A | Email from Hans Probst to Jeffrey Reeds et al., re: Summary of Tele-Conference Regarding Line Extension Agreement (March 19, 2012) |
| PX60B | Email from Ron Musgrave to Hans Probst and Johnny Ringstaff; re: Summary of Tele-Conference Regarding Line Extension Agreement (March 20, 2012) |
| PX60C | Email from Hans Probst to Jeffrey Reeds et al., re: Summary of Tele-Conference (March 21, 2012) |
| PX60D | Letter from Rita Burns, Contracting Officer for the Government to Kathy Creveling of NV Energy (March 27, 2012) |
| PX60E | Email from Ron Musgrave to Hans Probst; re: Conference Call with MW Builders on Nevada Energy (March 29, 2012) |
| PX64 | NV Energy Electric Service Requirements 2009 Edition Cover Page |
| PX65 | NV Energy Electric Service Requirements 2009 Edition Cover Letter |
| PX66 | NV Energy archive website with 2009 Electric Service Standards |
| PX67 | Electric Service Requirements Southern Nevada June 2013 Edition, Pages 1-453 (June 19, 2013) |
| PX215 | Letter from Government to NV Energy re: Drawing of ES-002 (March 27, 2012) |
| PX217 | Rule 9 Consult/Coord. DIA Advance Checklist and executed Design Initiation Agreement (April 28, 2011) |
| PX222 | Nevada Energy Design Approval Agreement signed by Mike Marti (July 25, 2011) |
| PX223 | Nevada Energy Design Initiation Agreement No. 3597 signed by Mike Marti (April 27, 2011) |
| PX224 | Project Information Sheet showing the 63rd RSC as Customer (Not Dated) |
| PX226 | Email from Daphne Weekly to Hans Probst; re: NVE Access to Equipment Request (October 13, 2011) |

| PX227 | Email from Daphne Weekly to Rich Rial; re: NVE Access to Equipment Request and NV Energy, Access to Equipment Agreement attached (October 12, 2011) |
|---|---|
| PX229 | Bureau of Land Management Rights-of-Way Decision Letter N-86654 (September 1, 2009) |
| PX230 | Bureau of Land Management Rights-of-Way Decision Letter N-86654 Modified (February 28, 2011) |
| PX231 | NV Energy Letter re: Bureau of Land Management Permit N-90323 and BLM Requirements Prior to Construction (February 1, 2012) |
| PX232 | Bureau for Land Management Rights-of-Way N-90323 Approval Letter (January 31, 2012) |
| PX233 | General Purpose License to Provide and Maintain Electrical Services (Unsigned, Not Dated) |
| PX238 | Basic Change Document AV079; 170 Day Time Extension to settle REAs (September 26, 2014) |
| PX239 | Email from Daphne Weekly to Hans Probst et al.; NV Energy Right-of-Way, Survey Attached (September 22, 2011) |
| PX240 | Email from Daphne Weekly to Rodolfo Posis et al.; RE: Las Vegas ARC – Energy Right-of-Way, MW Builders Request to USACE attached (September 20, 2011) |
| PX244 | Email from Rebecca Risse to Daphne Weekly et al.; re: Access Authorization (March 6, 2012) |
| PX247 | Email from Johnny Ringstaff to Robert Caskie et al.; RE: USARC – NVE Easement (March 7, 2012) |
| PX248 | Email from Hans Probst to Dacia Levier et al., re: USACE signature on attached NV Energy Third Party Authorization Form with attachments (March 15, 2012) |
| PX250 | Email from Hans Probst to Daphne Weekly et al., re: NVE Access to Equipment Request (October 18, 2011) |
| PX251 | Email from Hans Probst to Ronald Musgrave et al., RE: Las Vegas – ARC – Stupid Question (November 15, 2011) |
| PX252 | Email from Hans Probst to Johnny Ringstaff et al., RE: Las Vegas – ARC – RFI-0174 (December 6, 2011) |
| PX253 | Email from Hans Probst to Ronald Musgrave; ASSURANCE to Utility COMPANY REQUEST (February 28, 2012) |
| PX254 | Government Memorandum; RE: ARIMD Engineering Program Review (EPR) Meeting Minutes, 8 March 2012 (May 21, 2012) |
| PX257 | Email from Hans Probst to Daphne Weekly; RE: USARC – NVE EASEMENT (March 2, 2012) |
| PX258 | Email from Ronald Musgrave to Johnny Ringstaff et al.; Las Vegas - ARC - Power Supply (December 27, 2011) |
| PX260 | Email chain and attachment from Mark Cutler to Hans Probst et al.; NV Energy Access Authorization Signed 16 March 2012 (March 16, 2012) |

| | |
|---|---|
| **PX261** | Email from Robert Caskie to Ronald Musgrave; RE: Las Vegas - ARC - Serial Letter C-0013 (November 23, 2011) |
| **PX262** | Email from Daphne Weekly to Hans Probst et al.; RE: Las Vegas - ARC - NV Energy Right-of-way (September 20, 2011) |
| **PX263** | Email from Daphne Weekly to Ronald Musgrave – with redactions; Re: Las Vegas – ARC, NV Energy Easement (October 12, 2011) |
| **PX266** | Email with attachment from Tara O'Leary to Daphne Weekly; RE: Las Vegas ARC Land (August 5, 2009) |
| **PX267** | Email from Tara O'Leary to Hans Probst; RE: Las Vegas – ARC – NV Energy Right-of-Way (September 26, 2011) |
| **PX268** | Email from Tara O'Leary to Hans Probst; Re: Las Vegas, NV - Code 4 (June 29, 2009) |
| **PX269** | Email from Johnny Ringstaff to Ronald Musgrave—redacted version; RE: Las Vegas - ARC – Serial Letter C-0013 (November 23, 2011) |
| **PX270** | Email from Ronald Musgrave to Daphne Weekly et al.; RE: Las Vegas - ARC, NV Energy Easement (October 12, 2011) |
| **PX272** | Government Tele-Conference Request (May 21, 2012) |
| **PX274** | Army Reserve Center Phase 2 Specifications |
| **PX276** | MW Builders Serial Letter S-0080 Re: Permanent Power Impact Preliminary Estimate (August 28, 2012) |
| **PX281** | Email from Diane McCartin to Hans Probst et al.; FW: Army Reserve Utility Issues (June 28, 2012) |
| **PX282** | Email Monday from Kevin Finley to Rebecca Risse; FW: Corps of Engineers and Nevada ARC (April 30, 2012) |
| **PX284** | Email from Sparky Campbell to Hans Probst; re Las Vegas ARC: NVE (August 8, 2012) |
| **PX287** | Letter from Rita Burns, Contracting Officer for the Government, to Kathy Creveling of NV Energy (August 21, 2015) |
| **PX288** | Army Reserve Center Phase 2 plans volumes 1-3 |
| **PX290** | Email from Hans Probst to Hugh Jay Huff; Re: Las Vegas ARC Phase [ - P2 Comments Update (August 27, 2012) |
| **PX291** | Email from Diane McCartin to Kevin Jasper; re Utility Information Paper for SERG Meeting and Army Reserve Utility Issues (August 9, 2012) |
| **PX294** | Email from Hans Probst to Diane McCartin RE: Army Reserve Utility Issues (June 29, 2012) |
| **PX295** | Email from Hans Probst to Quincy Meade RE: Las Vegas, NV Phase I CWE (August 7, 2012) |
| **PX296** | Final Phase 2 Design Meeting Minutes (August 28-29, 2012) |
| **PX297** | Email from Daphne Weekly to Robert Caskie, RE: Las Vegas ARC Land (September 13, 2011) |

| PX298 | Email from Robert Caskie to Ronald Musgrave, FW: Army Reserve Center - Meter Applications (August 21, 2012) |
| --- | --- |
| PX301 | Email from Robert Caskie to Hans Probst; RE: Las Vegas ARC Phase II FY13 Project Start/Initial Schedule (August 29, 2011) |
| PX303 | Email from Tara O'Leary to Jon Miller; FW: Las Vegas 2 Final Review Draft Minutes (September 19, 2012) |
| PX305 | Email from Hans Probst to David Rushing et al., RE: Las Vegas ARC; Permanent Power Delay Impact Preliminary Estimate (September 7, 2012) |
| PX308 | Updated Bergelectric Claim (May 15, 2013) |
| PX309 | NV Energy Rebate Checks to Government (March 4, 2014) |
| PX313 | NV Energy Affidavit of Records Custodian Susan M. Wood (May 20, 2015) |
| PX316 | Recorded Easement - Gettle (February 21, 2012) |
| PX318 | Executed Design Approval Agreement (July 25, 2011) |
| PX319 | Executed Design Initiation Agreement (April 27, 2011) |
| PX320 | Executed Line Extension Agreement (July 23, 2012) |
| PX322 | Draft Line Extension Agreements and Comments (Not Dated) |
| PX323 | Approved Baseline Schedule – AR00 (08 Nov 10) |
| PX324 | MWB Project Schedule AR16 (January 30, 2012) |
| PX325 | MWB Project Schedule AR17 (February 22, 2012) |
| PX326 | MWB Project Schedule AR18 (March 28, 2012) |
| PX327 | MWB Project Schedule AR19 (April 26, 2012) |
| PX328 | MWB Project Schedule AR20 (May 25, 2012) |
| PX329 | MWB Project Schedule AR21 (June 29, 2012) |
| PX330 | MWB Project Schedule AR22 (July 31, 2012) |
| PX331 | MWB Project Schedule AR23 (August 31, 2012) |
| PX332 | MWB Project Schedule AR24 (September 28, 2012) |
| PX333 | MWB Project Schedule AR25 (October 31, 2012) |
| PX334 | MWB Project Schedule AR26 (November 30, 2012) |
| PX335 | MWB Project Schedule Narrative AR16 (January 27, 2012) |
| PX336 | MWB Project Schedule Narrative AR17 (February 22, 2012) |
| PX337 | MWB Project Schedule Narrative AR18 (March 30, 2012) |
| PX338 | MWB Project Schedule Narrative AR19 (April 26, 2012) |
| PX339 | MWB Project Schedule Narrative AR20 (May 28, 2012) |
| PX340 | MWB Project Schedule Narrative AR21 (July 9, 2012) |
| PX341 | MWB Project Schedule Narrative AR22 (August 8, 2012) |
| PX342 | MWB Project Schedule Narrative AR23 (September 7, 2012) |
| PX343 | MWB Project Schedule Narrative AR24 (October 15, 2012) |
| PX344 | MWB Project Schedule Narrative AR25 (October 15, 2012) |
| PX345 | MWB Project Schedule Narrative AR26 (December 10, 2012) |

| PX346 | Management Solutions Combined Schedule Analyses with Transmittals (May 21, 2012) |
|---|---|
| PX348 | Management Solutions Sched. Analysis for AR19 (May 21, 2012) |
| PX348B | Email from Greg Herriott to Eric Stone re FW: Las Vegas 10-C-0078 Apr12 schedule review; attachment (May 21, 2012) |
| PX350 | Management Solutions Sched. Analysis for AR21 (July 23, 2012) |
| PX351 | Management Solutions Sched. Analysis for AR22 (August 20, 2012) |
| PX352 | Revised Generator Claim Cost (December 15, 2015) |
| PX353 | Generator Claim Cost Backup Documents from Lube Nevada, Sunstate Equipment, Power Plus! and Bergelectric |
| PX356 | MWB Job Cost Summary (December 5, 2010 to September 14, 2014) |
| PX357 | MWB Labor Jobsite Cost Reports (October 26, 2015) |
| PX358 | MWB Non-Labor Jobsite Cost Reports (October 26, 2015) |
| PX359 | Neil Miltonberger, the Kenrich Group, LLC, Expert Report Narrative and Appendix 1-8: (December 15, 2015) |
| PX360 | Neil Miltonberger, the Kenrich Group, LLC Expert Report Exhibits (December 15, 2015) |
| PX361 | MWB Job Cost Labor History File |
| PX362 | MWB Job Cost Non-Labor Job Cost History File |
| PX363 | Neil Miltonberger, the Kenrich Group, LLC, Expert Rebuttal Report Narrative and Appendix 1-3 (January 15, 2016) |
| PX364 | Neil Miltonberger, the Kenrich Group, LLC, Expert Rebuttal Report Exhibits & Attachments (January 15, 2016) |
| PX366 | Third Party Authorization signed by Rita Burns (March 29, 2011) |
| PX371 | Line Extension Agreement executed by Rita Burns (July 12, 2012) |
| PX372 | Contracting Officer's Final Decision (without support) (June 10, 2013) |
| PX379 | NV Energy Design Approval Agreement (Electric), with revisions (May 11, 2012) |
| PX385 | Email from Wesley Hanks to Kathy Creveling; Grant of Easement (December 20, 2011) |

| | |
|---|---|
| **PX394** | Email from Daphne Weekly to Sharon McShea and Rebecca Risse; Access to Equipment Easement (February 28, 2012) |
| **PX412** | Rule 9 Line Extension Agreement (March 14, 2012) (Unsigned) |
| **PX422** | Plan Sheets: ES-101, ES-102, and ES-002 (June 2010) |
| **PX426** | Hans Probst email with attachment to Ronald Musgrave, FW: Las Vegas ARC FY09NV Energy Design Initiation Agreement and Authorization to Proceed (March 21, 2012) |
| **PX432** | Weathers Report Analysis of MW Builders, Inc's Claims (partial) (December 15, 2015) |
| **PX433** | Weathers Rebuttal Report in Response to Reports Prepared by Neil W. Miltonberger of The Kenrich Group, LLC, Inc. and Denny Lee of Criterium Group, LLC (January 28, 2016) |
| **PX436** | Email String re Electric Service to Sloan Road Site (March 13, 2012) |
| **PX444** | Management Solutions: Schedule Analysis AR22 (August 20, 2012) |
| **PX446** | Schedule Analysis AR17 (February 22, 2012) |
| **PX447** | Selected Monthly Schedule Narrative Reports (March 2012 through May 2013) |
| **PX448** | Excerpted Article, "Cost Engineering", by Robert M. D'Onofrio, P.E (July/August 2015) |
| **PX449 (g)** | Vicinity Map, Nye Overhead (May 24, 2011) |
| **PX449 (h)** | Meter Room Detail (May 24, 2011) |
| **PX449 (i)** | Vicinity Map, Arville Street (May 24, 2011) |
| **PX449 (j)** | Rial Timeline of Events (October 26, 2015) |
| **PX449 (l)** | Email from Michael Marti to Tina Furlong and attachments RE: LV ARC Power (March 29, 2011) |
| **PX449 (n)** | Email from Michael Marti to Ronald Musgrave, FW: NV Energy Coordination (June 13, 2011) |
| **PX449 (p)** | Email from Michael Marti to Ronald Musgrave, FW: ARC, NV Energy Easement (October 12, 2011) |
| **PX449 (q)** | Email from Hans Probst to Quincy Meade et al re: Stakeholder Conference Call (March 13, 2012) |

| | |
|---|---|
| **PX449 (r)** | Email from Bret Matson to Jason Gibbard FW: USARC and Line Extension Agreement attachment (March 14, 2012) |
| **PX452** | Design Phase Meeting Minutes (April 28, 2009) |
| **PX453** | MW Builders Serial Letter S-0034 Re: Permanent Power Requirement for Project Completion (December 5, 2011) |
| **PX457** | Partnering Meeting Notes (January 26, 2011) |
| **PX460** | Design Initiation Agreement Prepared (April 1, 2011) |
| **PX461** | Design Approval Agreement (July 25, 2011) |
| **PX468** | Email chain re Line Extension Agreement (July 12, 2012) |
| **PX469** | Email from Daphne Weekly to Hans Probst et al., - Redacted re NVE Access to Equipment Request, multiple attachments (October 18, 2011) |
| **PX470** | Project Drawing Sheets Volumes one through five, As Awarded (September 2010) |
| **PX470A** | Drawing Sheet ES-002 |
| **PX471** | Drawing Sheets ES-001, 002, 100, 101, 102; CD-100 |
| **PX472** | Select Design Sheets: CD-101, 101, 102, 103, 104, 105; CS-113, 114, 500; CU-100, 101, 102, 103, 104, 213, 510; 1A-500, 800, 801; 3A-112n, 550, 551, 552 (June 2010) |
| **PX475** | Subcontract between MW Builders and Bergelectric Corporation (December 6, 2010) |
| **PX477** | MW Builders/Government Weekly Meeting Minutes (June 1, 2011 - August 17, 2011) |
| **PX480** | Email from Bret Matson to Michael Marti; Sparky Campbell; Re: Las Vegas ARC Response, and attachment RFI 174 Response (October 31, 2011) |
| **PX481** | Email from Michael Marti to Rich Rial et al; re: FW: Las Vegas ARC Revised Response to RFI 174, and attachment (October 29, 2011) |
| **PX485** | Email from Michael Marti to Ronald Musgrave et al.; re FW: USARC—Revised Plan—Transformer "T-2" Relocation, Three Site Drawings attached (November 2, 2011) |

| PX487 | Design Sheets ES-101, 102 with Ductbank Path Highlighted in Red and ES-002 |
|---|---|
| PX488 | Letter from Yolanda Benito of NV Energy re BLM Permit N-90323 (February 1, 2012) |
| PX489 | Cable Easement APN: 191-19-501-0008, from Alan O. Gettel Living Trust to CenturyLink (February 6, 2012) |
| PX490 | Easement from Alan O. Gettel Living Trust to NV Energy APN: 191-19-501-008 (February 6, 2012) |
| PX492 | Project Information Sheet with 63rd Regional Support Command as Customer (Not Dated) |
| PX493 | Permanent Power Fee Check and Fully Executed Line Extension Agreement (July 2012) |
| PX495 | Letter with Enclosure from Rita Burns, Contracting Officer, to Kathy Creveling of NV Energy re Electrical Connection and Service (June 15, 2012) |
| PX496 | Email chain from Daphne Weekly to Hans Probst et al., RE: NV Energy Project - Access Authorization (March 8, 2012) |
| PX497 | Email from Hans Probst to Ronald Musgrace RE: Las Vegas – ARC- Power News? (May 2, 2012) |
| PX498 | Email from Rebecca Risse to Jeffrey Reeds et al., RE: Las Vegas Army Reserve Center – NV Energy Electric Service Contract (March 14, 2012) |
| PX499 | Email from Rebecca Risse to Kevin Finley; RE: Las Vegas ARC - NV Energy Attorney POC (May 15, 2012) |
| PX500 | Email string between attorneys Rebecca Risse and Kevin Finley et al. re: NV Energy power to the ARC (May 17 - June 18, 2012) |
| PX501 | Email from Johnny Ringstaff to Ronald Musgrave et al., RE: NV Energy Project - Access Authorization (March 14, 2012) |
| PX502 | Email from Johnny Ringstaff to Hans Probt et al., Transmitting March 27 Letter from Rita Burns (April 2, 2012) |
| PX503 | Email from Johnny Ringstaff to Hans Probst, RE: USARmy Training Facility (March 28, 2012) |
| PX504 | Email from Johnny Ringstaff to Hans Probst et al., RE: Letter of assignment (March 29, 2012) |
| PX505 | Email from Johnny Ringstaff to Ronald Musgrave et al., Re:Las Vegas Issues (May 21, 2012) |
| PX509 | Email from Hans Probst to Ronald Musgrave, FW: Las Vegas - ARC - Power News?, attachments (May 2, 2012) |
| PX510 | Email from Ronald Musgrave to Hans Probst, RE: Las Vegas ARC - Construction Completion Estimate (May 1, 2012) |
| PX514 | Email from Rebecca Risse to Kevin Finley, RE: Vegas ARC, attachments (June 29, 2012) |
| PX518 | Email from Kevin Finley to Rebecca Risse, RE: Vegas ARC, attachments (July 2, 2012) |

| **PX519** | Email from Kevin Finley to Rebecca Risse, RE: Las Vegas ARC Utility service, attachments (June 25, 2012) |
|---|---|
| **PX523** | Email from Kevin Finley to Rebecca Risse, FW: Corps of Engineers and Nevada ARC (April 30, 2012) |
| **PX524** | Email from Rita Burns to Kathy Creveling, re Las Vegas ARC Utility Service, Draft Letter and Purchase Order attached (June 15, 2012) |
| **PX525** | Email from Rebecca Risse to Kevin Finley et al. re: Line Extension Agreement with related documents attached (July 7, 2012) |
| **PX526** | Email from Ronald Musgrave to Hans Probst et al. with Original Submittal for LV ARC SLOAN attached (February 18, 2011) |
| **PX528** | Email from Ronald Musgrave to Hans Probst et al., re: Line Extension Agreement (March 21, 2012) |
| **PX529** | Email from Hans Probst to Kathy Creveling re: Meeting (April 11, 2012) |
| **PX531** | Email from Hans Probst to Ronald Musgrave re: Problem at New Reserve Center (April 20, 2012) |
| **PX534** | Email from Hans Probst to Ronald Musgrave re: NV Energy and MW Builders (June 22, 2012) |
| **PX538** | Email from Darrell Nation to Donald Johantges et al., re: Utility Contract Issue (June 28, 2012) |
| **PX540** | Email from John Keever to Robert Caskie et al., re: NV Energy and MW Builders - redacted (June 28, 2012) |
| **PX541** | Email from Hans Probst to Kevin Finley et al., re: Line Extension Agreement (July 12, 2012) |
| **PX542** | Email from Hans Probst to Ronald Musgrave re: Access Agreement (March 16, 2012) |
| **PX543** | Email from Hans Probst to Ronald Musgrave re: NV Energy Inspections and Work Schedule (August 21, 2012) |
| **PX544** | Email from Hans Probst to Tar O'Leary, et al., re: Water Permit and Filter Design (September 7, 2012) |
| **PX545** | Email from Ron Musgrave to Amanda Klingerman et al., re: Meter Requirements for Panel PHP1 (Pump House) (July 16, 2012) |
| **PX546** | Email from John Keever to Robert Caskie et al., re: Power at Site (September 26, 2012) |
| **PX548** | Email from Hans Probst to Kimberly Haddox et al., re: Projects in Construction with Issues (October 11, 2012) |
| **PX550** | Email from Hans Probst to Tara O'Leary et al., re: Utility Delay Claim (September 12, 2012) |
| **PX553** | Email from Doug Peckinpaugh to Hans Probst et al., re: Phase I - Preliminary Budgetary Estimate (June 11, 2012) |
| **PX561** | Email from Hans Probst re: Phase I – NV Energy with NV Energy Access Authorization Signed 29 Feb 12 attached (March 6, 2012) |

| PX565 | Email from Hans Probst to Ronald Musgrave re: LVARC-LRL is awful quiet (June 5, 2012) |
|-------|------|
| PX566 | Email from Michael Marti to Bret Matson Et al. with Original Submittal for LV ARC Sloan attached (February 17, 2011) |
| PX567 | Email from Michael Marti to Tina Furlong with Project Info Sheet from 3-29-2011 attached (March 29, 2011) |
| PX569 | Bergelectric Bid (including supporting docs sent to MWB) (November 23, 2010) |
| PX570 | Bergelectric Labor Project Report (March 13, 2011) |
| PX571 | Bergelectric Subcontract (including all exhibits) (December 6, 2010) |
| PX574 | Original Submittal to NVE for Project – October 1, 2009 attached to Mike Marti email dated (February 18, 2011) |
| PX575 | Letter from MWB re: Updated Progress Schedule (including updated schedule) (January 20, 2012) |
| PX576 | Bergelectric email string re: Water Tank and Work Progress (March 30, 2012) |
| PX577 | MWB Letter to subcontractors re: Permanent Power Impact (May 9, 2012) |
| PX578 | Email from Rich Rial re: Revised NVE Design Drawings (May 11, 2012) |
| PX579 | List of Completion Delay Impacts (Not Dated) |
| PX580 | Email from MWB to Bergelectric re: Temporary Power (June 21, 2012) |
| PX581 | Email from William Vanadore re: Need for Revised Mason & Hanger Design (July 16, 2012) |
| PX582 | Email from MWB to NVE re: Meter Application/Metering Requirements (August 7, 2012) |
| PX583 | Army MEM-0002, Letter from Johnny Baggette to Kathy Creveling re: Meter Inspection (August 17, 2012) |
| PX584 | Email string re: Electrical Inspection for NVE (September 10, 2012) |
| PX585 | Email from Sparky Campbell to Justin Knippel et al. re: Electrical Engineer for Inspections (September 17, 2012) |
| PX587 | Meeting Minutes – Subcontractor Coordination Meeting (October 23, 2012) |
| PX589 | Email from Sparky Campbell to subs re: Delay Claims (December 18, 2012) |
| PX590 | Email from MWB to Justin Knippel re: Statement to be Included with Claim (December 20, 2012) |

13

| | |
|---|---|
| **PX591** | Email from Justin Knippel to MWB with Bergelectric's Revised Claim attached (April 5, 2013) |
| **PX592** | Letter from MWB to Justin Knippel, re: Reservation of Rights/LDs (May 15, 2013) |
| **PX593** | Bergelectric Chart of Actual Manpower Consumed Weekly from January 8, 2012 to May 5, 2013 |
| **PX594** | Bergelectric Work In Progress Report (April 2, 2013) |
| **PX595** | Bergelectric Work In Progress Report (April 3, 2013) |
| **PX596** | Bergelectric Payment Application No. 12 rev. 1 (March 31, 2012) |
| **PX597** | Bergelectric Best and Final Bid Tabulations (April 19, 2010) |
| **PX598** | AR-26 Update Schedule (December 12, 2012) |
| **PX599** | AR-27 Update (December 31, 2012) |
| **PX600** | AR-28 Update (January 31, 2013) |
| **PX601** | Claim Work In Progress Report (April 2, 2013) |
| **PX602** | Bergelectric Task Hour Spreadsheet (No Date) |
| **PX603** | Bergelectric Claim -including Exhibits (May 15, 2013) |
| **PX604** | Bergelectric Labor Project Report (December 29, 2013) |
| **PX605** | Bergelectric Labor Project Report (March 25, 2012) |
| **PX606** | Criterium Expert Report w/ Exhibits (December 15, 2015) |
| **PX607** | Criterium Supplemental Report w/ Exhibits (December 30, 2015) |
| **PX609** | Bergelectric Labor Productivity Reports (March 13, 2011) |
| **PX610** | Contrator's Daily Reports (April 1, 2012 to January 31, 2013) |
| **PX611** | Email from Rebecca Risse to Kevin Finley RE: Vegas ARC LEA with attached final LEA and Contract Clauses (July 3, 2012) |
| **PX612** | Email from Rebecca Risse Risse to Kevin Finley RE: Vegas ARC LEA with attached Accounting Sheet, Cash Ticket and Memo Advanced Statement of Costs (July 3, 2012) |
| **PX614** | Email from Kevin Finley to Rebecca Risse; re Revisions to Contract Clauses (June 28, 2012) |
| **PX618** | Email from Kevin Finley to Rebecca Risse RE: Las Vegas ARC Utility Service (June 25, 2012) |
| **PX633** | Letter Granting Access to NV Energy from Michael Schweiger, Major General of the U.S. Army Reserve to NV Energy Director of Land Services, James Saavedra (March 16, 2012) |
| **PX637** | Email from Bret Mason to Rich Rial, RE: USARC – NVE Easement (February 29, 2012) |
| **PX638** | Recorded Grant of Easement (February 21, 2012) |

| PX642 | Email from Rich Rial to Hans Probst, RE: Las Vegas ARC - NV Energy Line Extension - Conference Call (March 22, 2012) |
|---|---|
| PX645 | Transmittals to from Rich Rial to Century Link, NV Energy, and Cox Communications (May and June 2011) |
| PX649 | MWB Total Job Cost Report and Back-up |
| PX650 | Desert Fire Job Cost and Labor Documents |
| PX651 | 222 Water Line Mod Original Cost Proposal – MWB #0010 (November 4, 2011) |
| PX652 | Lawsuit Summons – Bergelectric Corp v. MW Builders (November 26, 2014) |
| PX653 | (FULLY EXECUTED) Settlement Agreement between Bergelectric, MW Builders and Federal Insurance (January 12, 2015) |
| PX654 | PowerPlus! Invoices to Bergelectric (2011-2013) |
| PX655 | Bergelectric USAR Temp Power Proposal (November 3, 2010) |
| PX656 | MWB Total Month by Month Job Cost Summary |
| PX657 | Email from Linda Duff to Steve Schmal and Jack Zimmerman, Transmitting Permanent Pwer Impact Letter (May 9, 2012) |
| PX658 | MW Builders Letter re: Permanent Power Impact (May 9, 2012) |
| PX659 | Email from Larry Campbell to Peggy Ray, Transmitting Letter re: Delays (May 18, 2012) |
| PX660 | Letter from Dessert Fire responding to May 9 Letter from MW Builders (May 10, 2012) |
| PX661 | Desert Fire Protection Estimate Guideline (August 22, 2011) |
| PX662 | Letter of Intent from MW Builders to Dessert Fire (September 8, 2011) |
| PX663 | Desert Fire Protection Payroll Documents (August 2012) |
| PX664 | Additional Desert Fire Protection Payroll Documents (August and September 2012) |
| PX665 | Additional Desert Fire Protection Payroll Documents (September and October 2012) |
| PX666 | MW Builders Labor Burden Employee Mix NV ARC (Not Dated) |
| PX667 | MW Builders Job Cost Management Summary (October 26, 2015) |
| PX674 | Kenrich Report re: In Response to Government Counterclaims (April 7, 2016) |
| PX675 | Email from Hans Probst to Ron Musgrave et al., re: Update (March 15, 2012) |
| PX676 | Email from Greg Herriott to Bret Matson re: NV Energy Electric Service to Sloan Rod Site (March 13, 2012) |
| PX677 | Email from Michael Marti to Ron Musgrave et al., transmitting Design Initiation Agreement (April 18, 2011) |
| PX678 | Email from Bret Matson to Ron Musgrave et al., transmitting Serial Letter S-0054 re: Notice of Potential Delay (April 9, 2012) |

| PX682 | Power Availability Delay Claim; Revision May 2016 |
|---|---|
| PX683 | Sworn Expert Testimony of Neil W. Miltonberger, ECF Nos. 68-1, 68-2, 68-3, 68-4, 68-5,68-6, and 68-7 (April 18, 2016) |
| PX684 | Sworn Expert Testimony of Denny Lee, ECF No. 68-8, 68-9 (April 18, 2016) |

**B.** **Joint Exhibits**

| JX1 | Mason & Hanger Meeting Minutes (January 27, 2009) |
|---|---|
| JX2 | Meeting Minutes/Project: Las Vegas USARC GTA Las Vegas, NV (April 28, 2009) |
| JX3 | Design Initiation Agreement (May 6, 2009) |
| JX4 | Email from Tina Furlong to Jon Miller re: Las Vegas Army Reserve Center (July 21, 2009) |
| JX5 | Meeting Minutes/Project: Las Vegas USARC GTA Las Vegas, NV (August 4, 2009) |
| JX6 | DOI Letter to USARC: Decision Right-of-Way Grant N-86654 Issued Rental Determined (September 1, 2009) |
| JX7 | Universal Plumbing – Subcontract (September 1, 2010) |

| | |
|---|---|
| **JX8** | Solicitation, Offer, and Award (September 1, 2010) |
| **JX9** | Bergelectric Subcontract (December 6, 2010) |
| **JX10** | MMC Contractors Subcontract (December 22, 2010) |
| **JX11** | Email from Ronald Musgraves to Hans Probst re: FW: LV ARC Power (February 17, 2011) |
| **JX12** | Email from Michael Marti to Gwen Gleason re: FW: LV ARC Power (February 17, 2011) |
| **JX13** | DOI Ltr to USARC: Decision Right-of-Way Grant N-86654 Modified (February 28, 2011) |
| **JX14** | Email from Hans Probst to Dacia Levier re: Las Vegas NV ARC - Electric Service (UNCLASSIFIED) (March 15, 2011) |
| **JX15** | Email from Michael Marti to Tina Furlong re: LV ARC Power (March 29, 2011) |
| **JX16** | Email Transmittal - Design Initiation Agreement - 11 pages (April 15, 2011) |
| **JX17** | Email from Hans Probst to Tara O'Leary re: FW: Las Vegas - ARC Nevada Energy contract PN 69436 USARC - Las Vegas (April 27, 2011) |
| **JX18** | Email from Tara O'Leary to Jon Miller re: Las Vegas - ARC Nevada Energy contract PN 69436 USARC - Las Vegas (April 27, 2011) |
| **JX19** | Design Initiation Agreement (April 28, 2011) |

| **JX20** | Email from Michael Marti to Ronald Musgrave re: FW: NV Energy Coordination (June 13, 2011) |
|---|---|
| **JX21** | Design Approval Agreement - 4 pages (July 25, 2011) |
| **JX22** | Email from Ronald Musgraves to Hans Probst re: FW: LV ARC, Coordination Meeting Minutes (August 10, 2011) |
| **JX23** | Email from Wesley Hanks to Kathy Creveling re: 3-42922 PN69436 USARC Las Vegas (August 24, 2011) |
| **JX24** | Email from Ronald Musgrave to Hans Probst re: Las Vegas - ARC-NV Energy Right-of-Way (September 7, 2011) |
| **JS25** | Desert Fire Subcontract (September 12, 2011) |
| **JX26** | MW Builders Ltr to USARC, re: Off-site easement for power and communications infrastructure (September 14, 2011) |
| **JX27** | NV Distribution Planning Development Planning Memo (October 5, 2011) |
| **JX28** | NV Distribution Planning Development Planning Memo (October 5, 2011) |
| **JX29** | Email from Michael Marti to Ronald Musgrave re: FW: ARC, NV Energy Easement (October 12, 2011) |
| **JX30** | Email from Michael Marti to Ronald Musgraves re: CP#0015, Power Easement Procurement (November 1, 2011) |
| **JX31** | Email from Rich Rial to Kathy Creveling re: FW: 3-42922 PN69436 USARC Las Vegas (November 12, 2011) |

18

| JX32 | MW Builders Ltr Musgraves re: Permanent Power Requirement for Project Completion (December 5, 2011) |
| --- | --- |
| JX33 | Email from Wesley Hanks to Kathy Creveling re: USARC (December 20, 2011) |
| JX34 | Email from Sharon McShea to Rebecca Risse re: FW: USARC Sloan Easement – NVE (December 29, 2011) |
| JX35 | Email from Daphne Weekly to Cindy Skromak re: Easement Request for NV Energy DACA09-2-12-0306 (NV Energy Project 3000042922) (January 4, 2012) |
| JX36 | Email from Wesley Hanks to Lee Simpkins re: N-90323 offer package, 3000042922 US Army Sloan Training Center (January 12, 2012) |
| JX37 | Email from Rich Rial to Kathy Creveling re: FW: 3000042922-USARC (January 26, 2012) |
| JX38 | Right Of Way Grant/Temporary Use Permit (February 7, 2012) |
| JX39 | Email from Li Zhang to Wesley Hanks re: FW: 3000042922 (February 7, 2012) |
| JX40 | Email from Daphne Weekly to Wesley Hanks re: Easement Request Between Army and NV Energy DACA09-2-12-0306 (NV Energy Project 3000042922) aka Army Reserve Center Sloan NV (February 8, 2012) |
| JX41 | Email from Rebecca Risse to Daphne Weekly re: NV Energy Project 3000042922 (February 10, 2012) |
| JX42 | Email from Daphne Weekly to Sharon McShea re: NV Energy Project 3000042922 aka Las Vegas Army Reserve Center, Sloan NV – Access Authorization (March 2, 2012) |
| JX43 | Email from Has Probst to Ronald Musgraves re: Las Vegas - ARC - NVE (March 2, 2012) |

19

| | |
|---|---|
| **JX44** | Email from Hans Probst to Ronald Musgraves re: Las Vegas Army Reserve Center - NVEnergy Electric Service to Sloan Road Site (March 13, 2012) |
| **JX45** | Email from Hans Probst to Quincy Meade re: Las Vegas Army Reserve Center - NVEnergy Electric Service to Sloan Road Site (March 13, 2012) |
| **JX46** | Email from Rebecca Risse to Jeffrey Reeds re: Las Vegas Army Reserve Center - NVEnergy Electric Service Contract (March 14, 2012) |
| **JX47** | Email from Ronald Musgraves to Hans Probst re: NV Energy Project 3000042922 aka Las Vegas Army Reserve Center, Sloan NV –Access Authorization (March 14, 2012) |
| **JX48** | Email from Jeffrey Reeds to Kathy Creveling re: Message from BLTOO2 (March 14, 2012) |
| **JX49** | Email from Bret Matson to Jason Gibbard re: FW: USARC (March 14, 2012) |
| **JX50** | Dept. of the Army Ltr to NV Energy - Re: utilities. (March 16, 2012) |
| **JX51** | Email from Hans Probst to Jeffrey Reeds re: Las Vegas Army Reserve Center - NV Energy Electric Service to Sloan Rd Site (March 19, 2012) |
| **JX52** | Kathy Creveling Email re: Las Vegas ARC - NV Energy Line Extension Agreement - Conference Call (March 19, 2012) |
| **JX53** | Email from Ronald Musgraves to Rinly Moolakatt re: NV Energy Project 3000042922 aka Las Vegas Army Reserve Center, Contract Info (March 20, 2012)Sloan NV - Award and Email from Bret Matson to Greg Herriott re: FW: USARC (March 20, 2012) |
| **JX54** | Email from Hans Probst to Jeffrey Reeds re: Las Vegas Army Reserve Center – NV Energy Electric Service to Sloan Rd Site (March 21, 2012) |
| **JX55** | USAR Ltr to NV Energy re: contract (March 27, 2012) |

20

| | |
|---|---|
| **JX56** | Email from Greg Herriott to Johnny Ringstaff re: Conf Call with MW Builders on Nevada Energy (March 29, 2012) |
| **JX57** | Email from Johnny Ringstaff to Hans Probst re: Las Vegas Army Reserve Center - NV Energy Electric Service to Sloan Road Site (April 2, 2012) |
| **JX58** | MWB Ltr to Musgrave Subject: Notice of Potential Delay (April 6, 2012) |
| **JX59** | Email from Hans Probst to Ronald Musgraves re: Fw: Las Vegas ARC - NV Energy Line Extension Agreement (April 18, 2012) |
| **JX60** | Email from Kevin Finley to Kathy Creveling, re: Las Vegas ARC (April 19, 2012) |
| **JX61** | Email from Kevin Finley to Rebecca Risse re: FW: Corps of Engineers and Nevada ARC (April 30, 2012) |
| **JX62** | MW Builders Ltr - Subject: Permanent Power Impact (May 9, 2012) |
| **JX63** | Desert Fire Ltr: Re: 45 Army Reserve Center Las Vegas, NV Permanent Power Impact CP#0042 (May 10, 2012) |
| **JX64** | Email from Hans Probst to Ronald Musgraves re: LV ARC - Power (May 11, 2012) |
| **JX65** | Email from Kevin Finley to Rebecca Risse re: Las Vegas ARC - NV Energy Attorney POC (May 15, 2012) |
| **JX66** | Email from Rebecca Risse to Kevin Finley re: Las Vegas ARC - NV Energy Attorney POC (May 15, 2012) |
| **JX67** | Email from Hans Probst to Rebecca Risse re: Las Vegas ARC - NV Energy Attorney POC (May 15, 2012) |

| | |
|---|---|
| **JX68** | Email from Kathy Creveling to Rebecca Risse re: Army Project (June 8, 2012) |
| **JX69** | USARC Ltr to Creveling Re: attempts to reach agreement for NV Energy to provide electrical connection and service to the Las Vegas ARC. (June 15, 2012) |
| **JX70** | Email from Hans Probst to Ronald Musgraves re: Las Vegas - ARC - Power (June 18, 2012) |
| **JX71** | Email from Kevin Finley to Kathy Creveling re: Exhibit B & C for 3000042922 (June 18, 2012) |
| **JX72** | Email from Rebecca Risse to Harold Mitts re: NV Energy Template Government LEA (June 20, 2012) |
| **JX73** | Email from Kevin Finley to Rebecca Risse re: NV Energy Template Government LEA (June 21, 2012) |
| **JX74** | Email from Kevin Finley to Rebecca Risse re: NV Energy Template Government LEA (June 21, 2012) |
| **JX75** | Email from Rebecca Risse to Kevin Finley re: FW: Las Vegas ARC Utility service (June 21, 2012) |
| **JX76** | Email from Rebecca Risse to Kevin Finley re: FW: Las Vegas ARC Utility service (June 22, 2012) |
| **JX77** | Email from Rebecca Risse to Kevin Finley re: Vegas ARC (June 26, 2012) |
| **JX78** | Email from Rebecca Risse to Kevin Finley re: Vegas ARC (June 27, 2012) |
| **JX79** | Email from Kevin Finley to Rebecca Risse re: Vegas ARC (June 27, 2012) |

| | |
|---|---|
| **JX80** | Email from Hans Probst to Kathy Creveling re: Las Vegas ARC at Sloan Road - Electric Line Extension (June 28, 2012) |
| **JX81** | Email from Rebecca Risse to Kevin Finley re: Vegas ARC (July 2, 2012) |
| **JX82** | Email from Kevin Finley to Rebecca Risse re: FW: Vegas ARC LEA (July 6, 2012) |
| **JX83** | Email from Rebecca Risse to Kevin Finley re: Vegas ARC LEA (July 7, 2012) |
| **JX84** | Email from Hans Probst to Ronald Musgraves re: Las Vegas ARC - NV Energy Scope Escalation (August 20, 2012) |
| **JX85** | MW Builders Ltr - Re: Notice to Subcontractors of Established Permanent Power (October 12, 2012) |
| **JX86** | Email from Sparky Campbell to Larry Campbell re: Vegas ARC: Information required on Claim associated with the delivery of Permanent Power (December 14, 2012) |
| **JX87** | Desert Fire Ltr: Fire Sprinkler System Installation – Delay (December 18, 2012) |
| **JX88** | MW Builders Ltr to ARC re: Power Availability Delay Claim (December 27, 2012) |
| **JX89** | MW Builders Ltr to USAC re: MW Builders response to COE letter dated 2.25.2013; Power Availability Delay Claim (February 15, 2013) |
| **JX90** | Job Cost Summary (October 26, 2015) |
| **JX91** | Supplemental Expert Report of Denny Lee (December 7, 2015) |

| **JX92** | Miltonberger Rebuttal to Stephen Weathers Report (January 15, 2016) |
|---|---|
| **JX93** | Bergelectric Rebuttal to Stephen Weathers (January 15, 2016) |
| **JX94** | Chronology |
| **JX95** | Partial Electrical Site Plan |

## C.   Defendant's Exhibits

| **DX1** | Final Summary Bid Schedule (January 6, 2005) |
|---|---|
| **DX2** | Email from Doug Peckinpaugh to Mark Cutler re: PN 69436 USARC Las Vegas - Las Vegas, NV - Electric Utilities (February 5, 2009) |
| **DX3** | Email from Michael Stewart to Mark Cutler re: Las Vegas ARC FY09 (May 14, 2009) |
| **DX4** | Email from Mark Cutler to Michael Stewart re: Las Vegas ARC FY09 NV Energy Design Initiation Agreement and Authorization to Proceed (May 15, 2009) |
| **DX5** | Email from Jon Miller to Scott Fast re: FW: Fire Pump/Cost Estimate Status Follow-up (June 30, 2009) |
| **DX6** | Email from Tara O'Leary to Kevin Finley re: FW: Las Vegas ARC FY09 NV Energy Design Initiation Agreement and Authorization to Proceed (July 6, 2009) |
| **DX7** | Email from Tara O'Leary to Jon Miller re: Las Vegas ARC FY09 NV Energy Design Initiation Agreement and Authorization to Proceed (July 7, 2009) |

| | |
|---|---|
| **DX8** | Email from Jon Miller to Tina Furlong re: FW: Las Vegas Army Reserve Center (July 15, 2009) |
| **DX9** | Email from Michael Stewart to Jon Miller re: FW: Las Vegas Army Reserve Center (July 15, 2009) |
| **DX10** | Letter from Dept. of the Army to Mark Cutler re: ROW-GTA Project Sloan, NV - Real Estate Agreement N-86654 (September 2, 2009) |
| **DX11** | Universal Plumbing - Financial Statement 001 (March 31, 2010) |
| **DX12** | USAR PowerPoint Presentation (G-001a) (June 1, 2010) |
| **DX13** | Awar d Contract (June 11, 2010) |
| **DX14** | Revised ES-002 Diagram (July 20, 2010) |
| **DX15** | Original ES-002 (July 20, 2010) |
| **DX16** | Page 158 of 193 - 52.236-3 Site Investigation and Conditions Affecting the Work(APR 1984) (September 1, 2010) |
| **DX16A** | Solicitation For US Army Reserve Las Vegas Vol 1of 2 (September 1, 2010) |
| **DX16B** | Solicitation For US Army Reserve Las Vegas Vol 2 of 2 (September 1, 2010) |
| **DX17** | Project Schedule (September 1, 2010) |

| | |
|---|---|
| **DX18** | Email from Jeremy Lambden to Tim Chadwick re: As Awarded Final Summary - Las Vegas AFRC (September 3, 2010) |
| **DX19** | Kenrich schedule to schedule MWB-020729 through MWB-021532 (November 6, 2010) |
| **DX20** | Letter from Dept. of the Army to MW Builders re: Notice to Proceed (November 9, 2010) |
| **DX21** | Contractors Quality Control Report Daily Log Construction (November 10, 2010) |
| **DX22** | Email from Michael Marti to Gene Burton re: ARC Site Address (December 21, 2010) |
| **DX23** | Email from Jason Evelyn to Greg Herriott re: FW: Partnering meeting minutes (February 17, 2011) |
| **DX24** | Email from Gene Burton to Rich Rial re: LV ARC – Sloan (February 21, 2011) |
| **DX25** | Email from Gene Burton to Michael Marti re: Nevada Energy Project (February 22, 2011) |
| **DX26** | Email from Michael Marti to Gene Burton re: Nevada Energy Project (February 22, 2011) |
| **DX27** | Email from Gene Burton to Michael Marti re: Nevada Energy (February 23, 2011) |
| **DX28** | Project Information Sheet (March 3, 2011) |
| **DX29** | Email from Michael Marti to Bret Matson re: Mid Qtr. Report (March 28, 2011) |

| | |
|---|---|
| **DX30** | NV Energy Consultant/3rd Party Contact Authorization Form (March 29, 2011) |
| **DX31** | Email from Gene Burton to Michael Marti re: LV ARC Power (March 30, 2011) |
| **DX32** | Universal Plumbing - Financial Statement 002 (March 31, 2011) |
| **DX33** | Project Information Sheet (March 31, 2011) |
| **DX34** | Email from Michael Marti to Ronald Musgrave re: FW: PN 69436 USARC - Las Vegas (April 18, 2011) |
| **DX35** | Email from Greg Herriott to Michael Marti re: PN 69436 USARC - Las Vegas (April 18, 2011) |
| **DX36** | AACEI RP 29R-03 - Forensic Schedule Analysis (April 25, 2011) |
| **DX37** | Email from Hans Probst to Dacia Levier re: FW: Las Vegas - ARC Nevada Energy contract PN 69436 USARC – Las Vegas (April 26, 2011) |
| **DX38** | Email from Ronald Musgrave to Hans Probst re: FW: Power Consultant (April 26, 2011) |
| **DX39** | Email from Michael Marti to Greg Herriott (April 26, 2011) |
| **DX40** | Email from Rich Rial to Michael Marti re: Power Consultant (April 28, 2011) |
| **DX41** | Email from Michael Marti to Rich Rial re: Power Consultant (April 28, 2011) |

| | |
|---|---|
| **DX42** | Email from Rich Rial to Michael Marti re: Power Consultant (April 28, 2011) |
| **DX43** | Email from Jon Miller to Tara O'Leary re: FW: USARC Las Vegas - NV Energy Emails (May 2, 2011) |
| **DX44** | Email from Jon Miller to Tara O'Leary re: FW: Las Vegas ARC FY09 NV Energy Design Initiation Agreement and Authorization to Proceed (May 2, 2011) |
| **DX45** | Email from Bret Matson to Michael Marti re: Project Review Narrative (May 18, 2011) |
| **DX46** | NVE Vicinity Map (May 24, 2011) |
| **DX47** | NVE Vicinity Map (May 24, 2011) |
| **DX48** | NVE Vicinity Map (May 24, 2011) |
| **DX49** | MW Builders Minutes June 2011 (June 8, 2011) |
| **DX50** | PAGE INTENTIONALLY LEFT BLANK |
| **DX51** | Email from Ronald Musgrave to Hans Probst re: Las Vegas - ARC, Utility Update (June 30, 2011) |
| **DX52** | Email from Michael Marti to Ronald Musgrave re: FW: ARC, Utility Update (June 30, 2011) |
| **DX53** | Email from Michael Marti to Rich Rial re: JUNK EMAIL ARC, Update (July 5, 2011) |

| | |
|---|---|
| **DX54** | Cox Proprietary Diagram (July 14, 2011) |
| **DX55** | PAGE INTENTIONALLY LEFT BLANK |
| **DX56** | Email from Michael Marti to Greg Herriott re: Mid Qtr. Report (August 11, 2011) |
| **DX57** | Desert Fire Subcontract (September 12, 2011) |
| **DX58** | Letter from MW Builders to Dept. of the Army re: Off site easement for power and communications Infrastructure (September 14, 2011) |
| **DX59** | PAGE INTENTIONLLY LEFT BLANK |
| **DX60** | Email from Michael Marti to Jason Gibbard re: Alan Gettle Meeting (October 27, 2011) |
| **DX61** | Letter from Bergelectric to MW Builders re: Temporary Power (November 21, 2011) |
| **DX62** | PAGE INTENTIONALLY LEFT BLANK |
| **DX63** | Email from Ronald Musgrave to Hans Probst re: FW: Army Reserve Center (November 29, 2011) |
| **DX64** | Email from Bret Matson to Brian Kerzetski re: Riser (December 7, 2011) |
| **DX65** | Email from Bret Matson to Sparky Campbell re: MID 4th QUARTER 2011 PROJECT REVIEW, 12/12/2011 (December 14, 2011) |

| | |
|---|---|
| **DX66** | Email from Bret Matson to Rich Rial re: FW: Easement Request for NV Energy DACA09-2-12-0306 (NV Energy Project 3000042922) (December 27, 2011) |
| **DX67** | Email from Bret Matson to Greg Herriott re: ARC 4th Qtr. PP Presentation (January 3, 2012) |
| **DX68** | AR15 Classic Schedule Layout (January 16, 2012) |
| **DX69** | Email from Bret Matson to Gene Burton re: LV ARC Easements (February 2, 2012) |
| **DX70** | Email from Bret Matson to Ronald Musgrave re: BLM Easements (February 3, 2012) |
| **DX71** | Bergelectric Pay App and Waiver 2012.02.15-2012.06.15 (February 15, 2012) |
| **DX72** | MW Builders monthly narrative AR17 to AR19 (February 22, 2012) |
| **DX73** | MW Builders Pay Application Status Ltrs (February 22, 2012) |
| **DX74** | AR17 Final Version (February 22, 2012) |
| **DX75** | Tab B - snapshot of AR17 (February 22, 2012) |
| **DX76** | AR17 Classic Schedule Layout (February 22, 2012) |
| **DX77** | AR17 Backward Logic Path (February 22, 2012) |

| | |
|---|---|
| **DX78** | AR17 Classic Schedule Layout (February 22, 2012) |
| **DX79** | Email from Bret Matson to Greg Herriott re: Midquarters (February 24, 2012) |
| **DX80** | Email from Hans Probst to William Vanadore re: FW: Las Vegas Army Reserve Center - NVEnergy Electric Service to Sloan Road Site (March 12, 2012) |
| **DX81** | PAGE INTENTIONALLY LEFT BLANK |
| **DX82** | Email from Bret Matson to Greg Herriott re: FW: Las Vegas Army Reserve Center - NVEnergy Electric Service to Sloan Road Site (March 13, 2012) |
| **DX83** | Design Approval Agreement (March 13, 2012) |
| **DX84** | PAGE INTENTIONALLY LEFT BLANK |
| **DX85** | Email from shepman40@cox.net to John Sannicolas re: Delays (March 15, 2012) |
| **DX86** | Email from Bret Matson to Rich Rial re: FW: USArmy #3000042922 (March 19, 2012) |
| **DX87** | PAGE INTENTIONALLY LEFT BLANK |
| **DX88** | Email from Bret Matson to wvanadore@bergelectric.com re: Items of Concern (March 19, 2012) |
| **DX88A** | Project Information Sheet (March 19, 2012) |

| | |
|---|---|
| **DX89** | Email from Ronald Musgrave to Hans Probst re: Las Vegas Army Reserve Center - NVEnergy Electric to Sloan Road Site (March 20, 2012) |
| **DX90** | Email from Hans Probst to Ronald Musgrave re: PN69436 USARC Las Vegas – 3000042922 (March 21, 2012) |
| **DX91** | Email from Hans Probst to Ronald Musgrave re: PN69436 USARC Las Vegas - 3000042922 (March 21, 2012) |
| **DX92** | Email from Kathy Creveling to Ronald Musgrave re: PN69436 USARC Las Vegas-3000042922 (March 21, 2012) |
| **DX93** | Email from Bret Matson to Gary Puckett re: FW: PN69436 USARC Las Vegas-3000042922 (March 21, 2012) |
| **DX94** | Email from Bret Matson to Ronald Musgrave re: PN69436 USARC Las Vegas-3000042922 (March 21, 2012) |
| **DX95** | Email from Bret Matson to Ronald Musgrave re: FW: Executed DIA for USArmy 30000042922 (March 21, 2012) |
| **DX96** | Email from Ronald Musgrave to Hans Probst re: Las Vegas - ARC – NVE (March 21, 2012) |
| **DX97** | Email from Kathy Creveling to Ronald Musgrave re: FW: LEA w DRAFT Watermark & Secured (March 26, 2012) |
| **DX98** | AR18 Schedule (March 28, 2012) |
| **DX99** | Kenrich schedules on Solar (March 28, 2012) |
| **DX100** | AR18 Classic Schedule Layout (March 28, 2012) |

| | |
|---|---|
| **DX101** | Email from Bret Matson to Ronald Musgrave re: FW: Conf Call with MW Builders on Nevada Energy (March 29, 2012) |
| **DX102** | Email from Ronald Musgrave to Hans Probst re: Conf Call with MW Builders on Nevada Energy (March 29, 2012) |
| **DX103** | Email from Bret Matson to Rich Rial re: FW: Conf Call with MW Builders on Nevada Energy (March 30, 2012) |
| **DX104** | Letter from MW Builders to USARC re: Pay Application #16 Narrative Report (March 30, 2012) |
| **DX105** | Collection of Monthly narrative reports from Kenrich report March 2012 to March 2013 (March 30, 2012) |
| **DX106** | Email from William Vanadore to: Bret Matson re: FW: USARC Las Vegas NPC WO #3000042922 - Email 2 of 2 (March 31, 2012) |
| **DX107** | AIA Document G702, Application and Certificate for Payment (March 31, 2012) |
| **DX108** | Work In Progress Report (April 1, 2012) |
| **DX109** | Email from Kathy Creveling to Hans Probst re: FW: Las Vegas Army Reserve Center - NV Energy Electric Service to Sloan Road Site (April 2, 2012) |
| **DX110** | Email from Bret Matson to Greg Herriott re: FW: Las Vegas Army Reserve Center - NV Energy Electric Service to Sloan Road Site (April 2, 2012) |
| **DX111** | Email from Bret Matson to Ronald Musgrave re: Notice of Delay (April 9, 2012) |
| **DX112** | Desert Fire Periodic Releases 2012.04.11 - 2012.05-09 (April 11, 2012) |

| | |
|---|---|
| **DX113** | Email from Bret Matson to Jason Evelyn re: LEA w DRAFT Watermark & Secured (April 12, 2012) |
| **DX114** | Bergelectric Daily Report - Work Order #12773 (April 12, 2012) |
| **DX115** | Contractors Quality Control Report Daily Log Construction (April 12, 2012) |
| **DX116** | Desert Fire Pay App and Waiver - April 2012, April 2013 & Sept 2012 (April 15, 2012) |
| **DX117** | Request for Information Report (RFI) (April 16, 2012) |
| **DX118** | Bergelectric SOV Billing (April 17, 2012) |
| **DX119** | Email from Bret Matson to Edward Swedyk re: LV ARC Coordination Mtg. Minutes (April 19, 2012) |
| **DX120** | Email from Greg Herriott to Jason Evelyn re: FW: Las Vegas Power (April 27, 2012) |
| **DX121** | Letter from MW Builders to USARC re: CP-0039 - Metering Requirements at Pump House (April 27, 2012) |
| **DX122** | PAGE INTENTIONALLY LEFT BLANK |
| **DX123** | PAGE INTENTIONALLY LEFT BLANK |
| **DX124** | Bergelectric Periodic Releases 2012.05.09 - 2013.07.10 (May 9, 2012) |

| | |
|---|---|
| **DX125** | MMC Contractors Periodic Releases 2012.05.09-2013.07.17 (May 9, 2012) |
| **DX126** | Universal Plumbing - Periodic Releases 2012.05.09-2013.11.13 (May 9, 2012) |
| **DX127** | Email from Rebecca Risse to Hans Probst re: Las Vegas ARC - NV Energy Attorney POC (May 15, 2012) |
| **DX128** | Email from Greg Herriott to Ronald Musgrave re: FW: Las Vegas - ARC - MW Builders - Cost Proposals (May 16, 2012) |
| **DX129** | Email from Gwen Gonzales to: Ron Musgrave re: Job 222 - Serial Letter S-0064 (Permanent Power Delay) (May 23, 2012) |
| **DX130** | Bergelectric Letter - Re: Temporary Power (May 25, 2012) |
| **DX131** | Email from Greg Herriott to John Sannicolas re: FW: Army Reserve Center - Subcontractor Coordination Meeting 2012.05.22 (May 30, 2012) |
| **DX132** | Bergelectric Jobwalk Checklist (June 1, 2012) |
| **DX133** | PAGE INTENTIONALLY LEFT BLANK |
| **DX134** | Bergelectric Jobwalk Checklist (June 1, 2012) |
| **DX135** | Bergelectric Jobwalk Checklist (June 1, 2012) |
| **DX136** | Email from Jason Evelyn to Tim Chadwick re: Las Vegas ARC (June 4, 2012) |

| | |
|---|---|
| **DX137** | Contractors Quality Control Report Daily Log Construction (June 7, 2012) |
| **DX138** | Las Vegas ARC Red Zone Meeting Minutes (June 14, 2012) |
| **DX139** | Email from Rita Burns to Kathy Creveling re: FW: Las Vegas ARC Utility service (June 15, 2012) |
| **DX140** | Email from Rebecca Risse to Rita Burns re: Vegas ARC Utility service (June 15, 2012) |
| **DX141** | Email from Johnny Ringstaff to Jason Evelyn re: Las Vegas Power issues (June 18, 2012) |
| **DX142** | Email from: Amanda Klingerman to Greg Herriott re: ARC - NV Energy Line Ext. Agreement (June 18, 2012) |
| **DX143** | Email from Kevin Finley to Rebecca Risse re: Exhibit B (June 18, 2012) |
| **DX144** | Email from Kevin Finley to: Rebecca Risse re: Las Vegas ARC Utility service (June 25, 2012) |
| **DX145** | Email from Hans Probst to Quincy Meade re: Las Vegas ARC - Red Zone Meeting Minutes (June 26, 2012) |
| **DX146** | Email from Rebecca Risse to Kevin Finley re: Vegas ARC (June 27, 2012) |
| **DX147** | Email from Rebecca Risse to Kevin Finley re: Vegas ARC LEA (July 3, 2012) |
| **DX148** | Email from Amanda Klingerman to Ronald Musgrave re: Serial Letter 72 Outstanding CP's related to NV Energy Requirements (July 9, 2012) |

| DX149 | Email from Ronald Musgrave to Greg Herriott re: FW: Las Vegas - ARC-NVE removable bollards (July 9, 2012) |
|---|---|
| DX150 | Letter from Dept. of the Army to MW Builders re: Clarification of Serial Letter C-0026 (July 11, 2012) |
| DX151 | Email from Kevin Finley to Kathy Creveling re: Vegas ARC LEA (July 12, 2012) |
| DX152 | Email from Amanda Klingerman to William Vanadore re: ARC- Update (July 12, 2012) |
| DX153 | Order for Supplies or Services (July 12, 2012) |
| DX154 | Email from Ronald Musgrave to Greg Herriott re: FW: Las Vegas ARC - NV Energy and MW Builders (July 12, 2012) |
| DX155 | Mod 22 (July 13, 2012) |
| DX156 | Email from Gary Puckett to Greg Herriott re: Las Vegas - ARC - Week of July 23rd (July 17, 2012) |
| DX157 | Email from Amanda Klingerman to Greg Herriott re: Las Vegas - ARC - Week of July 23rd (July 17, 2012) |
| DX158 | Email from Greg Herriott to Jason Gibbard re: FW: Las Vegas - ARC- Week of July (July 17, 2012) |
| DX159 | Bergelectric Daily Report - Work Order #12773 (July 17, 2012) |
| DX160 | Payment information to NV Energy $149, 264.00 (Check #200337) (July 18, 2012) |

| | |
|---|---|
| **DX161** | Email from Sparky Campbell to Amanda Klingerman re: FW: Vegas ARC (July 27, 2012) |
| **DX162** | Email from Ronald Musgrave to Tim Redmon re: FW: Serial Letter 75 - Response to Serial Letter C-0030 Metering Requirements at Pump House (July 30, 2012) |
| **DX163** | Email from Sparky Campbell to Jan Hoy re: Vegas ARC (August 7, 2012) |
| **DX164** | Letter from Jay Vanadore to Sparky Campbell re: Temporary Power (August 8, 2012) |
| **DX165** | Email from Sparky Campbell to Hans Probst re: Las Vegas ARC: NVE (August 8, 2012) |
| **DX166** | Mod 24 executed (August 14, 2012) |
| **DX167** | Management Solutions Schedule Analysis (August 20, 2012) |
| **DX168** | Email from Sparky Campbell to Greg Herriott re: Vegas ARC: Berg C.O. for the supply of temp. power (August 22, 2012) |
| **DX169** | PAGE INTENTIONALLY LEFT BLANK |
| **DX170** | Email from Ronald Musgrave to Hans Probst re: Las Vegas - ARC – NVE (August 23, 2012) |
| **DX171** | Bergelectric Work Order and Invoices (August 23, 2012) |
| **DX172** | Email from Amanda Klingerman to Ronald Musgrave re: Army Reserve Center - MW Builders & Corps of Engineers Weekly Coordination Meeting Minutes (August 24, 2012) |

| | |
|---|---|
| **DX173** | Handwritten Memo re: delay issues (August 24, 2012) |
| **DX174** | Email from Sparky Campbell to Greg Herriott re: Vegas ARC: Permanent Power Delay Prelim Estimate (August 27, 2012) |
| **DX175** | Bergelectric Change or Extra Work Order (August 28, 2012) |
| **DX176** | Bergelectric Invoices (August 29, 2012) |
| **DX177** | Bergelectric Invoices (August 29, 2012) |
| **DX177A** | Transaction Envelope (August 30, 2012) |
| **DX177B** | Transaction Envelope (August 30, 2012) |
| **DX178** | Email from Sparky Campbell to Jason Gibbard re: Vegas ARC (September 4, 2012) |
| **DX179** | Email from Greg Herriott to Sparky Campbell re: Vegas ARC: 2nd Qtr/2012 Power Point for Project Review? (September 13, 2012) |
| **DX180** | Email from Greg Herriott to Sparky Campbell re: 45 Army Reserve Center Power Delay Claim (September 13, 2012) |
| **DX181** | Email from Sparky Campbell to Michael King re: 45 Army Reserve Center Power Delay Claim (September 19, 2012) |
| **DX181A** | Transaction Envelope (September 24, 2012) |

| | |
|---|---|
| **DX182** | Mod 28 (September 27, 2012) |
| **DX183** | PAGE INTENTIONALLY LEFT BLANK |
| **DX184** | Email from Eric Stone to Sparky Campbell re: Vegas Payapp (October 15, 2012) |
| **DX185** | Email from Tim Potter to TJP re: FW: army reserve late-delay claim (October 21, 2012) |
| **DX185A** | Transaction Envelope (October 23, 2012) |
| **DX185B** | Transaction Envelope (October 23, 2012) |
| **DX186** | Email from Ronald Musgrave to Johnny Ringstaff re: Las Vegas - ARC – NVE (November 7, 2012) |
| **DX187** | Email from Ronald Musgrave to Hans Probst re: Las Vegas ARC NVE (November 8, 2012) |
| **DX188** | Email from Sparky Campbell to Bart Spencer re: Vegas ARC: Close-out documentation schedule (November 20, 2012) |
| **DX189** | Email from Sparky Campbell to Greg Herriott re: Vegas ARC: Permanent Power Delay (November 27, 2012) |
| **DX190** | Office Overhead Cost Breakdown (November 30, 2012) |
| **DX191** | AR26 Full Schedule (November 30, 2012) |

| | |
|---|---|
| **DX192** | AR26 Classic Schedule Layout (November 30, 2012) |
| **DX193** | Email from Sparky Campbell to Greg Herriot re: Vegas ARC: CP #0059 for arsenic removal system (December 3, 2012) |
| **DX194** | Email from Sparky Campbell to Greg Herriott re: FW: Vegas ARC: Information required on Claim associated with the delivery of Permanent Power (December 19, 2012) |
| **DX195** | Email from Sparky Campbell to Greg Herriott re: Vegas ARC: Permanent Power Delay (December 11, 2012) |
| **DX196** | Email from Greg Herriott to Sparky Campbell re: Vegas ARC: Permanent Power Delay (December 11, 2012) |
| **DX197** | Email from Sparky Campbell to Greg Herriott re: FW (December 19, 2012) |
| **DX198** | Email from Larry Campbell to Sparky Campbell re: Vegas ARC: Information required on Claim associated with the delivery of Permanent Power (December 19, 2012) |
| **DX199** | Letter from MW Builders to USARC re: Power Availability Delay Claim (December 27, 2012) |
| **DX200** | (Exhibit 089) Email from Sparky Campbell to Ronald Musgrave re: Vegas ARC: MW CP0062, Serial Ltr. S-0098, Proposal for NVE Power Service Cost (January 3, 2013) |
| **DX201** | Payment information to Tab Contractors $15, 313.42 (Check #209651) (January 19, 2013) |
| **DX202** | Email from Johnny Ringstaff to Sparky Campbell re: Eichleay Formula (January 24, 2013) |
| **DX203** | Letter from MW Builders Ltr to Bergelectric re: Notice of Liquidated Damages (January 31, 2013) |

| | |
|---|---|
| **DX204** | Contractors Quality Control Report Daily Log Construction (February 4, 2013) |
| **DX205** | Email from Justin Knippel to Alan Mashburn re: FW: Vegas ARC Project: Notice of Liquidated damages (February 5, 2013) |
| **DX206** | Email from Gary Puckett to Brian Kerzetski re: FW: Army Reserve Center - Functional Testing Site Visit documentation packet_01-30-13 thru 02-01-13 (February 8, 2013) |
| **DX207** | Email from Justin Knippel to Sparky Campbell re: Notice of Liquidated Damages (February 10, 2013) |
| **DX208** | Bidder Inquiry Report (February 13, 2013) |
| **DX209** | Letter from Dept. of the Army to MW Builders re: Power Availability Claim (February 25, 2013) |
| **DX210** | PAGE INTENTIONALLY LEFT BLANK |
| **DX211** | Email from Sparky Campbell to Justin Knippel re: Eich ley Formula (March 27, 2013) |
| **DX212** | Email from Brian Kerzetski to Sparky Campbell re: Richley Formula (March 28, 2013) |
| **DX213** | Universal Plumbing - Financial Statement (March 31, 2013) |
| **DX214** | Letter from Bergelectric to MW Builders re: delay and impact damages (April 5, 2013) |
| **DX215** | Letter from MW Builders to Bergelectric - Re: Army Reserve Center - Sloan, Nevada; Bergelectric Corp's Revised Claim dated April 5, 2013 (May 7, 2013) |

| | |
|---|---|
| **DX216** | Letter from Bergelectric to MW Builders - RE: Bergelectric's revised impact claim (May 9, 2013) |
| **DX217** | Letter from Bergelectric to MW Builders - RE: Bergelectric's revised impact claim w/requested changes (May 15, 2013) |
| **DX218** | Letter from USARC to MW Builders re: Contract No. W912QR-10-C-0078, Army Reserve Center, Las Vegas, NV, Power Availability Delay Claim (June 10, 2013) |
| **DX219** | Contractors Quality Control Report Daily Log Construction (June 12, 2013) |
| **DX220** | Email from Ronald Musgrave to Greg Herriott re: FW: Las Vegas ARC - NV Energy and MW Builders (July 12, 2013) |
| **DX221** | Rule 09 Electric Line Extensions (August 12, 2013) |
| **DX222** | PAGE INTENTIONALLY LEFT BLANK |
| **DX223** | PAGE INTENTIONALLY LEFT BLANK |
| **DX224** | MW Builders Time-Related Costs: By Month (October 17, 2013) |
| **DX225** | Letter from Dept. of the Army to MW Builders re: Acceptance of Constructed Facilities/Start of Warranty Periods 13 December 2013 (December 18, 2013) |
| **DX226** | Special Items (December 31, 2013) |
| **DX227** | Desert Fire Final Waiver (April 9, 2014) |

| | |
|---|---|
| **DX228** | Plaintiff's MW Builders Rule 26(a)(l) Initial Disclosures (July 2, 2014) |
| **DX229** | Tab Contractors: Final Waiver (September 5, 2014) |
| **DX230** | Bergelectric v. MW Builders – Complaint (November 26, 2014) |
| **DX231** | Email from Sparky Campbell to Lisa Rice re: Army Reserve – Payment (December 1, 2014) |
| **DX232** | Email from Sparky Campbell to Lisa Rice re: Army Reserve – Payment (December 2, 2014) |
| **DX233** | Email from Karen Witt to Lisa Rice re: JOB 222 TAB CONTRACTORS - FLW.pdf (December 4, 2014) |
| **DX234** | Email from Karen Witt to Lisa Rice re: JOB 222 TAB CONTRACTORS - FLW.pdf (December 10, 2014) |
| **DX235** | Plaintiff's MW Builders Response to 1st Set of Document Requests(January 21, 2015) |
| **DX236** | Settlement Agreement between MW Builders and Bergelectric (January 27, 2015) |
| **DX237** | MMC Contractors Final Release (January 29, 2015) |
| **DX238** | MMC Final Waiver (January 29, 2015) |
| **DX239** | Universal Plumbing - Final Release (February 9, 2015) |

| | |
|---|---|
| **DX240** | NVE Declaration (May 20, 2015) |
| **DX241** | Change Request Register (May 21, 2015) |
| **DX242** | Change Request Register; Mod 11; Mod 43; Mod 47; Mod 49; Mod 60 (May 21, 2015) |
| **DX243** | Job Cost Summary (October 26, 2015) |
| **DX244** | Job Cost Summary (October 26, 2015) |
| **DX245** | Rial handwritten chronology (October 26, 2015) |
| **DX246** | Plaintiff MW Builders Response to 1st Set of Interrogatories (October 28, 2015) |
| **DX247** | Plaintiff MW Builders Response to Defendants Requests For Admission (October 28, 2015) |
| **DX248** | Fax from MW Builders to USARC Re: Revised Cost Proposal (December 15, 2015) |
| **DX249** | Assessment of Project Delay & Economic Damages (December 15, 2015) |
| **DX250** | Exhibit from Kenrich report - Summary of Plan Manhours vs. Recorded Manhours (December 15, 2015) |
| **DX251** | MW Builders Cvr Ltr and Plaintiff's Privilege Log (December 22, 2015) |

| DX252 | Miltonberger Rebuttal to Stephen Weathers Report (January 15, 2016) |
|---|---|
| DX253 | MW Builders 1st Supplemental Designation of Experts (February 26, 2016) |
| DX254 | Notice of 30(b)(6) Deposition of MW Builders (February 26, 2016) |
| DX255 | PAGE INTENTIONALLY LEFT BLANK |
| DX256 | MW Builders Payroll Check History Inquiry (March 30, 2016) |
| DX257 | Miltonberger's Rebuttal Expert Report In Reponse to Counterclaim (April 7, 2016) |
| DX258 | J. Knippel – Notes (no date) |
| DX259 | Mason design analysis (no date) |
| DX260 | Resume of S. Campbell and E. Stone (no date) |
| DX261 | Bergelectric v. US Army Summary of Plan Manhours v. Recorded Manhours (no date) |
| DX262 | Army Reserve Materials, Subcontractors, Rentals, Labor List (no date) |
| DX263 | Labor History (no date) |

| | |
|---|---|
| **DX264** | STF INC. - File Information on disk (no date) |
| **DX265** | Century Link Diagram (no date) |
| **DX266** | Out of Town Living Reimbursement Per Diem Expense Report (no date) |
| **DX267** | Labor History (no date) |
| **DX268** | Capital Project Management Invoices (no date) |
| **DX269** | CPMI Ltr re: Costs related to job costs (no date) |
| **DX270** | Rule 09 (Issued 02-20-03; Effective 03-07-03) (March 7, 2003) |
| **DX271** | Rule 09 (Issued 08-09-13; Effective 08-12-13) (August 12, 2013) |
| **DX272** | Weathers Rebuttal Expert Report (January 28, 2016) |
| **DX273** | Weathers Expert Report (December 15, 2015) |
| **N/A** | 30(b)(6) Deposition of Daniel Campbell and Exhibits 292, 294A, 295, 297, 298, 299, 300, 301, 302, 303, 304, 305, 312, 314, 319, 322, 324, 363, 364, 365, 366, 367, 368, and 369 |
| **N/A** | 30(b)(6) Deposition of David Cimpl and Exhibits 1, 4, 5, 6, 8, 14, 17, 20, 21, 22, 31, and 32 |

| **ECF No. 89, 89-1, 89-2, 89-3, 89-4, 89-5, 89-6, 89-7, 89-8, 89-8, 89-9** | Written Direct Testimony of Stephen A. Weathers, P.E., and exhibits thereto, as filed on CM/ECF (April 26, 2016) |
| --- | --- |
| **ECF No. 96** | Written Direct Testimony of Stephen A. Weathers, P.E., and exhibits thereto, as filed on CM/ECF (May 9, 2016). |

## D.    Exhibits Deemed Admissible by Court Order

In addition, on May 2, 2016, Plaintiff submitted a fourth amended exhibit list, MW Builders, Inc.'s Fourth Amended Exhibit List (May 2, 2016), ECF No. 94. The Government objected to Exhibits PX 679, PX 680 and PX 681 on that exhibit list.  Defendant's Response to Plaintiff's Supplemental Exhibit Lists (May 06, 2016), ECF No. 95.  Also, following trial, on August 17, 2016, Plaintiff filed a motion to enter additional evidence, specifically, exhibit PX 685. Plaintiff's Motion to Enter Additional Evidence (August 17, 2016), ECF No. 114.  The Government opposed the motion.  Defendant's Opposition to Plaintiff's Post-Trial Motion to Admit "Additional" Evidence (September 2, 2016), ECF No. 121; Plaintiff's Reply in Support of It Motion to Enter Additional Evidence (September 9, 2016), ECF No. 122.  On August 26, 2016, Plaintiff filed a motion to enter into evidence Plaintiff's Exhibits PX 679, PX 680, and PX 681, which Defendant opposed.  Plaintiff's Motion to Enter Plaintiff's Exhibits 679, 680 and 681 (August 26, 2016), ECF No. 118; Defendant's Response to Plaintiff's Post-Trial Motion to Admit Exhibits 679, 680 and 681 (September 2, 2016), ECF No. 120.

After considering both Plaintiff's and Defendant's arguments, the Court granted an order to admit PX679, PX680, PX681, and PX685. *See* Order Granting Plaintiff's August 17, 2016 Motion To Enter Additional Evidence, and Plaintiff's August 26, 2016 Motion To Enter Exhibits PX679, PX680 and PX681 (June 9, 2017), ECF No. 135.  The Court also granted defendant's request for leave to file the rebuttal report of Stephen Weathers.  *Id.* at 2.

Accordingly, the following Exhibits have been deemed admissible and part of the record:

| **PX679** | Email from Daphne Weekly to Tara O'Leary et al., re: Las Vegas ARC Land with attached maps (August 5, 2009) |
| --- | --- |
| **PX680** | Nevada Power Company Electric Service Requirements, 2008 Edition |
| **PX681** | Mason and Hanger Final Submittal Design Analysis (August 2009) |
| **PX685** | Neil Miltonberger's Supplemental Report on Bergelectric Corp's Loss of Productivity Claim (May 27, 2016) |

| **ECF No. 127-1** | Evaluation of Neil Miltonberger's Assessment of Bergectric's Loss of Productivity Claim, Stephen A. Weathers, P.E. (June 14, 2016) |

**E.**     <u>**Court Exhibits**</u>

The following Exhibits were admitted by the Court during trial:

| | |
|---|---|
| **CX1** | Note concerning Generator Claim Duplications |
| **CX2** | Tables of Delay Calculations signed by Stephen Weathers and Neil Miltonberger (May 9, 2010) |

**IT IS SO ORDERED.**

<u>s/ Susan G. Braden   </u>
**SUSAN G. BRADEN**
**Chief Judge**